UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

LOUBERT ALEXANDRE, YVON AUGUSTIN, MAX
CHARTELAIN, WILFRED GERMAIN, CLAUDE
LESSAGE, and JEAN PIERRE, INDIVIDUALLY AS
OWNERS OF YELLOW CAB MEDALLIONS IN THE
CITY OF NEW YORK AND ON BEHALF OF A CLASS
OF ALL OWNERS SIMILARLY SITUATED, AS WELL
AS INDIVIDUALLY, TOGETHER WITH MAMNUNUL
HAQ and ASIM AKHTAR, AS HOLDERS OF HACK
LICENSES IN THE CITY OF NEW YORK AND AS
REPRESENTATIVES ON BEHALF OF A CLASS OF
ALL HOLDERS OF HACK LICENSES IN THE CITY
OF NEW YORK, and the NEW YORK TAXI WORKERS
ALLIANCE,                                                    07 Civ. 8175 (RMB)

                                          Plaintiffs,

                    -against-

THE NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION, MATTHEW DAUS, AS
COMMISSIONER/CHAIR OF THE NEW YORK CITY
TAXI AND LIMOUSINE COMMISSION, AND THE
CITY OF NEW YORK,

                                          Defendants.

------------------------------------------------------------------------- x


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### PRELIMINARY STATEMENT

Plaintiffs are New York City taxicab medallion owners, taxicab owners, taxi

drivers who lease a taxi medallion and/or vehicle, and a trade association of taxi drivers, the New

York Taxi Workers Alliance ("TWA"), who purport to represent larger classes of taxi owners

and operators. Defendants are the New York City Taxi and Limousine Commission ("TLC"),

TLC Commissioner and Chairman Matthew Daus, and the City of New York (the "City"). Plaintiffs ask this Court to stop the TLC from implementing its Taxicab Technology System ("TTS") Rules providing for passenger service and driver efficiency improvements through the installation in taxicabs of certain electronic equipment including global positioning system ("GPS") technology. The TTS Rules, providing benefit to the City's 240,000,000 passengers who pay some $1.8 billion annually for taxicab rides as well as benefit to the drivers of the 13,085 licensed taxicabs, have been the subject of public hearings and rulemakings over more than three years. The TTS technology has been subject to extensive testing for reliability and customer satisfaction with positive results. Significant investment has been made by the companies that are providing the electronic equipment as well as by the TLC and other City agencies to meet the scheduled deadlines in the TTS Rules. Now, on the eve of the October 1, 2007 date on which the requirement for installation of the equipment begins, plaintiffs make broad, speculative and unsupported claims that the TTS Rules violate their rights secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and Article I §§ 6 and 12 of the New York Constitution. Plaintiffs assert that the TTS Rules will impose an undue financial burden upon them, invade their right to privacy, and will result in a government taking of their property rights in their taxicabs, in their taxi licenses and in the routes that they travel on the public streets which they characterize as proprietary business information. Plaintiffs' allegations are not supported by fact or law.

Plaintiffs' licenses to operate taxicabs in the City do not provide unfettered rights but are subject to extensive regulation for the public welfare and safety. The TTS Rules and TLC contracts pursuant thereto will provide TLC significantly more efficient access to the same trip record information that has long been required from taxi drivers and will not enable TLC to

access any information that does not relate to the on-duty operation of taxicabs. Plaintiffs' operation of taxicabs on the public throroughfares of the City for the benefit of the public are not entitled to privacy protection, and their routes and various locations on the public streets are not proprietary information. The costs to plaintiffs as a result of the TTS Rules are minimal and in any event are entirely lawful. Plaintiffs utterly fail to meet their required burden for entitlement to a preliminary injunction, and their motion should be denied.

## STATEMENT OF FACTS AND REGULATORY BACKGROUND

The TLC is the City agency which creates, administers and enforces the City's licensing and regulation of taxicabs. In accordance with §2303(a) of the New York City Charter ("City Charter"), TLC is authorized to regulate and supervise the business and industry of transportation of persons by licensed vehicles for-hire in the City. City Charter §2303(b)(6) authorizes TLC to adopt regulations relating to taxicab safety, design and comfort, and §19-503(a) of the New York City Administrative Code ("Admin. Code") authorizes TLC to promulgate regulations necessary to exercise the authority conferred upon it under the City Charter. Moreover, the New York City Council has long recognized that "the business of transporting passengers for hire by motor vehicle in the City of New York is affected with a public interest, is a vital and integral part of the transportation system of the city, and must therefore be supervised, regulated and controlled by the city." Admin. Code §19-501.

One of TLC's statutory mandates is to "prescribe, revise and otherwise regulate reasonable rates of fare" for taxicab service (New York City Charter, § 2304(b)). In mid-2003, several organizations, including plaintiff TWA, petitioned the TLC to raise taxi fares. After review of the rate increase request, it was ultimately the recommendation of TLC staff to proceed with consideration of the rate increase only in combination with passenger service enhancements, that would provide benefit to passengers in exchange for the substantially higher

taxi fares. See, Declaration of Andrew Salkin, dated September 23, 2007 ("Salkin September 23[rd] Declaration") ¶¶ 3, 4, attached to the Declaration of Paula Van Meter dated September 24, 2007 ("Van Meter Declaration") as Exhibit A.

## A.      History of the Rulemaking

On March 30, 2004 the TLC considered and passed rules to increase taxi fares by a record 26%, and to mandate passenger service enhancements, including the installation in taxicabs of electronic equipment: a vehicle locator, text messaging, personal information monitor, electronic trip sheet and credit/debit card payment. These rules were published in *The City Record* on April 14, 2004. In its Statement of Basis and Purpose for these rules, with respect to the electronic trip sheet, TLC stated, "[t]echnology is available to replace the hand-written trip sheets with an automated collection of trip information, such as the date, time and location of each passenger pick-up and discharge, the number of passengers as well as the metered fare paid will provide a valuable resource for statistical purposes. The potential benefits of centralized data can include complex analysis of taxicab activity in the five boroughs for policy purposes, as well as the additional benefit of aiding in the recovery of lost property." A copy of the rules and Statement of Basis and Purpose is annexed to the Van Meter Declaration as Exhibit C. These rules became effective on May 14, 2004. After further additions and amendments in 2005 and early 2007, the current version of the rules governing taxicab technology service systems ("TTS Rules") became effective on July 12, 2007, and are described below.

The TTS Rules are contained in Title 35 of the Rules of the City of New York ("RCNY"). The Taxicab Technology System is defined at 35 RCNY §1-01 as "hardware and software that provides the following four core services (collectively "four core services"): (i) allows credit, debit and prepaid card payment required by section 3-03(e)(7) of this title, (ii) text

messaging required by section 3-03(e)(8) of this title, (iii) trip data collection and transmission required by section 3-06 of this title, and (iv) data transmission with the passenger information monitor required by section 3-07 of this title." Moreover, the "trip record" is defined as "the written, computerized, automated and/or electronic accounting of a taxicab ride." 35 RCNY §2-01.

The trip data collection and transmission required by the TTS Rules is defined at 35 RCNY §3-06(b): "data to be transmitted shall include the taxicab license number; the taxicab driver's license number; the location of trip initiation; the time of trip initiation; the number of passengers; the location of trip termination; the time of trip termination; the metered fare for the trip; and the distance of the trip." The same trip data has previously been required in handwritten form[1]. Notably, this trip data that TLC will collect does not include the route taken from the point of initiation of the trip to the point of trip termination. Further, there is no provision for collection of data by the TLC concerning any off-duty operation of the taxi. See, Declaration of

---

[1] 35 RCNY §2-28(a) identifies the items that must be in a written trip record: 1) at the start of each trip, starting time, specific location and number of passengers, 2) on completion of each trip, destination, time and amount of the fare and any tolls paid, 3) taximeter readings and concluding time of his or her [the driver's] workshift, 4) toll bridges or tunnels used by the driver, whether or not with a passenger, and 5) all other entries required by the rules. Additionally, Chapter 2 of 35 RCNY pertains to the Taxicab Drivers Rules. Specifically, 35 RCNY § 2-01 requires that a taxicab driver creates and maintains a trip record. 35 RCNY § 2-01 states in pertinent part, "trip data to be transmitted or recorded shall include the taxicab license number (medallion number); the taxicab driver's license number; the location of trip termination; the time of trip termination; the itemized metered fare for the trip (tolls, surcharge, and tip if paid by credit or debit card); the distance of the trip, the trip number, the method of payment, the total number of passengers, as well as such other information as may be required by the Commission." Thus, the TTS Rules require the reporting of the same data that the driver now is required to enter on a written trip record, with the exception that the taxicab technology system will transmit a tip that is charged to a charge or debit card. However, if a tip is paid in cash, it is not transmitted with the trip data. Consequently, except for the amount of a charged tip, TLC is not gathering any data pursuant to the TTS Rules that it does not presently gather.

Andrew Salkin, dated September 24, 2007 ("Salkin September 24th Declaration") ¶¶ 25, 26 attached to the Van Meter Declaration as Exhibit B.

The TTS Rules set forth the compliance date for the procurement and installation of the taxicab technology system. Pursuant to 35 RCNY § 1-01, the "compliance date for the installation of taxicab technology systems in medallion taxicabs shall be the date of the first regularly scheduled inspection for each taxicab on or after October 1, 2007, unless extended pursuant to section 1-11(g)[2] of this chapter." 35 RCNY 1-11(g) required that on or before August 1, 2007, a medallion owner contract with one of four taxicab technology service providers ("vendors") to procure the taxicab technology system. See 35 RCNY § 1-11(g).

**B.    Benefits of the TTS equipment**

Each of the four components of the TTS equipment, the credit card reader, the driver information monitor ("DIM"), the passenger information monitor ("PIM"), and the electronic trip sheet  provides benefit, to both passengers and taxi drivers:

The **Credit card reader** affords the passenger the obvious convenience of a credit card payment option.  The driver also benefits in important respects.  TLC review of electronic trip sheet data to date shows that passengers who pay by credit card give drivers larger tips than those who pay in cash, based upon TLC records.  In addition, the TLC expects that

---

[2] 35 RCNY §1-11(g) states: "The owner of any taxicab required to be equipped with a taxicab technology system shall contract to procure such equipment on or before August 1, 2007. Except as provided in this subdivision, the owner shall install a taxicab technology system no later than the compliance date set forth in section 1-01 of this chapter. Taxicabs that are to be retired within six (6) months of the compliance date for each such taxicab shall be exempt from the requirement that the taxicab technology system be installed in the taxicab. If any taxicab technology service provider contracts to provide more than three thousand (3,000) taxicabs with its taxicab technology system on or before August 1, 2007, the date by which each such taxicab is required to be equipped with such taxicab technology system may, upon prior written approval from the Chairperson, or his or her designee, be extended to each such taxicab's first scheduled inspection at the Commission's Safety and Emissions Facility on and after February 1, 2008."

universal availability of the credit card option may increase ridership, and therefore driver income. Further, maintaining less cash in the taxicab translates to greater security for the taxicab driver. See, Salkin September 24th Declaration ¶8.

The **DIM** is a small text messaging screen that allows the TLC to engage in limited communication directly with the driver. The value of the DIM to passengers is at least three-fold. First, text messaging will facilitate recovery of passengers' property left in taxicabs. During fiscal year 2007, the TLC received over 88,000 inquiries, via the City's 311 information system, from passengers who had lost property in cabs - more than half of all 311 inquiries received by the Commission. Where the medallion number of the cab is known, the text messaging system will enable the Commission to send an alert directly to the driver of the taxicab, asking the driver to check for and secure the lost property for return to the passenger. Second, the text messaging system will enable the TLC to alert drivers to fare opportunities, and, by facilitating the connection between passenger and taxicab, to reduce the passenger's waiting time. For example, the DIM will be able to receive messages that a special event at Madison Square Garden is ending and passengers are waiting for taxis. And third, the DIM will enable the TLC to communicate to drivers about street obstacles, like accidents, construction, traffic delays, and so on. Enhancing the drivers' ability to avoid delays will speed the passengers' trips. The corresponding benefit to drivers is that by identifying fare opportunities more quickly and moving passengers more efficiently the driver is able to make more trips during a shift, and thereby increase his/her income. Id, ¶¶ 9, 10.

The **PIM** allows the TLC to communicate directly with the passenger. Previously, the only in-taxi communication between the TLC and the passenger consisted of written message stickers, which the PIM replaces. Unlike stickers, the PIM allows dynamic

communication. PIM content might partly be uniform for all passengers, or it might vary based on the time of day, the location of the taxicab, and so on. Information on the PIMs can include a wealth of information that the TLC wants to make available to passengers in furtherance of the Commission's regulatory purposes. For example, the PIM might communicate a reminder to passengers to fasten their seatbelts, or to watch for cyclists as they exit the cab. Id. ¶11.

PIM content may also include advertising and programming. These elements are not required by the TLC, but are permitted as a means of providing a source of revenue to offset the costs of the equipment, thereby providing benefit to owners and drivers. Finally, the PIM makes fares and payments more comprehensible. The PIM displays the components of the fare, such as tolls, more clearly showing the calculation of the total fare than does the meter. And the PIM suggests to the passenger alternative tip amounts, showing the application of several percentages to the total fare. Id. ¶12.

The **electronic trip sheet** benefits passengers by contributing an enormous body of information to the TLC's regulatory analysis. Trip sheets have been required for years and have been written by hand, one for each of more than half a million rides per day. The labor cost of deciphering handwritten information of varying legibility, and then manually processing that information, limited the TLC's use of trip sheet data to statistically small samples. Ironically, the effort to analyze TWA's fare increase petition in 2003 served to highlight the fact that analysis of driver income based on samples and surveys was necessarily imprecise. Comprehensive computerized fare information would enhance the accuracy of the analysis. Id. ¶13.

Electronic trip sheets will also enable the TLC to conduct automated, comprehensive analyses of pick-up points, drop-off points, trip time and distance, and passenger counts. Analysis of this information will enable the TLC to more precisely tailor its regulatory

framework to the realities of the industry, including better matching taxicab supply and passenger demand. For instance, the TLC will be able to know how many vehicles and drivers are typically on the road at 2:00 a.m. - and, if the supply is inadequate, to consider regulatory measures to redress the shortage. Taxicab supply and demand can vary based on geographic location, time of day, weather, and a variety of other factors that analysis will enable the TLC to quantify with greater precision, and to address. Id. ¶14.

The geocoded information provided by the GPS feature of the electronic trip sheet also assists in locating passengers' lost property. The majority of passengers who report lost property do not know the medallion number of the taxicab they rode in. But all passengers can say reliably when and where they got into and got out of the taxicab. The electronic trip sheet data enables the TLC to send a text message to drivers of taxicabs who were in the stated location at the stated time, thereby considerably enhancing the prospects of speedy recovery of the lost property. Id. ¶15.

The electronic trip sheet also benefits drivers. The obligation to keep complete, handwritten trip sheets has been reported as a substantial burden for drivers. Electronic trip sheets eliminate the obligation. Drivers who failed to comply with trip sheet obligations bore an additional burden of violations that will now be eliminated.[3] Id. ¶¶16, 17.

## C.    Costs related to the TTS equipment

The costs to owners for installation and lease of the TTS equipment averages approximately $600 per year. See, Declaration of Ira Goldstein dated September 24, 2007 ("Goldstein Declaration") attached to the Van Meter Declaration as Exhibit D, ¶42. The TTS Rules permit advertising on the PIM, and on rooftop attachments, as a means of offsetting these

---

[3]  In the period from 2004 to 2007, over 45,000 summonses were issued to taxicab drivers for trip sheet violations, resulting in the imposition of more than $500,000 in fines.

costs and providing a potential revenue stream to owners.  See, 35 RCNY §3-07(b)(iv).  Further, a contract provision mandated by the TLC requires equipment vendors to indemnify owners for any violations received as a result of equipment malfunction. See, Goldstein Declaration ¶41.  Additionally,  it is expected that income to drivers will increase due to more efficient operation and increased tips. See, Salkin September 24th Declaration ¶¶8, 10.

In contrast, there has been significant investment by the City in the TTS program, and by the vendors under contract with the TLC to provide the equipment.  As detailed in the Affidavit of Amos Taman, President of Verifone Transportation Systems ("VTS Declaration"), attached to the Van Meter Declaration as Exhibit E, the investment of the vendors of the TTS equipment is substantial.  VTS has entered into contracts with approximately 5,500 owners to provide the TTS equipment, and has expended or committed millions of dollars to meet its contractual obligations with the City and the owners. Id, ¶4.  Similarly, the President of Creative Mobile Technologies LLC, another TTS vendor, reports significant financial investment and exposure as a result of the commitments to meet the deadlines of the TTS Rules.  See, Declaration of Jesse Davis dated September 24, 2007 ("Creative Mobile Declaration") attached to the Van Meter Declaration as Exhibit F.  These investments would be severely impacted by any delay in the deadlines set by the TTS Rules.  Id. ¶11.

## POINT I

## PLAINTIFFS CANNOT DEMONSTRATE ANY CONSTITUTIONAL VIOLATION OF PERSONAL PRIVACY.

**A.    Plaintiffs demonstrate no Fourth Amendment violation and no reasonable expectation of privacy in the information collected pursuant to the TTS Rules.**

Plaintiffs assert broadly that their "fundamental right to privacy guaranteed by the Fourth Amendment and the New York State Constitution is being violated by

the GPS facet of the TTS program". See, Memorandum In Support of Plaintiffs' Order to Show Cause For Temporary Restraining Order and Preliminary Injunction, dated September 19, 2007 ("Plaintiffs' Memo of Law") p. 16. However, they have failed to show how the collection of data pursuant to the TTS Rules concerning the operation of regulated taxicabs on the public streets violates any protected areas of privacy or reasonable expectations of privacy.

Plaintiffs object that the information about the location of their vehicles on the City streets that will be captured by the GPS equipment invades their privacy. However, the trip information about on-duty operation of taxis that the TLC will collect under the TTS Rules is the same information that plaintiffs have been furnishing in handwritten form for years. Any data concerning the location of off-duty taxi operations, or routes taken between trip initiation and termination, that may be captured by the GPS system cannot be accessed by the TLC and may not be disclosed by the equipment vendors. See, Goldstein Declaration ¶16. Therefore, the TTS Rules will not create intrusions by the TLC on plaintiffs' operation of their regulated taxicabs beyond what already exist. Further, the information collected by the GPS equipment is not private information protected by the Fourth Amendment.

The basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. Davis v. United States, 328 U.S. 582, 596 (1946); Jones v. United States, 357 U.S. 493, 498 (1958). However, "the Fourth Amendment cannot be translated into a general constitutional 'right to privacy'." Katz v. United States, 389 U.S. 347, 350 (1967). The Supreme Court in Katz noted that "Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution." Id at 350 n.5. The government intrusion crosses the constitutional line only if it

infringes upon some reasonable expectation of privacy. See, <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979); <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968). A privacy expectation must meet both subjective and objective criteria: the complainant must have an actual expectation of privacy, and that expectation must be one that society recognizes as reasonable. See, <u>Oliver v. United States</u>, 466 U.S. 170, 177 (1984); <u>Smith v. Maryland</u>, *supra* at 740.

But, it has long been held that there is little basis for any legitimate expectation of privacy in a motor vehicle operating on public streets. As noted by the Court in <u>Cardwell v. Lewis</u>, 417 U.S. 583, 590, "A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." Indeed, plaintiffs concede that it has been established that there is no reasonable expectation of privacy on the public thoroughfares, citing <u>United States v. Knotts</u>, 460 U.S. 276 (1983). See, Plaintiffs' Memo of Law, p. 22. As the <u>Knotts</u> Court held,

> "A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When Petschen traveled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." *Id* at 281-282.

Plaintiffs characterize themselves as businessmen entitled to keep private the routes they travel in their taxicabs. See, e.g. Affidavit of Loubert Alexandre, dated August 29, 2007 ¶24; Plaintiffs' Memo of Law p. 17. However, a businessman has no reasonable expectation of privacy in a work environment that is open to public scrutiny, such as the operation of for-hire vehicles on the public roads. See, <u>Hector Vega-Rodriguez, et al. v. Puerto Rico Telephone Company et al.</u>, 110 F.3d 174 (1st Cir. 1997) (holding that the videotaping of employees in an open work area does not violate the Fourth Amendment).

**B.    There is no Fourteenth Amendment violation of privacy interest.**

               Plaintiffs also appear to assert a violation of their privacy interest in avoiding disclosure of personal confidential matters, citing Barry v. City of New York, 712 F.2d 1554 (2nd Cir. 1983). At issue in Barry was the City ordinance requiring financial disclosure by certain City officials and the public release of such information upon a request for inspection. The objection to the release of that personal financial information was based upon the principle that there are matters involving personal rights that are so fundamental that even though they are not explicitly protected by the constitution they fall within a "penumbra" of constitutional protection guaranteed by the Fourteenth Amendment. *Id* at 1558-1559, citing Whalen v. Roe, 429 U.S. 589 (1977). The Barry Court upheld the City ordinance finding that the release of the "highly personal" information does not rise to the level of a constitutional violation. *Id* at 1562.

               The personal confidential matters that have been found entitled to privacy protection under the Fourteenth Amendment include only "fundamental" rights "implicit in the concept of ordered liberty", such as marriage, procreation, contraception, family relationships and child rearing. Whalen v. Roe, *supra* at 600; Roe v. Wade, 410 U.S. 113 (1973). The Whalen Court upheld the New York statute requiring the reporting by doctors of the identity of prescription drug patients to a State database, and found no impairment of privacy interest sufficient to violate the Fourteenth Amendment.

               The equipment required by the TTS Rules, and the information that it can access, do not involve matters of a highly personal confidential nature. As stated, the operation of a regulated for-hire vehicle on the public streets is not a private matter. It is absurd to assert that records of the locations of taxi routes could rise to the level of personal confidential matters warranting privacy protection, when unquestionably that same information is displayed on the

public streets.  In <u>Paris Adult Theatre v. Slaton</u>, 413 U.S. 49 (1973) the Court observed that the constitutional protections that may safeguard the privacy of family intimacy would not extend to marital intercourse on a street corner or a theater.  Plaintiffs cannot demonstrate any violation of constitutionally protected privacy interests, and thus the TTS Rules are not subject to any heightened scrutiny.

Plaintiffs assert that, "Since the plaintiffs have an expectation of privacy, the court must balance such expectation against the TLC's government interest."  Plaintiffs Memo of Law p. 26.  Plaintiffs then cite <u>Savino v. Suffolk County</u>, 774 F.Supp. 756 (E.D.N.Y. 1991), a case involving an equal protection challenge, to suggest that a heightened level of constitutional scrutiny should be applied to the TTS Rules.  However, this presupposes that a fundamental right is involved, based solely on plaintiffs' expectation of privacy.  As previously discussed, no such fundamental right is involved in this case.

The Court in <u>Whelan v. Roe</u>, supra, overturned the District Court ruling that the State had failed to demonstrate the "necessity" for the regulation at issue.  The Court noted that such requirement of a showing of necessity is not appropriate, "For we have frequently recognized that individual States have broad latitude in experimenting with possible solutions to problems of vital local concern."  Id at 875.  The Court further noted that, "Mr. Justice Brandeis' classic statement, of the proposition merits reiteration:

> 'To stay experimentation in things social and economic is a grave responsibility.  Denial of the right to experiment may be fraught with serious consequences to the Nation.  It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.  This Court has the power to prevent an experiment.  We may strike down the statue which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. ....  But in the exercise of this high power, we must be ever on our

guard, lest we erect our prejudices into legal principles.  If we would guide by the light of reason, we must let our minds be bold.' New State Ice Co. v. Liegmann, 285 U.S. 262, 311 (dissenting opinion).

Plaintiffs seek to prevent the implementation of the TTS Rules and the technological advancement they provide in order to maintain the outdated systems that currently exist.  Defendants seek to improve taxi service and TLC's ability to regulate it for the public good by utilizing modern methods.  This is a legitimate solution to problems of vital concern to the City.  This Court should not interfere in the implementation of the TTS Rules as scheduled.

**POINT II**

**PLAINTIFFS CANNOT ESTABLISH A VIOLATION OF THE TAKINGS CLAUSE.**

Plaintiffs' claim that the TTS Rules violate the takings clause of the United States and New York State Constitutions is unfounded.  The taking of private property by the government for public use may occur when the government physically occupies or acquires ownership of private property or when the government enacts or enforces laws, regulations or rules that restrict some beneficial use or the full exploitation of private property.  See, e.g., Brown v. Legal Foundation of Washington, et. al., 538 U.S. 216 (2003); Palazzolo v. Rhode Island, 533 U.S. 606 (2001); Seawall Associates v. New York, 74 N.Y.2d 92 (1989).  While it is well-settled that the government may regulate the use of property, "if a regulation goes too far it will be recognized as a taking."  Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922).

Where no physical occupation of private property has occurred, the courts have engaged in ad hoc factual inquiries to discern whether the government action complained of constitutes a compensable taking.  See Penn Central v. New York City, 438 U.S. 104, 124 (1978). Factors that are relevant to the analysis include "the regulation's economic effect on the [property] owner, the extent to which the regulation interferes with reasonable investment-

backed expectations, and the character of the government action." Palazzolo, 533 U.S. at 617, (citing Penn Central, 438 U.S. at 124). See also, Meriden Trust & Safe Deposit Co. v. FDIC, 62 F.3d 449, 454 (2d Cir. 1995); Matter of Friedenburg v. New York State Dep't. of Envt'l. Conservation, 767 N.Y.S.2d 451, 2003 N.Y. App. Div. LEXIS 12447, * 19-20 (2d Dep't 2003). Where, as here, a regulation furthers legitimate public goals, does not leave the plaintiffs' businesses worthless or economically idle, and does not frustrate reasonable investment-backed expectations, there has been no regulatory taking. See id.

Plaintiffs assert that the installation of the equipment required by the TTS Rules in their taxicabs interferes with their property interest in the vehicles, and that the cost of the equipment, the potential lost income due to malfunctions of the equipment, and the "infringement" on the property interest in their taxi driver licenses[4] due to potential enforcement for violations of the TTS Rules all constitute unlawful takings of their property.    As discussed below, plaintiffs do not raise any legitimate takings claim.  Furthermore, to the extent that any compensation were to be required, it has already been provided to plaintiffs for the costs of the TTS equipment by way of the 2004 rate increase that was combined by the TLC in rulemaking with the TTS Rules.  See, Salkin September 23rd Declaration ¶¶4-10.  Additionally, the TTS Rules provide public benefit to both taxi passengers and drivers.  See, Salkin September 24th Declaration ¶¶ 8-16.

The costs that any plaintiffs may incur to comply with the TTS Rules are simply part of the costs that plaintiffs must incur in order to be able to do business in a highly regulated

---

[4] Plaintiffs have no unfettered property rights in their taxi driver licenses or owner licenses, which are subject to the extensive requirements of TLC regulation, including the TTS Rules.

industry.[5]  The fact that some plaintiffs will have to spend money to come into compliance with the TTS Rules is not a *per se* taking within the meaning of the State or Federal Constitutions.  In fact, "requiring money to be spent is not a taking of property."  Atlas Corp., et. al. v. United States, 895 F.2d 745, 756 (Fed. Cir. 1990) (citing United States v. Sperry Corp., 493 U.S. 52, 110 S. Ct. 387, 395 n. 9 (1989) (deduction of a tribunal user fee from settlement award not a physical occupation requiring just compensation)).  See also, Adams v. United States, 2003 U.S. Claims LEXIS 238 (2003); Commonwealth Edison Co. v. United States, 46 Fed. Cl. 29, 40 (2000), aff'd 271 F.3d 1327 (Fed. Cir. 2001) (imposition of monetary assessment on domestic utilities, was an obligation to pay money, which did not constitute a protected property interest for Takings Clause purposes).

To the extent the Court finds that a government regulation which requires that money be spent is susceptible to a takings analysis, it is clear that the proper method for analyzing whether such regulation effects a taking is the ad-hoc factual analysis that was first articulated by the Supreme Court in Penn Central, supra and recently affirmed in Palazzolo, supra.  See Atlas Corp., 895 F.2d at 756 (stating that "[r]equiring money to be spent is not a taking of property," but nonetheless engaging in Penn Central's ad hoc analysis).

The first prong of the regulatory takings analysis looks at the economic effect of the regulation on the plaintiffs.  Plaintiffs cannot establish that, as a result of the TTS Rules, they cannot operate profitable businesses.  See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 495-96 (1987) (lack of proof that plaintiff could no longer operate a profitable business undermines takings claim).  While plaintiffs assert that there will be substantial financial impact from the TTS Rules, the facts do not support this.

---

[5]  The requirements for equipment installation in the TTS Rules applies only to medallion

The actual costs of compliance with the TTS Rules are minimal. As described in the supporting Goldstein Declaration the costs of installation and lease of the equipment averages approximately $600.00 per year, or less than ten cents per trip. Id at ¶13. And while plaintiffs contend that they face license suspension and loss of livelihood because of their failure to comply with the TTS Rules, all they have to do is come into compliance in order to avoid those possible losses. If this Court were to find the TTS Rules unconstitutional, plaintiffs could seek recovery of the costs of installation of the equipment and costs to restore their vehicles to their previous conditions.[6]

Moreover, simply because a regulation may impact on future profits, does not mean the regulation is unconstitutional. See e.g., J & M Parking Management v. City of New York, 1998 U.S. Dist. LEXIS 1881 *10-11 (S.D.N.Y. 1998) (finding that a local law which reduced the maximum fee (from $100 to $25) that a company could charge to remove a "boot" or steel clamp from the wheel of a vehicle that had been parked in an unauthorized location did not effect a regulatory taking) (citing Andrus v. Allard, 444 U.S. 51, 66 (1987) ("loss of future profits – unaccompanied by any physical property restriction – provides a slender reed upon which to rest a takings claim"); Bowles v. Willingham, 321 U.S. 205, 517-18 (1944) (upholding rent control regulation even though effect of regulation was to reduce rent that landlords could collect); St. Francis Hosp. Ctr. v. Heckler, 714 F.2d 872, 884 (7th Cir. 1983) (holding that

-----

owners, and not to drivers who merely lease medallions or vehicles. See, 35 RCNY § 1-11(g).

[6] Plaintiffs contend that the installation of the equipment constitutes a "permanent" invasion of their property. See, Plaintiffs Memo of Law, pp. 6, 9. In fact, the equipment may be removed readily, with little cost of restoration to previous condition. See, Goldstein Declaration ¶25; Creative Mobile Declaration ¶8.

diminishment of market value resulting from regulation will not give rise to taking where property owner retains "full rights and control over [his or her] net investment") cert. denied, 465 U.S. 1022 (1984)).

Nor can plaintiffs establish that the TTS Rules interfere with their reasonable investment-backed expectations. To the extent plaintiffs complain that the regulation will impact the profitability of their business, this impact does not rise to the level of a taking because petitioner cannot reasonably claim an "investment backed expectation" in being able to conduct a business of operating a taxicab in the City of New York completely free from regulation or oversight. See Greystone Hotel Co. v. City of New York, 13 F. Supp. 2d 524, 528 (S.D.N.Y 1998), aff'd, 1999 U.S. App. LEXIS 14960 (2d Cir. 1999) (citing Federal Home Loan Mortgage Corp. v. New York State Div. of Housing and Community Renewal, 83 F.3d. 45, 48 (2d Cir. 1996) (no regulatory taking because "Although FHLMC will not profit as much as it would under a market-based system, it may still rent the apartments and collect the regulated rents.")).

As stated by the Supreme Court in Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 227 (1986), "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." Accordingly, even governmental regulations which have prohibited existing profitable uses or business activities, or which have caused radical reductions in property values, have withstood challenge on takings grounds. See, e.g., Keystone, 480 U.S. 470 (prohibition against mining 50% of coal on property); Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602, 645-46 (1993) (business' participation in employee pension plan); Branch v. United States, 69 F.3d 1571, 1581 (Fed. Cir. 1995) cert. denied, 519 U.S. 810 (1996) (banking).

Finally, we turn to the character of the government action. As stated by the Supreme Court in Penn Central "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124. This prong of the regulatory takings analysis requires the court to "consider the purpose and importance of the public interest reflected in the regulatory imposition." Loveladies Harbor, Inc. v. Untied States, 28 F.3d 1171, 1176 (Fed. Cir. 1994). A regulation which burdens a property right "may constitute a 'taking' if [it is] not reasonably necessary to the effectuation of a substantial public purpose." Penn Central, 438 U.S. at 127.

As discussed above, the TTS Rules provide a number of taxicab passenger service enhancements. As set forth in the statement of basis and purpose accompanying TLC's promulgation of the TTS Rules, the advantages provided by the electronic equipment will enable communication with the taxi passenger and driver to provide helpful information and emergency alerts, and to improve the distribution of taxi service to better meet actual areas of demand. See, Exhibit C to Van Meter Declaration; Salkin September 24th Declaration ¶14.

It is therefore clear that that plaintiffs' "have failed to demonstrate 'any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking.'" Meriden Trust & Safe Deposit Co., 62 F.3d at 455 (quoting Keystone, 480 U.S. at 493).

## POINT III

## PLAINTIFFS' TAXI ROUTES AND POINTS OF OPERATION ARE NOT PROPRIETARY INFORMATION.

Plaintiffs allege that the GPS equipment required by the TTS Rules will disclose their proprietary patterns of conducting their business in violation of their State and Federal

constitutional rights. See, Complaint ¶33. Specifically, plaintiffs allege, without citing any legal authority, that choices made in the context of driving their taxicabs comprise proprietary information. This alleged proprietary information includes "where to start [a] shift, when to take … bathroom and food breaks, and many other factors based on what [they] believe to be most profitable and suitable on a given day." See, e.g. Affidavit of Yvon Augustin in support of plaintiffs' application for preliminary injunction ¶23. Moreover, plaintiffs "deem this information and … the choices of routes that [they] make to transport [their] passengers from Point A to Point B as [their] proprietary information." Id. Plaintiffs contend that the TTS equipment will capture and record this alleged "private information" which they consider "as valuable to [them] as Coke's recipe of secret ingredients is to Coke." Id.

Petitioners' alleged proprietary information is not at all similar to the types of information that the courts consider as proprietary. In the cases where the courts have identified proprietary information, the information is more discreet in nature and unavailable to the public than the routes traveled or stops made on public streets, which plaintiffs are alleging is proprietary information.[7] Unlike design specifications or computer technology, the routes plaintiffs take through New York City streets are visible, available, and indeed a part of the public domain. Defendants submit that choosing one route instead of another to travel between points or circumvent traffic does not rise to the distinction of proprietary information.

---

[7] See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 463-64 (1985)(identifying proprietary information as the standards, specifications, procedures and methods for operating a Burger King Restaurant); Convolve, Inc. v. Compaq Computer Corp., 2006 U.S. Dist. LEXIS 13848 at *42-44 (S.D.N.Y. Mar. 29, 2006)(discussing whether defendant improperly used plaintiff's proprietary information regarding computer disk drive technology); Sysco v. Maines Paper & Food Svc., Inc., 254 A.D.2d 611, 612 (3rd Dep't 1998)(noting that under the terms of defendants' sales agreements confidential or proprietary information included sales and delivery schedules, customer lists, promotional programs, pricing policies, lists and sales totals); Sylmark

To the extent plaintiffs are asserting their alleged proprietary information deserves protection as a trade secret, plaintiffs' assertion is unfounded. Whereas the recipe for Coke is an established trade secret,[8] plaintiffs' alleged proprietary information in the routes they take to transport the riding public on City streets is not. These routes do not qualify for trade secret protection because, at a minimum, they are available to the public. Whether information is a trade secret depends, in part, upon the ease or difficulty with which the information could be acquired or duplicated by others. See, Ashland Management Inc. v. Janien, 82 N.Y.2d 395, 407 (1993); Delta Filter Corp. v. Morin, 108 A.D.2d 991, 992 (3d Dep't 1985). Moreover, plaintiffs' alleged proprietary information would not be considered a trade secret because it is readily ascertainable through sources outside the business. See Savannah Bank, N.A. v. Savings Bank of Fingerlakes, 261 A.D.2d 917, 918 (4th Dep't 1999). Accordingly, plaintiffs claim that their alleged proprietary business information is entitled to protection is unfounded.

## POINT IV

### ONLY THOSE PLAINTIFFS WHO OWN MEDALLIONS HAVE STANDING, AND PLAINTIFFS DO NOT REPRESENT THE PURPORTED CLASS.

---

Holdings Ltd. V. Silicone Zone Int'l. Ltd., 5 Misc. 3d 285, 298 (N.Y. Co. 2004)(considering precise dimensions and final design specifications as proprietary information).

[8] Six factors are to be considered in determining whether a trade secret exists: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by a business' employees and others involved in the business; (3) the extent of measures taken by a business to guard the secrecy of the information; (4) the value of the information to a business and to its competitors; (5) the amount of effort or money expended by a business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Eagle Comtronics, Inc. v. Pico, Inc., 89 A.D.2nd 803, 803 (4th Dep't 1982).

-22-

The TTS Rules impose the obligation to install the TTS equipment on medallion owners, not on taxi drivers who lease the medallion and/or vehicle. See, 35 RCNY §1-11(g); Goldstein Declaration ¶23. Therefore, because plaintiffs Haq, Akhtar and TWA are not owners of taxi medallions they are under no obligation to contract for the TTS equipment and therefore do not have standing to prevent the installation of the equipment required by the TTS Rules.

The doctrine of standing addresses the question of whether a plaintiff is entitled to have the court decide the merits of its claims. "Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III" of the United States Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To have standing, a party must "'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464 (1982)(citing Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41 (1976).

The representations made by the Class B plaintiffs that there will be significant financial impact upon taxi drivers from the TTS Rules is based upon pure speculation. The realities known about the TTS equipment, through testing and experience, are that any negative financial impact is insignificant, and a positive financial impact is likely. See, Goldstein Declaration ¶42; Salkin September 24th Declaration ¶¶28, 29. Accordingly, the Class B plaintiffs and TWA lack standing in this litigation.

Plaintiffs seek class action status under Rule 23 of the Federal Rules of Civil Procedure. It is well-settled that plaintiffs bear the burden of establishing all the requirements of Rule 23. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997); Selby v. Principal Mut. Life Ins. Co., 197 F.R.D. 48, 54 (S.D.N.Y. 2000). Moreover, the court must undertake a "rigorous analysis" to determine whether plaintiffs have satisfied these requirements. General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).

Federal Rule 23(a) establishes four prerequisites to a class action: (1) the numerosity requirement, which states that the class must be so numerous that joinder of all members would be impractical; (2) the commonality requirement, which requires that there are questions of law or fact common to all members of the class; (3) the typicality requirement, which mandates that the claims or defenses of the named plaintiffs be typical of the claims or defenses of the class; and (4) the representative requirement, which states that the named plaintiffs and their counsel will fairly and adequately protect the interests of the unnamed members of the class. Fed.R.Civ.P. 23(a). "To be eligible for class certification, plaintiffs must first show that the proposed class satisfies all four requirements of Rule 23(a)." Marisol A. v. Giuliani, 929 F.Supp. 662, 689 (S.D.N.Y. 1996), aff'd., 126 F.3d 372 (2d Cir. 1997).

Plaintiffs are unlikely to satisfy the requirements for class certification, particularly the commonality and typicality requirements. The "Class A" plaintiffs, purportedly representing all medallion owners, all assert that they are not under contract for TTS installation. This places the Class A plaintiffs in the small minority of only 1% of the total number of owners; of the 1,3085 owners, only 135 to date, or 1% are not in compliance with the TTS Rules. Similarly, there is insufficient demonstration that the two "Class B" plaintiffs and TWA are representative of all taxicab vehicle owners. Indeed, the results of the recent taxicab "strike"

would suggest to the contrary. The issue of class certification remains for the future, but plaintiffs do not appear to be adequately representative of the purported class.

**POINT V**

**PLAINTIFFS' APPLICATION FOR A
PRELIMINARY INJUNCTION SHOULD BE
DENIED**

The standards for granting a temporary restraining order and a preliminary injunction are the same. See Local 1814, International Longshoremen's Association, Afl-Cio, v. New York Shipping Association, Inc., 965 F.2d 1224, 1228 (2d Cir. 1992). To obtain such relief, plaintiffs must establish (a) that it is necessary to prevent irreparable harm; and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 77-78 (2d Cir. 1994); Guiness & Sons PLC v. Sterling Pub. Co., 732 F.2d 1095, 1099 (2d Cir. 1984). However, in a case in which "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard. Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989). To be entitled to such a mandatory injunction "the moving party must make a "clear" or "substantial" showing of a likelihood of success." Jolly v. Coughlin, 76 F.3d 460, 473 (1996); Berry v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996), cert. denied, 520 U.S. 1251 (1997); Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989). See also, Time Warner Cable of New York City v. Bloomberg, L.P., 118 F.3d 917, 923 (2d Cir. 1997).

An injunction "is not a remedy which issues as of course." "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in

employing the extraordinary remedy of injunction." <u>Weinberger v. Romero-Bancelo</u>, 456 U.S. 305, (1982); <u>Harrisonville v. W.S. Dickey Clay Mfg. Co.</u>, 289 U.S. 334, 337-38 (1933). See, <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944). Whether the relief sought is in the public interest is a factor which may be considered. <u>Standard & Poor's Corp. v. Commodity Exchange, Inc.</u>, 683 F.2d 704, 711 (2d Cir. 1982).

Plaintiffs cannot establish irreparable harm or make a clear showing of the likelihood of success on the merits. Thus, plaintiffs' application for a temporary restraining order and preliminary injunction should be denied.

**A.     Plaintiffs Cannot Establish Irreparable Harm.**

Plaintiffs cannot meet the first element of the standard for a preliminary injunction. "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." <u>Citibank, N.A. v. Citytrust</u>, 756 F.2d 273, 275 (2d Cir. 1985).

"To establish irreparable harm, plaintiffs must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'" <u>Tucker Anthony Realty Corp. v. Schlesinger</u>, 888 F.2d 969, 972 (2d. Cir. 1989) (<u>quoting</u> <u>Consolidated Brands, Inc. v. Mondi</u>, 638 F. Supp. 152, 155 (E.D.N.Y. 1986)). Moreover, to warrant the granting of a preliminary injunction, the alleged irreparable harm "must be one requiring a remedy of more than mere monetary damages. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation." <u>Tucker Anthony</u>, <u>supra</u>, 888 F.2d at 975. Here, plaintiffs have provided no evidence that any damages sustained if they are ultimately successful on the merits of their claim, which is not likely in any event, cannot be rectified by financial compensation.

Furthermore, since plaintiffs have failed to demonstrate any constitutional violation by the TTS Rules, there is also no demonstration of irreparable harm.

**B.      Plaintiff Cannot Make a Clear Showing of a Likelihood to Succeed on the Merits.**

As discussed above, plaintiffs have failed to demonstrate that the TTS Rules violate their constitutional rights as alleged. The TTS Rules do not violate any constitutionally protected privacy interests, and do not result in any unconstitutional taking of property. Further, the information gathered by the TTS equipment is not proprietary and is the same information that could be observed in plain view on the City streets. And, finally, the equitable remedy of injunctive relief should not be available to plaintiffs who are guilty of laches in waiting years to initiate this litigation at the very last moment while the vast majority of others in the industry, and the vendors of the equipment, have incurred expenses to meet the deadlines in the TTS Rules.

## CONCLUSION

For the foregoing reasons, plaintiff's application for a temporary restraining order and preliminary injunction should be denied in its entirety.

Dated:        New York, New York
              September 24, 2007

                        MICHAEL A. CARDOZO
                        Corporation Counsel of the City of New York
                        Attorneys for Defendants
                        100 Church Street, Room 5-193
                        New York, NY 10007
                        (212) 442-4050

              By:    _____
                        PAULA VAN METER
                        Assistant Corporation Counsel

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS AND REGULATORY BACKGROUND ...................... 3

       A.  History of the Rulemaking................................................................ 4

       B.  Benefits of the TTS equipment......................................................... 6

       C.  Costs related to the TTS equipment.................................................. 9

POINT I

       PLAINTIFFS CANNOT DEMONSTRATE ANY
       CONSTITUTIONAL VIOLATION OF
       PERSONAL PRIVACY. ................................................................... 10

       A.  Plaintiffs demonstrate no Fourth Amendment
            violation and no reasonable expectation of
            privacy in the information collected pursuant to
            the TTS Rules. ........................................................................ 10

       B.  There is no Fourteenth Amendment violation of
            privacy interest.................................................................... 13

POINT II

       PLAINTIFFS CANNOT ESTABLISH A
       VIOLATION OF THE TAKINGS CLAUSE............................................ 15

POINT III

       PLAINTIFFS' TAXI ROUTES AND POINTS OF
       OPERATION ARE NOT PROPRIETARY
       INFORMATION................................................................................ 20

POINT IV

       ONLY THOSE PLAINTIFFS WHO OWN
       MEDALLIONS HAVE STANDING, AND
       PLAINTIFFS DO NOT REPRESENT THE
       PURPORTED CLASS....................................................................... 22

**Page**

POINT V

       PLAINTIFFS' APPLICATION FOR A
PRELIMINARY INJUNCTION SHOULD BE
DENIED ........................................................................................... 25

       A.   Plaintiffs Cannot Establish Irreparable Harm. ................................... 26

       B.   Plaintiff Cannot Make a Clear Showing of a
Likelihood to Succeed on the Merits. ............................................... 27

CONCLUSION ............................................................................................................ 27

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                          <u>Pages</u>

<u>Adams v. United States,</u>
  2003 U.S. Claims LEXIS 238 (2003) ........................................................ 17

<u>Amchem Prods., Inc. v. Windsor,</u>
  521 U.S. 591 (1997)............................................................................... 23

<u>Andrus v. Allard,</u>
  444 U.S. 51 (1987)................................................................................. 18

<u>Ashland Management Inc. v. Janien,</u>
  82 N.Y.2d 395 (1993)............................................................................ 22

<u>Atlas Corp., et. al. v. United States,</u>
  895 F.2d 745 (Fed. Cir. 1990)................................................................ 17

<u>Barry v. City of New York,</u>
  712 F.2d 1554 (2nd Cir. 1983)................................................................ 13

<u>Berry v. City of New York,</u>
  97 F.3d 689 (2d Cir. 1996),
  <u>cert. denied,</u> 520 U.S. 1251 (1997) ......................................................... 25

<u>Bowles v. Willingham,</u>
  321 U.S. 205 (1944)............................................................................... 18

<u>Branch v. United States,</u>
  69 F.3d 1571 (Fed. Cir. 1995)
  <u>cert. denied,</u> 519 U.S. 810 (1996) ........................................................... 19

<u>Brown v. Legal Foundation of Washington, et. al.,</u>
  538 U.S. 216 (2003)............................................................................... 15

<u>Burger King Corp. v. Rudzewicz,</u>
  471 U.S. 462 (1985)............................................................................... 21

<u>Cardwell v. Lewis,</u>
  417 U.S. 583 ......................................................................................... 12

<u>Citibank, N.A. v. Citytrust,</u>
  756 F.2d 273 (2d Cir. 1985).................................................................... 26

<u>Commonwealth Edison Co. v. United States,</u>
  46 Fed. Cl. 29 (2000),
  <u>aff'd</u> 271 F.3d 1327 (Fed. Cir. 2001) ...................................................... 17

<u>**Cases**</u>                                                                                              <u>**Pages**</u>

<u>Concrete Pipe & Products v. Construction Laborers Pension Trust,</u>
   508 U.S. 602 (1993) ............................................................................................. 19

<u>Connolly v. Pension Benefit Guar. Corp.,</u>
   475 U.S. 211 (1986) ............................................................................................. 19

<u>Consolidated Brands, Inc. v. Mondi,</u>
   638 F. Supp. 152 (E.D.N.Y. 1986) ...................................................................... 26

<u>Convolve, Inc. v. Compaq Computer Corp.,</u>
   2006 U.S. Dist. LEXIS 13848 (S.D.N.Y. Mar. 29, 2006) ....................................... 21

<u>Davis v. United States,</u>
   328 U.S. 582 (1946) ............................................................................................. 11

<u>Delta Filter Corp. v. Morin,</u>
   108 A.D.2d 991 (3d Dep't 1985) .......................................................................... 22

<u>Eagle Comtromics, Inc. v. Pico, Inc.,</u>
   89 A.D.2d 803 (4th Dep't 1982) ......................................................................... 22

<u>Federal Home Loan Mortgage Corp. v. New York State Div.</u>
   <u>of Housing and Community Renewal,</u>
   83 F.3d 45 (2d Cir. 1996) ..................................................................................... 19

<u>Matter of Friedenburg v. New York State Dep't. of Envt'l. Conservation,</u>
   767 N.Y.S.2d 451, 2003 N.Y. App. Div. LEXIS 12447 (2d Dep't 2003) ................ 16

<u>General Telephone Co. of Southwest v. Falcon,</u>
   457 U.S. 147 (1982) ............................................................................................. 23

<u>Gladstone, Realtors v. Village of Bellwood,</u>
   441 U.S. 91 (1979) ............................................................................................... 23

<u>Greystone Hotel Co. v. City of New York,</u>
   13 F. Supp. 2d 524 (S.D.N.Y 1998),
   <u>aff'd</u>, 1999 U.S. App. LEXIS 14960 (2d Cir. 1999) .............................................. 19

<u>Guiness & Sons PLC v. Sterling Pub. Co.,</u>
   732 F.2d 1095 (2d Cir. 1984) ............................................................................... 25

<u>Harrisonville v. W.S. Dickey Clay Mfg. Co.,</u>
   289 U.S. 334 (1933) ............................................................................................. 25

<u>Hector Vega-Rodriguez, et al. v. Puerto Rico Telephone Company et al.,</u>
   110 F.3d 174 (1st Cir. 1997) .............................................................................. 12

**Cases**                                                             **Pages**

J & M Parking Management v. City of New York,
   1998 U.S. Dist. LEXIS 1881 (S.D.N.Y. 1998) ..................................................... 18

Jolly v. Coughlin,
   76 F.3d 460 (1996) ............................................................................................... 25

Jones v. United States,
   357 U.S. 493 (1958) ............................................................................................. 11

Katz v. United States,
   389 U.S. 347, 350 (1967) ..................................................................................... 11

Keystone Bituminous Coal Ass'n v. DeBenedictis,
   480 U.S. 470 (1987) ................................................................................... 17, 19, 20

Local 1814, International Longshoremen's Association,
   Afl-Cio, v. New York Shipping Association, Inc.,
   965 F.2d 1224 (2d Cir. 1992) ............................................................................... 24

Loveladies Harbor, Inc. v. Untied States,
   28 F.3d 1171 (Fed. Cir. 1994) ............................................................................. 20

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) ............................................................................................. 23

Marisol A. v. Giuliani,
   929 F.Supp. 662 (S.D.N.Y. 1996),
   aff'd., 126 F.3d 372 (2d Cir. 1997) ...................................................................... 24

Meriden Trust & Safe Deposit Co. v. FDIC,
   62 F.3d 449 (2d Cir. 1995) ............................................................................ 16, 20

New State Ice Co. v. Liegmann,
   285 U.S. 262, 311 ............................................................................................... 15

Oliver v. United States,
   466 U.S. 170 (1984) ............................................................................................ 12

Palazzolo v. Rhode Island,
   533 U.S. 606 (2001) ...................................................................................... 15, 17

Paris Adult Theatre v. Slaton,
   413 U.S. 49 (1973) .............................................................................................. 13

Penn Central v. New York City,
   438 U.S. 104 (1978) ............................................................................ 15, 16, 17, 20

**Cases**                                                                                    **Pages**

Pennsylvania Coal Co. v. Mahon,
    260 U.S. 393 (1922).............................................................................................. 15

Plaza Health Laboratories, Inc. v. Perales,
    878 F.2d 577 (2d Cir. 1989).............................................................................. 25

Polymer Tech. Corp. v. Mimran,
    37 F.3d 74 (2d Cir. 1994)................................................................................. 25

Roe v. Wade,
    410 U.S. 113 (1973)........................................................................................ 13

Savannah Bank, N.A. v. Savings Bank of Fingerlakes,
    261 A.D.2d 917 (4th Dep't 1999)..................................................................... 22

Savino v. Suffolk County,
    774 F.Supp. 756 (E.D.N.Y. 1991) ................................................................... 14

Seawall Associates v. New York,
    74 N.Y.2d 92 (1989)........................................................................................ 15

Selby v. Principal Mut. Life Ins. Co.,
    197 F.R.D. 48 (S.D.N.Y. 2000) ...................................................................... 23

Simon v. Eastern Kentucky Welfare Rights Org.,
    426 U.S. 26 (1976).......................................................................................... 23

Smith v. Maryland,
    442 U.S. 735 (1979)................................................................................... 11, 12

St. Francis Hosp. Ctr. v. Heckler,
    714 F.2d 872 (7th Cir. 1983)
    cert denied, 465 U.S. 1022 (1984) .................................................................. 18

Standard & Poor's Corp. v. Commodity Exchange, Inc.,
    683 F.2d 704 (2d Cir. 1982)............................................................................. 25

Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd,
    5 Misc.3d 285 (N.Y. Co. 2004) ...................................................................... 21

Sysco v. Maines Paper & Food Svc., Inc.,
    254 A.D.2d 611 (3rd Dept. 1998) .................................................................... 21

Terry v. Ohio,
    392 U.S. 1 (1968)............................................................................................ 12

**Cases**                                                                          **Pages**

Time Warner Cable of New York City v. Bloomberg, L.P.,
   118 F.3d 917 (2d Cir. 1997)..................................................................... 25

Tucker Anthony Realty Corp. v. Schlesinger,
   888 F.2d 969 (2d. Cir. 1989)..................................................................... 26

United States v. Knotts,
   460 U.S. 276 (1983)................................................................................. 12

United States v. Sperry Corp.,
   493 U.S. 52, 110 S. Ct. 387 (1989).......................................................... 17

Valley Forge Christian College v. Americans United for
   Separation of Church & State, Inc.,
   454 U.S. 464 (1982)................................................................................. 23

Weinberger v. Romero-Bancelo,
   456 U.S. 305 (1982)................................................................................. 25

Whalen v. Roe,
   429 U.S. 589 (1977)........................................................................... 13, 14

Yakus v. United States,
   321 U.S. 414 (1944)................................................................................. 25


**Statutes**


35 RCNY § 1-01 ........................................................................................ 6

35 RCNY § 1-11(g) ........................................................................... 6, 16, 22

35 RCNY §1-01 ......................................................................................... 4

35 RCNY §2-01 ......................................................................................... 5

35 RCNY § 2-28(a) .................................................................................... 5

35 RCNY §3-06(b) .................................................................................... 5

35 RCNY §3-07(b)(iv) ............................................................................... 9

35 RCNY § 3-03(e)(7) ............................................................................... 4

35 RCNY § 3-03(e)(8) ............................................................................... 4

Admin. Code §19-501 ................................................................................ 3

**Statutes**                                                                                          **Pages**

Article I §§ 6 and 12 of the New York Constitution....................................................................... 2

City Charter §2303(b)(6) ............................................................................................................. 3

Fed.R.Civ.P. 23(a) ..................................................................................................................... 24

Fourth, Fifth and Fourteenth Amendments to the United States Constitution ............................. 2

New York City Administrative Code §19-503(a)........................................................................ 3

New York City Charter §2303(a) ................................................................................................ 3

New York City Charter, § 2304(b) .............................................................................................. 3