Alexandre et al. v. The New York City Taxi and Limousine Commission et al.
07 Civ. 8175 (RMB)


# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

LOUBERT ALEXANDRE, YVON AUGUSTIN, MAX CHARTELAIN, WILFRED GERMAIN, CLAUDE LESSAGE, and JEAN PIERRE, INDIVIDUALLY AS OWNERS OF YELLOW CAB MEDALLIONS IN THE CITY OF NEW YORK AND ON BEHALF OF A CLASS OF ALL OWNERS SIMILARLY SITUATED, AS WELL AS INDIVIDUALLY, TOGETHER WITH MAMNUNUL HAQ and ASIM AKHTAR, AS HOLDERS OF HACK LICENSES IN THE CITY OF NEW YORK AND AS REPRESENTATIVES ON BEHALF OF A CLASS OF ALL HOLDERS OF HACK LICENSES IN THE CITY OF NEW YORK, and the NEW YORK TAXI WORKERS ALLIANCE,

                                       Plaintiffs,

-against-

THE NEW YORK CITY TAXI AND LIMOUSINE COMMISSION, MATTHEW DAUS, AS COMMISSIONER/CHAIR OF THE NEW YORK CITY TAXI AND LIMOUSINE COMMISSION, AND THE CITY OF NEW YORK,

                                       Defendants.

------------------------------------------------------------------ x

07 Civ. 8175 (RMB)

**DECLARATION OF ANDREW SALKIN**

ANDREW SALKIN, hereby declares, pursuant to 28 U.S.C. §1746 subject to the penalties of perjury, that the following statements are true:

1. I am the first deputy commissioner of the Taxi and Limousine Commission (the "Commission"), and have served in that capacity since June, 2004. Before my appointment to that position, I served as Lower Manhattan borough commissioner at the City's Department of Transportation. In that position, starting in the summer of 2003, I was assigned to work with the Commission on operational and policy matters.

2.    I submit this declaration, at the request of the Court and in opposition to the plaintiffs' motion for a preliminary injunction, based on my personal knowledge of the facts, my review of Commission documents, and my conversations with Commission and other City personnel.

3.    I have been involved in the development and oversight of the taxi technology project from its inception in mid-2003.

The Origins of the Taxi Technology Project

4.    One of the Commission's statutory mandates is to "prescribe, revise and otherwise regulate reasonable rates of fare" for taxicab service (New York City Charter, § 2304(b)). In mid-2003, several organizations, including the plaintiff Taxi Workers Alliance, petitioned the Commission to raise taxi fares.

5.    The Commission's ultimate conclusion was that taxi passengers should get something in exchange for higher taxi fares. The staff's recommendation to the Commission was a three-part package of customer service enhancements consisting of: increased availability of group rides, new specifications for taxicab partitions, and the taxi technology systems that are the subject of this litigation. The taxi technology systems were proposed to have four components: the credit card reader, the driver information monitor, the passenger information monitor, and the electronic trip sheet. The ensuing rulemaking, discussed in detail below, included both the fare increase and these customer service enhancements in combination.

Implementation of the Taxi Technology Systems Project

6.    The staff's recommendation was to contract with a number of vendors to design, manufacture, sell, install and maintain the taxi technology systems. Because medallion

2

owners would be required to purchase the systems from designated vendors, the Commission's contracts with the system vendors are governed by state and local laws and rules applicable to government procurement, even though the City is not actually purchasing the systems. The Commission's licensees, including medallion owners, are subject to the Commission's rules, but the vendors are beyond the Commission's regulatory jurisdiction. Conversely, the Commission's licensees are not governed by the Commission's contracts with the vendors. Therefore, it was necessary to coordinate rulemaking and contracting, each described in turn below.

Rulemaking History

7. City agencies' rulemaking is governed by the City Administrative Procedure Act, chapter 45 of the New York City Charter. Pursuant to that Act, proposed rules are published for comment at least 30 days in advance of a public hearing before the Commission. The Commission votes on proposed rules in open session pursuant to the New York State Open Meetings Law.

8. A package of rules necessary to implement the taxi fare increase and the customer service enhancements package referred to above, including the taxi technology project, was initiated in early 2004. Chairman Daus described the rules package, including both the fare increase and the taxi technology system at the January 29, 2004, meeting of the Commission (see transcript attached as Exhibit A, pp. 15 – 30).

9. The proposed package of rules was the subject of a public hearing before the Commission on March 30, 2004 (see transcript attached as Exhibit B, pp. 10 – 231). Again, Chairman Daus described the rules proposals, including the fare increase and service enhancements, as a package (Exhibit B, pp. 10 – 17). A number of drivers

testified at the hearing, including a number of members and officials of the TWA. Among the witnesses to testify at the hearing was Bhairavi Desai, the executive director of the TWA. Ms. Desai testified in favor of the fare increase and raised some concerns about the credit card component of the taxi technology systems, but made no objection to the electronic trip sheet component of the systems (see, Exhibit B pp. 19-25). Some of the other witnesses referred to the technology systems, and several remarks were addressed to the GPS component of the systems, but no concern about privacy rights was expressed. For example, Mr. Mathew Biju testified about concerns he had about the reliability of GPS technology, and recommended that the Commission consider other tracking technologies (see, Exhibit B pp. 78-83).

10. The proposed rules were approved by the Commission following the conclusion of the public testimony. In other words, on March 30, 2004, the Commission gave its approval to the fare increase and to the customer service enhancements package, including the taxi technology systems consisting of electronic trip sheets, driver information monitors, passenger information monitors, and the credit card readers.

11. The 2004 rulemaking included rules required to enable implementation of the taxi technology project, and included a provision requiring installation of the system in all taxicabs by November 1, 2005.

12. As the development of the project proceeded, it became clear that the 2004 rules required a number of revisions. In addition, it became clear that the November 1, 2005 installation deadline would not be feasible. Therefore, in 2005, a second set of rules applicable to the taxi technology systems was proposed and promulgated. The rules adopted a variety of technical revisions to the 2004 rules, and substituted "by a date to be

4

determined by the Commission" for the November 1, 2005, deadline stated in the 2004 rules.

13. The 2005 rules were published as required, and a public hearing was held before the Commission on May 4, 2005 (see transcript attached as Exhibit C, pp. 13 - 103). At this hearing, Ms. Desai and a number of other TWA representatives testified in opposition to the inclusion of the GPS component of the taxi technology systems, asserting that the GPS technology violated drivers' rights of privacy (see, Exhibit C, pp. 53-59).

14. As the contracting process reached conclusion, and testing of the four successful bidders' products was underway in early 2007, the staff recommended a final set of technical amendments to the taxi technology rules, including imposition of new deadlines for the sale and installation of taxi technology systems. The proposed rules provided a deadline of August 1, 2007, for each medallion owner to enter into a contract for the purchase of a taxi technology system. The proposed rules further provided for deadlines ranging from October 1, 2007, to January 31, 2008, for the installation of the systems, with some exceptions. A particular medallion owner's deadline was fixed by that owner's deadline for vehicle inspection by the Commission – the Commission is required by law to inspect each taxicab once every four months at its inspection facility.

15. This final set of proposed rules was the subject of public hearings on March 8 and May 10, 2007, and they were approved by votes of the Commission on those two dates (see transcripts attached as Exhibit D, pp. 175 – 292, and Exhibit E, pp. 19 – 76). Specifically, the portion of the proposed rules that fixed the deadlines for purchase of the

5

technology systems and for installation of the systems were approved by the Commission at its May 10, 2007 meeting.

16. Again, a number of TWA representatives spoke in opposition to the inclusion of GPS technology at those public meetings.

Procurement History

17. The Commission commenced the formal process of contracting with vendors to develop and produce taxi technology systems with a public request for information that was published on June 21, 2004. Any interested member of the public was invited to respond. The purpose of the request for information was to gain information that would be useful in the further definition of the project.

18. Following receipt of some 60 responses to the request for information, the Commission hosted an "information summit" with potential vendors and taxi industry representatives, on October 14, 2004. Drivers were among those in attendance, and I recall the active participation of one TWA representative, Bill Lindauer.

19. Based on the Commission's analysis of the information received, assisted by a consultant retained by the Commission for that purpose, the Commission issued a request for proposals on March 2, 2005. On March 15, 2005, the Commission convened a pre-proposal conference, attendance at which was open to the public.

20. The request for proposals described the four components of the system, including the electronic trip sheet. The functionality of the electronic trip sheet would require reliance on some form of tracking technology.

21. The Commission received 12 timely proposals, and those proposals were submitted to a rigorous evaluation process. The evaluation committee consisted of two

Commission employees, one City Department of Transportation employee, one employee of the City's Department of Information Technology and Telecommunication, and one employee of the City's Office of Management and Budget.

22. Following evaluation of the proposals, the five bidders who met the minimum technical requirements were invited to submit "best and final offers," after which the Commission entered into negotiations for final contracts. One of the five withdrew, and contracts were ultimately signed with the remaining four in January and February 2006. All four vendors' proposals selected GPS as the tracking technology that the electronic tip sheet would rely on.

23. Notice of proposed contracts was published, and a public hearing was held before the Mayor's Office of Contract Services on the contracts on December 27, 2005. At least one TWA representative appeared at the hearing and objected to the proposed contracts.

24. The contracts and the contracting process were independently reviewed and approved by the City's Law Department, Department of Investigation, Comptroller, and Office of Contract Services.

25. The four contracts were registered by the Comptroller on June 19, 2006, thereby becoming effective. Thereafter, the four vendors began development of their technology systems and programs, followed by a rigorous testing program provided for by the contracts. Upon each vendor's satisfaction of performance requirements mandated in the contracts, that vendor was given a notice to proceed, entitling that vendor to begin selling and installing technology systems in taxicabs.

26. By the end of June, 2007 over 3,300 medallion owners had signed contracts to buy technology systems, and over 330 had been installed. By the end of July, over

10,800 owners had signed contracts, and over 900 had been installed. As of September 21, 2007, 12,950 owners had signed contracts, leaving only 135 taxicabs without purchase contracts, and 2,280 systems had been installed.

Dated:     New York, New York
           September 23, 2007

                                        _____
                                              ANDREW SALKIN