<u>Alexandre et al. v. The New York City Taxi and Limousine Commission et al.</u>
07 Civ. 8175 (RMB)

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

LOUBERT ALEXANDRE, YVON AUGUSTIN, MAX
CHARTELAIN, WILFRED GERMAIN, CLAUDE
LESSAGE, and JEAN PIERRE, INDIVIDUALLY AS
OWNERS OF YELLOW CAB MEDALLIONS IN THE
CITY OF NEW YORK AND ON BEHALF OF A CLASS
OF ALL OWNERS SIMILARLY SITUATED, AS WELL
AS INDIVIDUALLY, TOGETHER WITH MAMNUNUL
HAQ and ASIM AKHTAR, AS HOLDERS OF HACK
LICENSES IN THE CITY OF NEW YORK AND AS
REPRESENTATIVES ON BEHALF OF A CLASS OF
ALL HOLDERS OF HACK LICENSES IN THE CITY
OF NEW YORK, and the NEW YORK TAXI WORKERS
ALLIANCE,

07 Civ. 8175 (RMB)

**DECLARATION OF
ANDREW SALKIN**

                                           Plaintiffs,

-against-

THE NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION, MATTHEW DAUS, AS
COMMISSIONER/CHAIR OF THE NEW YORK CITY
TAXI AND LIMOUSINE COMMISSION, AND THE
CITY OF NEW YORK,

                                           Defendants.

------------------------------------------------------------------------ x

       ANDREW SALKIN, hereby declares, pursuant to 28 U.S.C. §1746 subject to the penalties of perjury, that the following statements are true:

       1. I am the first deputy commissioner of the Taxi and Limousine Commission, and have served in that capacity since June, 2004. Before my appointment to that position, I served as Lower Manhattan borough commissioner at the City's Department of Transportation. In that position, starting in the summer of 2003, I was assigned to work with the Commission on operational and policy matters.

-2-

2. I submit this declaration, together with my declaration dated September 23, 2007 which is attached to the Declaration of Paula Van Meter as Exhibit A, in opposition to the plaintiffs' motion for a preliminary injunction, based on my personal knowledge of the facts, my review of Commission documents, and my conversations with Commission and other City personnel.

3. I have been involved in the development and oversight of the taxi technology project from its inception in mid-2003. As explained in detail below, the project is intended foremost for the benefit of the 240,000,000 passengers who pay some $1.8 billion annually for taxicab rides, although the project also benefits taxi drivers in a number of respects.

<u>The Origins and Public Benefit of the Taxi Technology Project</u>

4. One of the Commission's statutory mandates is to "prescribe, revise and otherwise regulate reasonable rates of fare" for taxicab service (New York City Charter, §2304(b)). In mid-2003, several organizations, including the plaintiff Taxi Workers Alliance ("TWA"), petitioned the Commission to raise taxi fares.

5. Before the Commission could approve the requested fare increase, it was felt that taxi passengers should get something in exchange for substantially higher taxi fares. The staff's ultimate recommendation to the Commission was a three-part package of customer service enhancements. First was increased availability of group rides. Group rides benefit passengers by grouping passengers who are traveling separately from the same departure point to destinations that are close to each other. Each passenger pays less for a trip in a group than the passenger would pay for the same trip riding alone. A driver also benefits, because the total fare for the group is more than the fare would be for one passenger alone.

6. The second customer service enhancement recommended by staff was a new set of specifications for taxicab partitions. The old partitions were manufactured from a material that tended to scratch and yellow over time, reducing the ability of the passenger to see into the driver's compartment – to clearly see, for example, the driver's hack license, or the taxi meter. New specifications for partitions addressed that problem.

7. The third recommended customer service enhancement was the taxi technology systems that are the subject of this litigation. The systems were to have four components: the credit card reader, the driver information monitor (DIM), the passenger information monitor (PIM), and the electronic trip sheet. Each component has a distinct customer service value.

8. The credit card reader affords the passenger the obvious convenience of a credit card payment option. The driver also benefits in important respects. Our review of electronic trip sheet data to date shows that passengers who pay by credit card give drivers larger tips than those who pay in cash. In addition, Commission staff believe that universal availability of the credit card option may increase ridership, and therefore driver income. And finally, maintaining less cash in the taxicab translates to greater security for the taxicab driver.

9. The DIM is a small text messaging screen that allows the Commission to engage in limited communication directly with the driver. The value of the DIM to passengers is at least three-fold. First, text messaging will facilitate recovery of passengers' property left in taxicabs. During fiscal year 2007, the Commission received over 88,000 inquiries, via the City's 311 information system, from passengers who had lost property in cabs - more than half of all 311 inquiries received by the Commission. Where the medallion number of the cab is known, the text messaging system will enable the Commission to send an alert directly to the driver of

the taxicab, asking the driver to check for and secure the lost property for return to the passenger. Second, the text messaging system will enable the Commission to alert drivers to fare opportunities, and, by facilitating the connection between passenger and taxicab, to reduce the passenger's waiting time. For example, the DIM will be able to receive messages that an event at Madison Square Garden is ending. And third, the DIM will enable the Commission to communicate to drivers about street obstacles, like accidents, construction, traffic delays, and so on. Enhancing the drivers' ability to avoid delays will speed the passengers' trips.

10. The DIM adds value for the driver as well. Identifying fare opportunities more quickly and moving passengers more efficiently will enable a driver to handle more rides during a shift, and will increase the driver's income.

11. The PIM allows the Commission to communicate directly with the passenger. Previously, in-taxi communication between the Commission and the passenger consisted of stickers, which the PIM replaces. Unlike stickers, the PIM allows dynamic communication. PIM content might partly be uniform for all passengers, or it might vary based on the time of day, the location of the taxicab, and so on. The replaced New York City map stickers are an example of the drawbacks of static information: the map's perspective cannot be altered by the passenger. For instance, the passenger cannot zoom in or out to show more detail or more area, but the map on the PIM can be manipulated by the passenger to show varying levels of detail, down to street-level views of neighborhoods. Also, the Commission can make changes in PIM content quickly, whereas changes to the stickers require months of planning and roll-out, and significant expense. Information on the PIMs can include a wealth of information that the Commission wants to make available to passengers in furtherance of the Commission's

regulatory purposes. For example, the PIM might communicate a reminder to passengers to fasten their seatbelts, or to watch for cyclists as they exit the cab.

12. PIM content also includes advertising and programming. But since the PIM can be turned off by the passenger, the Commission's vendors, in order to profit from the sale of advertising and programming, will be forced to provide PIM content that passengers value. Finally, the PIM makes fares and payments more comprehensible. The PIM displays the components of the fare, such as tolls, more clearly showing the calculation of the total fare than does the meter. And the PIM suggests to the passenger alternative tip amounts, showing the application of several percentages to the total fare.

13. The electronic trip sheet benefits passengers by contributing an enormous body of information to the Commission's regulatory analysis. Trip sheets were formerly written by hand, one for each of more than half a million rides per day. The labor cost of deciphering handwritten information of varying legibility, and then manually processing that information, limited the Commission's use of trip sheet data to statistically small samples. Ironically, the effort to analyze TWA's fare increase petition in 2003 served to highlight the fact that analysis of driver income based on samples and surveys was necessarily imprecise. Comprehensive computerized fare information would enhance the accuracy of the analysis.

14. Electronic trip sheets will also enable the Commission to conduct automated, comprehensive analyses of pick-up points, drop-off points, trip time and distance, and passenger counts. Analysis of this information will enable the Commission to more precisely tailor its regulatory framework to the ground-level realities of the industry, including better matching taxicab supply and passenger demand. For instance, the Commission will be able to know how many vehicles and drivers are typically on the road at 2:00 a.m. - and, if the supply is inadequate,

to consider regulatory measures to redress the shortage. Taxicab supply and demand can vary based on geographic location, time of day, weather, and a variety of other factors that analysis will enable the Commission to quantify with precision, and to address.

15.     The geocoded information provided by the GPS feature of the electronic trip sheet also assists in locating passengers' lost property. The majority of passengers who report lost property do not know the medallion number of the taxicab they rode in. But all passengers can say reliably when and where they got into and got out of the taxicab. The electronic trip sheet data enables the Commission to send a text message to drivers of taxicabs who were in the stated location at the stated time, thereby considerably enhancing the prospects of speedy recovery of the lost property.

16.     The electronic trip sheet also benefits drivers. The obligation to keep complete, handwritten trip sheets was a substantial burden for drivers. Electronic trip sheets eliminate the obligation entirely. Drivers who failed to comply with trip sheet obligations bore an additional burden that is now outmoded: from 2004 to 2007, over 45,000 summonses were issued to taxicab drivers, resulting in the imposition of more than $500,000 in fines.

17.     It was anticipated that the substantial rate increase of 27% would provide revenue that would support any costs to medallion owners or drivers in connection with the passenger service enhancements.

Implementation of the Taxi Technology Systems Project

18.     The staff's recommendation was to contract with a number of vendors to design, manufacture, sell, install and maintain the taxi technology systems. Because medallion owners would be required to purchase the systems from designated vendors, the Commission's contracts with the system vendors are governed by state and local laws and rules applicable to government

procurement, even though the City is not actually purchasing the systems. The Commission's licensees, including medallion owners, are subject to the Commission's rules, but the vendors are beyond the Commission's regulatory jurisdiction. Conversely, the Commission's licensees are not governed by the Commission's contracts with the vendors. Therefore, it was necessary to coordinate rulemaking and contracting, each described in my Declaration dated September 23, 2007.

19. The rules necessary to implement the taxi fare increase and the customer service enhancements package, including the taxi technology project, was discussed at the January 29, 2004 meeting of the Commission, which meeting was open to the public. The entire package of rules was the subject of a public hearing before the Commission on March 30, 2004, as described in greater detail in my Declaration dated September 23, 2007.

20. Re-reading the transcript of the March 30, 2004 Commission meeting now, I am pleased to be able to say that the large majority of issues and concerns raised about the technology project at that meeting were addressed and satisfactorily resolved during the subsequent phases of development and implementation of the program.

Additional Opportunities for Input from Drivers and TWA

21. In addition to the opportunities for public participation in the rulemaking process and in the contracting process, described in my Declaration dated September 23, 2007, the Commission has engaged TWA in particular, and drivers in general, in frequent and extensive discussions related to the development and implementation of the taxi technology systems. TWA has had very open access to Commission staff.

22. Due to the complexity of the taxi technology project, Commission staff has worked diligently to reach out to all affected industries to gain feedback and share information.

The Commission's Office of Constituent Management, the function of which is to promote communication between the Commission and its regulated industries and other interested segments of the public, maintains regular communication with industry groups such as taxi owner and driver groups, including TWA. Staff from that office have met periodically with TWA officials, usually at the Commission's offices, but also on occasion at TWA's offices. In addition to these meetings, staff from that office, and my staff, have consistently maintained frequent communication with Ms. Desai by telephone and e-mail. To my knowledge, no request from TWA for a meeting with Commission staff has ever been denied.

23.     At some point after the 2004 fare increase was approved, along with the rules required to implement the accompanying customer service enhancements, TWA began a campaign of opposition to the taxi technology project. Despite the Commission's efforts to engage TWA in discussions about the details of the project, such as costs, for the most part TWA declined to be so engaged. TWA's position was consistently and flatly that the project should be killed; TWA officials were for the most part unwilling to engage in discussion about how the project might be modified, short of termination, to address any of their concerns.

24.     At one point, about September 2005, TWA met with me, the Commission's general counsel and other Commission staff, accompanied by lawyers from the New York Civil Liberties Union, who TWA had retained to represent them in discussions with us about the GPS technology. Following the first meeting with the NYCLU and TWA, we met a number of additional times with NYCLU alone, continuing to do so after NYCLU no longer represented TWA.

25.     The NYCLU attorneys stated to us their concerns about the possibility of abuse of the information that could potentially be collected by means of the GPS technology. Their

primary concern, as expressed to us, was that GPS technology could be used to track the location of a taxicab while the taxicab was off-duty, and in use for the driver's personal purposes. We explained our intentions for the use of taxicab location information. Specifically, we explained that the Commission would have access to only the same location information that the Commission already had access to by means of the paper trip sheets – the pick-up point and the drop-off point of each ride. The NYCLU attorneys accepted our assurance, but asked that we insert a provision to that effect into our vendor contracts, which were then in the final stages of negotiation. We agreed, and as a result, section 11.5 was added to the four vendor contracts. A copy of a contract containing the standard provisions entered into with vendors, including section 11.5 is attached to the Van Meter Declaration as as Exhibit G.

26. In sum, section 11.5 of the contracts prohibits the vendors from giving to any person or entity, which includes the City, the Commission, or their employees, information about the location of a taxicab while it is off-duty. The section provides only two exceptions: one for legal process, such as subpoena, and another where a medallion owner or agent expressly contracts with the vendor to receive such information.

27. On a number of occasions, we have asked TWA officials to suggest any additional protections that might allay their concerns. Their uniform response has been that the GPS technology should be eliminated from the system.

The Cost of the Systems to Drivers

28. The plaintiffs' papers suggest that the cost of the taxi technology systems can be passed along to drivers. This is true only as to drivers who own their own medallions or vehicles. A driver who leases both the medallion and the vehicle cannot be made to pay the cost of the installation or the maintenance of the systems.

29. Taxi drivers fall into three categories. One category is medallion owners who drive their own medallion taxicabs. Obviously, as medallion owners, this group will be required to absorb the costs of the taxi technology systems. In this connection, it bears mention that the average sale price of an individually owned medallion was $253,000 in April 2004, when the fare increase described above was approved, but by August 2007, the average sale price of an individually owned medallion had escalated to $424,000. Therefore any medallion owner who bought before April 2004 has realized a tremendous financial gain; any owner who bought after that did so with notice of the taxi technology requirements approved by the Commission in April 2004.

30. The second category of taxi drivers includes one of the plaintiffs, Mamnunul Haq. These drivers own their vehicles, but lease their medallions. The Commission regulates medallion leases by fixing maximum lease rates that medallion owners and agents may charge to drivers. Many of these drivers, evidently including Mr. Haq, finance their purchase of their vehicles through the agents from whom they lease their medallions. The Commission does not regulate these vehicle purchase and finance agreements. Therefore, presumably to the extent permitted by those agreements, agents can pass additional costs along to drivers who purchase or finance their vehicles with the agents.

31. The third category of taxi drivers consists of those who lease both their medallions and their vehicles. The Commission's maximum lease rates apply to these drivers – although, of course, the maximum lease rate for a medallion and a vehicle is higher than the maximum lease rate for a medallion only. (The maximum lease rates are in section 1-78 of the Commission's rules, title 35, Rules of the City of New York.) A driver's lease rate cannot be

raised beyond the maximum, regardless of the cost of the technology systems to medallion owners or agents.

32.   TWA representatives have on several occasions told us that the lease maximums are violated. Any such violation would be of serious concern to the Commission, and on each occasion Commission staff asked TWA representatives to produce documentation of, or witnesses who could testify to, such violations. When TWA or anyone else has alleged lease violations, Commission staff have investigated those allegations. To my knowledge, all of those investigations have led to determinations that the allegations of violations were unfounded.

Dated:    New York, New York
          September 24, 2007

_____
ANDREW SALKIN