Alexandre et al. v. The New York City Taxi and Limousine Commission et al.
07 Civ. 8175 (RMB)

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

| | |
|---|---|
| LOUBERT ALEXANDRE, YVON AUGUSTIN, MAX CHARTELAIN, WILFRED GERMAIN, CLAUDE LESSAGE, and JEAN PIERRE, INDIVIDUALLY AS OWNERS OF YELLOW CAB MEDALLIONS IN THE CITY OF NEW YORK AND ON BEHALF OF A CLASS OF ALL OWNERS SIMILARLY SITUATED, AS WELL AS INDIVIDUALLY, TOGETHER WITH MAMNUNUL HAQ and ASIM AKHTAR, AS HOLDERS OF HACK LICENSES IN THE CITY OF NEW YORK AND AS REPRESENTATIVES ON BEHALF OF A CLASS OF ALL HOLDERS OF HACK LICENSES IN THE CITY OF NEW YORK, and the NEW YORK TAXI WORKERS ALLIANCE, | 07 Civ. 8175 (RMB) <br><br> **DECLARATION OF** <br> **IRA GOLDSTEIN** |

                                                                   Plaintiffs,

-against-

THE NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION, MATTHEW DAUS, AS
COMMISSIONER/CHAIR OF THE NEW YORK CITY
TAXI AND LIMOUSINE COMMISSION, AND THE
CITY OF NEW YORK,

                                                                   Defendants.

------------------------------------------------------------------ x

      **IRA J. GOLDSTEIN,** declares under the penalty of perjury, pursuant to 28 U.S.C. §1746, that the following statements are true:

      1.    I am the Chief of Staff of the New York City Taxi and Limousine Commission ("TLC" or "Commission"). I have been employed as Chief of Staff since June 2002. One of my primary responsibilities as Chief of Staff has been to manage the Taxicab Technology System ("TTS") Project. I have managed the TTS project from the

contract negotiations with the vendors, assisted in rulemaking related to the project, and have had oversight of the project through its implementation to date.

2. I submit this declaration in opposition to the plaintiffs' motion for a preliminary injunction, based on my personal knowledge of the facts, my review of Commission documents, and my conversations with Commission and other City personnel.

3. In March 2004 the Taxi and Limousine Commission Board ("Board") voted to increase the taxicab rate of fare by 26%, in combination with a Board mandate that the public should receive improved services along with the historic fare increase. The specific improvements at issue were four technology based enhancements. The service enhancements were:

i. the electronic capture of trip sheet data;

ii. the ability to receive and respond to text messages;

iii. the ability to accept all major credit and debit cards as a form of payment; and

iv. a Passenger Information Monitor ("PIM") that would display a map that allows a passenger to follow his or her location or route.

4. The TLC staff was directed to develop an implementation plan that would provide an orderly, high quality service for passengers as well as drivers and owners. The TLC formed an implementation steering committee consisting of mid to senior staff from numerous City agencies including the Department of Transportation, the Mayor's Offices of Management and Budget, Operations and Contract Services, the City's Law Department and the Department of Information, Technology and Telecommunications. The steering committee determined that to ensure the highest

2

quality and maximize buying power, it should use the City's procurement process to accomplish these goals. The steering committee also recommended that the TLC seek funding for additional full-time staff to direct the implementation of the project with senior staff management, and for the hiring of a Project Monitoring/Quality Assurance Consultant ("PM/QA"). The PM/QA's role is to monitor the project for any potential critical issues such as deadlines not being met, ensure that citywide guidelines and best practices are being met, monitor costs as well as provide subject matter experts as necessary. In the early stages of the project, the PM/QA provided monthly risk management reports to the TLC as well as to Mayoral oversight agencies such as the Office of Management and Budget and the Department of Information, Technology and Telecommunications.

5. The TLC determined that having an undetermined limited number of qualified vendors would best serve the interest of all stakeholders in the program in terms of quality and price. A two step procurement process was developed to ensure high levels of competition and to ensure quality and control price. The first step was between the City and potential system providers and established minimum service levels and a maximum price of each system. The second step was between approved system providers and medallion owners to determine actual price, essentially allowing approved vendors to compete, by increasing service and/or lowering price, for market share of the medallion owners. To this end, the TLC issued a Request for Proposals ("RFP") that required interested bidders to submit business solutions rather than a specific unit or system since no off the shelf solution existed.

6. Working with the steering committee and the PM/QA, the TLC put together a multi-staged testing regime to ensure that when the systems were rolled out to the public, the systems would be serving the public and the taxicab industry to the highest levels possible. An extensive acceptance testing criteria was developed for all functionalities of the systems. All vendors needed to pass all enumerated criteria before being allowed to advance to the next phase of testing.

7. In the first stage of testing, each vendor was required to supply three vehicles representing the most widely used models of taxicabs, each equipped with all mandatory components of the systems, to the TLC for functionality testing. Initially, TLC staff and the PM/QA verified that the proposed hardware, software and system design was consistent with the vendor's proposal. The TLC then began functionality testing. Functionality testing encompassed all aspects of the in-cab system and portions of the backend of the systems to ensure that each function works correctly and within the range of acceptable time, reliability and accuracy required under the terms of the proposed contract. These performance requirements are commonly referred to as service level agreements ("SLAs"). This testing comprised of TLC staff working in pairs of two simulating the passenger and driver experiences in each vehicle.

8. According to Passenger Acceptance Surveys, credit card acceptance was viewed as the most important aspect of the project to passengers. Some examples of what was tested with respect to credit card processing was how long it took the in-car device to transmit and receive either an approval or denial of the transaction, ability to provide forms such as the end of trip report so that a driver can be paid at the end of a shift by the owner for his or her credit card transactions. The primary SLA for

credit processing is an average of 8 seconds or less. The TLC processed several hundred transactions for all the vendors to ensure that SLAs were being met.

9. Text messaging is another component of the project. It is anticipated that text messaging will be used by the TLC to assist passengers in retrieving property lost in cabs, advise taxicab drivers of fare opportunities and notify drivers of emergency situations. Text messaging must have the capability to transmit to a specific cab, a select group of cabs, to a full or partial medallion number, and to specific or range of geographic locations based on pick-up or drop-off. The speed and reliability that a vendor must be able to transmit a text message varies based on the number of cabs receiving the message. In general, all text messages must be received within 10 seconds or less 95% of the time. The text messaging unit must also have the ability to reply by choosing a preprogrammed key. For example, buttons may be labeled "Yes" and "No" for quick response to typical questions. The TLC simulated these circumstances during the Stage 1 testing.

10. The RFP required that taxicabs be equipped with a passenger information monitor ("PIM") that allows a passenger to follow his or her route during a cab ride. These PIMs are also used to share important information from the TLC, such as current taxicab fares and "Passenger Bill of Rights", other Public Service Announcements from the City and to complete the end of fare payment transaction. The functionality, ease of use and presentation of content were determined by conducting Passenger Focus Groups and Passenger Acceptance Surveys. Through our PM/QA, an expert transportation specialist was retained to conduct the Driver and Passenger Focus Groups and the Passenger Surveys.

5

11. Over two hundred New Yorkers were recruited to participate in these surveys. Each participant rode in a taxicab which had the system of each vendor. Participants completed almost three hundred ratings questions in a survey based on their experience with each of the four vendors systems. The participants were questioned about specific details of the PIMs. While the scores varied by vendor, each vendor was required to score at least 85% as a satisfactory rating to pass the testing. If a vendor's score was under 85%, it was required to change the design, functionality or presentation to a concept that scored an "acceptable" rating.

12. Overall, ninety-eight percent of the participants rated the systems as valuable.

13. Installation of the systems will likely increase taxicab ridership. Forty percent of the survey participants reported that they expect to use taxicabs more often when the systems are in cabs, including 17% who expect to take cabs "a lot more".

14. The TLC also conducted driver focus groups prior to the implementation process in December 2004.

15. Besides the overall value in soliciting drivers' opinions about the specific components of the systems, specific suggestions were incorporated into the system requirements from the driver focus groups and other driver feedback. There are several illustrative examples. Drivers were concerned that text messages not become a distraction or safety hazard. Attachment OBS (Owner Based Services) of the master agreement between the TLC and the vendors, at Section I, provides that text messages may only be received and responses from drivers when the cab is not in motion. Also, Attachment ATC (Acceptance Test Criteria) Section 2.3.10 provides that the driver

6

information monitor will only contain predetermined fixed responses and not a full keyboard.

16. Another concern raised by drivers was that off-duty data should not be collected by the TLC or released or sold to any other third party. Section 11.1.1, "Ownership and Control of TLC Data" of the master agreement between the TLC and each vendor explicitly prohibits vendors from disseminating this type of trip sheet data. Section 11.5 of the master agreement prohibits dissemination of off duty data unless it is expressly contracted for between the owner and vendor.

17. Finally, while drivers are required to take the shortest route unless the passenger specifies a route, drivers were concerned about passengers second-guessing the driver's choice of route. Based on driver feedback, the TLC limited the functionality of the map features contained in the PIM to eliminate functionality as a navigational tool. However, if a significant number of medallion owners determine that a GPS based navigational tool would be useful for drivers, vendors may offer it as an optional service after undergoing TLC testing and approval.

18. Furthermore, Stage 1 testing commenced in August 2006 and was completed in January 2007. All vendors completed this testing at different times. Stage 2 consisted of each vendor placing its respective systems in fifty taxicabs each. The contract required a minimum of forty-five days of on road testing in a "live" for hire environment.

19. In Stage 2, the TLC used the same acceptance test criteria as in Stage 1 except with an emphasis on testing back office functionality, reporting

7

requirements and information technology security testing. Data that was collected was also evaluated as to the functionality testing that occurred during Stage 1.

20. All vendors were required to exhibit all required functionality of the systems prior to being able to sell their systems to taxicab owners. SLAs were used as benchmarks wherever practical.

21. The TLC retained information technology security experts through its PM/QA. All components of the vendors' systems were required to meet the security standards of the credit card industry certifying organizations and City-wide standards where applicable. The security experts reviewed the system architecture and also performed what is known as "ethical hacking" whereby they attempted to breach the security of each vendors' in-cab and back office systems. Whenever the security experts were able to "hack" into a system or identified weaknesses in a vendor's system, the vendor was required to harden the system to the TLC's satisfaction prior to passing Stage 2 testing. Stage 2 testing commenced in November 2006 and was completed at various times by the vendors through June 2007.

22. In conversations with the TWA, it alleged that systems currently installed in taxicabs were malfunctioning at a high rate. The TLC agreed to continue testing the systems through the October 1, 2007 deadline.

23. The TLC is testing thirteen basic functions which include specific functions alleged to be faulty by the TWA. TLC staff have been visiting fleets and garages as well as testing the systems when a vehicle appears for its regularly scheduled inspection at the TLC's testing facility. In addition, TLC has been leasing cabs for an entire shift and simulating a typical taxicab shift.

24. As of September 21, 2007, the TLC has inspected 1,280 vehicles. The overall pass rate is 99.37%. The pass rate for the specific functions ranges from a low of 97 percent on credit card processing time of less than eight seconds to a high of 100 percent on having a functional "mute button" on the PIMs.

25. Plaintiffs have alleged that the installation of these systems are permanent in their vehicles. This is simply not the case. I am informed that the installation of the entire system usually involves cutting a hole into the steel portion of the vehicle's partition to place the PIM, attaching the driver information module ("DIM") with a few screws to the dashboard, attaching a credit card swipe with a few screws to the polycarbonate portion of the partition, and in some cases running electrical wires which are secured with harnesses from the DIM to an electrical source, usually the vehicle's battery. These are all installations that can be undone in the event that the owner wishes to remove the system. In fact, the TLC required the vendors to submit pricing for the cost to "de-install" or remove the system. The price for removal varies between vendors from a flat fee of $100 to $500 or a rate of $65 per hour.

26. The obligation to enter into contract for the installation of the TTS equipment is on the owner of the taxi medallion. The medallion owner is responsible for having the equipment installed in any taxi being operated under the medallion.

27. Prior to issuance of any notices of violation to owners for failure to meet the deadline for contracting for the TTS equipment, numerous notifications were issued about the required deadlines. The TLC also posted the same information on its web site.

28. The TLC sent four (4) mass mailings (at each vendor's own cost) to all medallion owners and medallion agents of marketing materials of each respective vendor which included TLC industry notices that informed owners of the list of approved vendors and of the August 1, 2007 deadline for an owner to sign a contract with an approved vendor as well as the compliance period commencing on October 1, 2007 for owners to install systems.

29. The TLC also posted an industry notice dated June 7, 2007 on the TLC web site advising of the August 1 deadline. This June 7, 2007 notice was preceded by notices dated May 25, 2007, June 1, 2007 and June 6, 2007 advising the taxicab industry of new vendors that were added to the approved list of vendors. A June 26, 2007 industry notice was posted on the TLC web site advising the taxicab industry of the above referenced deadlines.

30. Further, on July 30 2007, the TLC sent a final notice to owners that did not sign a contract with a vendor.

31. Additionally, the TLC hosted vendor expos on June 25, 2007 and July 10, 2007 to give medallion owners an opportunity to see all vendors in one setting.

32. Further, TLC staff performed outreach to explain the project to drivers at Kennedy Airport, LaGuardia Airport and taxicab fleets in the months of April, May, June and July 2007.

33. Plaintiff states that the cost of the systems will be so expensive that it will force them out of the taxicab business. This is simply not the case.

34. The prices and costs of the systems mentioned in the plaintiffs' papers are either pure fiction or were the highest possible prices that a vendor was allowed to charge a medallion owner.

35. The four vendors offered a wide variety of pricing options. The options varied in the amount of money due at the time of installation or upfront and percentage of advertising revenue that the medallion owner receives over the term of the contract.

36. TLC Rules Section 3.07(b)(iv) allows advertising as an option on the PIM. It is not mandated. In the vendors' responses to the Request for Proposals issued by the TLC, three of the four vendors submitted advertising and non-advertising models. If a medallion owner chooses an advertising model, the medallion owner is the one that benefits from any advertising revenue.

37. While it is difficult to calculate the exact average cost, upon information and belief, the average cost of ownership over three years exclusive of individual credit card transaction processing costs is approximately $1,740 or $580 annually. The upfront costs for the large majority of pricing plans are $200 or less with most of these being no initial cost. The highest upfront option was where the medallion owner chose to pay $1,750 upfront with significantly lower monthly fees and retain a higher percentage of the advertising revenues. All signed contracts included some type of revenue share for the medallion owner.

38. Leases between drivers and medallion owners and medallion agents are regulated by the TLC. This includes circumstances where a driver leases a car and medallion or just a medallion. The last time that lease cap fees were raised was in

March 2004 at the time of the historic fare rate increase. At that time, because of a much smaller increase to the lease caps than overall fare, drivers benefited from approximately 75 percent of the fare increase. In March 2007, drivers received one hundred percent of the additional ten percent fare increase. Upon information and belief, no one has petitioned the TLC for amendments to increase the lease cap.

39. In circumstances where a driver owns his vehicle but leases a medallion (commonly referred to as a driver owned vehicle or "DOV"), there are additional business arrangements between the DOV and an agent. It is common for an agent to finance the purchase of a taxicab and/or automobile insurance by the DOV. The TLC does not regulate this relationship anymore than the TLC can dictate finance terms between a major banking institution and a DOV.

40. One of the plaintiffs alleges that he was forced to install rooftop advertising in connection with the systems. At least one contracting medallion agent has advertised that installation of rooftop advertising will offset the cost of the systems.

41. The TLC took other steps to mitigate the costs on behalf of the medallion owners. In Section 16.3.1 of the mandatory terms and conditions between medallion owners and vendors in Owner-Contractor Form ("Attachment OCF"), the vendors are required to indemnify an owner or driver for any summonses received with respect to the malfunction of the systems so long the owner or driver met its malfunction reporting requirements to the vendor.

42. A typical taxicab conducts 25 trips per shift, often twice per day. There are 13,087 licensed taxicabs in the entire City of New York fleet. TLC reports that there are over 200,000,000 taxicab trips per year. With the cost of these systems averaging less

than $600 per year, the average cost for installation and maintenance of these systems averages less than $0.10 a ride. There are additional fees for rides paid for with credit cards. For July 2007, when credit cards were an option, TLC calculated just over 3% of riders paid with a credit card. The average charge, fare, tip, and tolls, averaged just under $20.00. TLC calculated that for these trips, the average tip was greater than 22%, which is much greater than the reported industry average of 10% to 15%. TLC also determined that the average service charge per credit card transaction was just under $1. For the month of July 2007, TLC estimates that an owner/driver with the systems installed paid approximately $3 for the system and $3 for the credit card processing per shift. This compares with the additional fare income of over $65 from just the 2004 fare increase.

Dated:     New York, New York
           September 24, 2007

_____
Ira Goldstein