UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LOUBERT ALEXANDRE et. al.,

                Plaintiffs,

- against -

THE NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION et. al.,

                Defendants.
------------------------------------------------------------------x

Civil Action No. 07-8175

### PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs respond to defendants legal assertions as follows:

**I    PLAINTIFFS HAVE ESTABLISHED THEIR NEED FOR A PRELIMINARY INJUNCTION**

Plaintiffs and defendants do not disagree about the standards which the Court is obligated to apply concerning the grant of a preliminary injunction. Plaintiffs and defendants do disagree about whether plaintiffs have established irreparable harm. Defendants conclude that plaintiffs have not establish harm which cannot be "rectified by financial compensation." (Defendants' Memo p. 26) Plaintiffs believe that the permanent invasion of, and change to, their vehicles which owner-operator plaintiffs must experience to accommodate TTS is "irreparable," the burden placed on DOVs, such as Haq, of having his vehicle permanently altered to accommodate TTS is "irreparable," and the loss of income caused by transaction fees on credit/debit card transactions fees, which the garage drivers must face without any direct control over TTS is substantial enough to warrant preliminary relief. Plaintiffs remind the Court that the degree of invasion is not significant, and the loss of future revenue can be taken into account in weighing

the harm which will befall a party if preliminary relief is not granted.  See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); case and Yong Ki Hong v. KBS America, Inc., 2002 WL 338187 (N.Y. Civ. Ct. 2002).

II    PLAINTIFFS HAVE DEMONSTRATED A "TAKING" WITHIN THE MEANING OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND THE NEW YORK STATE CONSTITUTION

Owner-operator plaintiffs and the DOV plaintiff have certainly demonstrated a physical invasion of their property because TTS encroaches upon their property.  Garage driver plaintiffs have a constitutional property interest in their hack licenses - see plaintiffs' memo pp. 7-8 - so even if the encroachment is not physical there can be a taking of their constitutional property as well. Plaintiffs and defendants agree that the Court must engage in a balancing test when the taking is not a physical appropriation.  Penn Central v. New York City, 438 U.S. 104, 124, 98 Sup. Ct. 2646 (1978).  Contrary to defendants' assertion (Defendants' memo p. 18), plaintiffs do claim that they cannot operate their businesses profitably (See *) As set forth in plaintiffs' affidavits, and specifically in plaintiff NYTWA's Reply Affidavit ("NYTWA Reply Aff."), sworn to on September 25, 2007 ¶ 8.a., the costs to plaintiffs are far greater than set forth by the defendants, and no amount of money can set right the unconstitutional invasion of plaintiffs' vehicles. (Defendants' Memo p. 18).

Truly, plaintiffs do not assert that they operate outside of regulation (see Defendants' memo p. 19), but rather that defendants have never attempted to make the slightest showing that the TTS amendments "achieve the legislative end." (Ibid.)  In Keystone Bituminous Coal Ass'n v. DeBenedicti, 480 U.S. 470 (1987), the legislative end was to protect the environment by protecting the ground surface from subsidence.  In Concrete Pipe & Products v. Construction

Laborers Pension Trust, 508 U.S. 602 (1993), the legislative end was protecting workers' pensions by enforcing withdrawal liability under ERISA. In Branch v. United States, 69 F.3d 1571 (Fed. Cir. 1995), the "legislative end" was upholding the solvency of banks by enforcing certain contingent liability claims against parties who had not expected their contingency to be reached.  In the instant case, there is no equivalent "legislative end." The circumstances which developed were that when the drivers and plaintiff NYTWA sought a fare increase, they were met with requirements of "technology enhancements" as a determination already made by defendants.  Plaintiffs agree with defendants' quote of Penn Central that "[a] regulation which burdens a property right 'may constitute a 'taking' if [it is] not reasonably necessary to the effectuation of a substantial public purpose" Penn Central, 438 U.S. at 127" (Defendants memo p. 20) See Reply Affidavit ¶ 3.  Providing a copy of Zagat's to every taxi passenger on a PIM does not match subsidence, pension guarantees or bank safety as an appropriate "legislative end" and does not warrant the infringement of plaintiffs' property. There has never been any good faith attempt to explore the drivers' concerns about privacy or a taking of their property by defendants (Ibid.).  There certainly was never any "agreement" to accept the technology enhancement as a quid pro quo for fare increases, which, even if arguable, hardly justifies as a "legislative end" under TLC's mandate.

Nor is MCQ's Enterprises Inc. v. Philadelphia Parking Authority, 2007 U.S. Dist. LEXIS 2130 (E.D.Pa. 1/11/07), cited by defendants in their letter to the Court dated September 23, 2007, dispositive of this case.  That case arose in a completely different procedural setting. Plaintiff, a taxi dispatch service which relied upon GPS to dispatch its own cabs, argued that it was being subjected to a unconstitutional taking, when the City required everyone not only to install a

particular kind of GPS, but to coordinate dispatch with one another. Plaintiff did not object to the installation of the mandated form of GPS, but rather having to coordinate its dispatch service with its competitors, in whose behalf, it urged the Court, it would now be working <u>MCQ's Enterprises Inc.</u> v. <u>Philadelphia Parking Authority</u> (Slip Opinion p.4). The Court found that while plaintiff might have a "colorable regulatory takings claim," (Slip Opinion p.4) which might be proven at trial, the relief would then lie in damages and the coordinated dispatch service need not be enjoined.

Although also distinguishable from the instant case, <u>MCQ's Enterprises Inc.</u> also touches on another of defendants' arguments: plaintiffs have no claim to their routes as proprietary information. In <u>MCQ's Enterprises, Inc.</u>, plaintiff sought to establish its customer list as proprietary information, under a state trade secret statute, but the Court deflected that claim by responding that a list of customers gives plaintiff no inside track as to who needs "to hire a cab at any given point in time." (Slip Opinion p. 13). Defendants argue that a driver's route cannot possibly be proprietary because streets are public property and any route a driver takes can be observed by everyone. While everyone may observe the comings and goings of taxicabs - should they choose - and unlike plaintiff in <u>MCQ's Enterprises, Inc.</u> whose list did not generate "competitive advantage (<u>Ibid.</u>)," those routes demonstrably can be turned to a "competitive advantage," because the driver who can traverse the streets in the shortest amount of time is available to make the most pick-ups, even if such a claim might be characterized as unusual or "not at all similar to the types of information that the courts consider as proprietary" (Defendants' Memo p. 21).

III    PLAINTIFFS HAVE ESTABLISHED THAT THEIR RIGHT TO PRIVACY UNDER THE FOURTH AMENDMENT AND THE NEW YORK CONSTITUTION IS BEING VIOLATED

Defendants baldly assert (Defendants' Memo p. 11) that because TLC is only capturing the same data it has always captured that plaintiffs have asserted no right to privacy. As particularly shown in paragraph 9 of NYTWA's reply affidavit, plaintiffs demonstrate that TTS, particularly GPS, gives TLC the ability to reach far beyond the limits of any data it has ever previously sought to capture, and search into so deeply into the private lives of drivers that such scrutiny crosses any reasonable boundaries. GPS has no off button, and this technology means TLC can keep track of drivers as it never has before. TLC's own bland assurances of off-duty privacy are hollow, because its contract provision barring release of release of even that information by the technology vendors is not restricted if the technology purchasers contract with the technology vendors to purchase it from the vendors (Goldstein Dec ¶ 16). The power to curb any use of that data, like so many powers TLC denies to itself, lies beyond its regulatory purview.

Next defendants argue (Defendants' Memo p. 12) that drivers have no reasonable expectation of privacy. They conduct their business in motor vehicles on public streets, so they must work without any expectation of privacy. However, because they are always in public does not mean that they wish share their proprietary methods of dealing with the challenges that the public streets present. See last paragraph of point II above. Citing Vega-Rodriguez v. Puerto Rico Telephone Co., 110 F.3d 174 (1st Cir 1997), defendants then compare drivers - who are independent contractors and not employees - to employees, arrogating to themselves the rights of employers at the same time TLC washes its hands of responsibility to DOVs and garage drivers. Defendants do correctly state that "confidential matters that have been found entitled to privacy

- 5 -

protection under the Fourteenth Amendment" must be "fundamental." (Defendants' Memo p. 13), but do not allow for the same possibility that even the Supreme Court itself did in United States v. Knotts, 460 U.S. 276 (1983) that "fundamental" rights may evolve as circumstances evolve. GPS is such an evolution and the area of privacy requires re-examination when GPS is utilized outside the confines of the employer-employee relationship.  Moreover, while it is true that marital intercourse might not be protected if conducted on a street corner (Defendants' Memo p. 14), plaintiffs work in public, but have never been required to publically declare the routes they follow in maximizing their profit opportunities. See last paragraph of Point II above.

IV  PLAINTIFFS OTHER THAN MEDALLION OWNERS HAVE STANDING AND NAMED PLAINTIFFS WILL REPRESENT THE CLASS

Defendants themselves cite several cases which state that to have standing, a party must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," that the injury "fairly can be traced to the challenged action" and is "likely to be redressed by a favorable decision." (Defendants' Memo p. 23) All individual plaintiffs have outlined in their affidavits how they are being harmed imminently and directly by the installation of GPS.  Just because TLC chooses to abdicate its responsibility to ensure that the cost of TTS is bourne only by those who will derive benefit from it - by claiming to find within its ostensibly boundless public purpose no power to regulate the flow of TTS costs between agents and DOV and garages and their lease drivers, it cannot hide behind the rationale that because it placed the burden only on medallion owners, those who do not own a medallion are not being directly and irrevocably harmed, and thus do not have standing to assert the wrong

being perpetrated against them. The harm to some by way of invasion of the DOVs' property and the garage drivers increased charges and fees is not at all speculative as defendants maintain, but rather too imminent and too real to avoid. As for plaintiff NYTWA, while it has joined the litigation to help all drivers properly state their claims, it asserts for itself only its opportunity costs, as it did in Padberg v. McGrath-MeKechnie, 203 F.Supp.2d 261 (E.D.N.Y. 2002). See Complaint Subsection C.c. of the Wherefore Clause. Its monetary claims are not put forward in this preliminary injunction motion, and the Court need not deal with at this time.

Lastly, there are some unstated considerations which need to be articulated. The great bulk of taxi drivers are immigrants. Many have fled repression and terror in their own countries, and live in a state of wary trepidation concerning government's benignity toward them. They look different than the majority they move among, and pray to different gods than the majority. Their standard of living does not approach that of the clientele they serve. They work in an industry traditionally abandoned to the lowest economic strata which industry is now far too fragmented to allow them to draw upon the strength to which the mass of their number should entitle them. They are easy to target and easy to victimize. They are the same people who have been cowed by governmental indifference into not reporting the crime they observe in the streets of Newark, New Jersey and who are hounded off the streets of our suburbs when they congregate to scratch out a day's living wage. This lawsuit is a chance for them to confirm that the power of government addresses their fears, wants and needs as well as those of the different majority, and that they are not nameless and numberless.

Dated:   September 25, 2007          Respectfully submitted,
         New York, New York          KOEHLER & ISAACS

By: *[signature]*
Malcolm A. Goldstein (MAG 4602)

By: *[signature]*
Naureen Rashid (NR 5803)

Attorneys for Plaintiffs
61 Broadway, 25th Floor
New York, New York 10006
(917) 551-1300