UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LOUBERT ALEXANDRE et. al.,

            Plaintiffs,

- against -

THE NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION et. al.,

           Defendants.
------------------------------------------------------------x

Civil Action No. 07-8175

REPLY AFFIDAVIT OF
NEW YORK TAXI WORKERS
ALLIANCE

State of New York  )
                   )ss:
County of New York)

    Bhairavi Desai, being duly sworn, deposes and says:

    1. I am the Executive Director of the New York Taxi Workers Alliance and make this affidavit in reply to the declarations and affidavits submitted by defendants in opposition to plaintiffs' motion for a preliminary injunction.

    2. Defendants have argue vaguely that drivers "agreed" to the Taxicab Technology System ("TTS") in return for fare increases granted in 2004 by the Taxi and Limousine Commission ("TLC"). Even defendants' own statement of the "Origins of the Taxi Technology Project," contained in the Declaration of TLC's Andrew Salkin made September 23, 2007 ("Salkin I"), belies that notion. He explains in paragraph 4 of Salkin I that several organizations petitioned TLC for fare increases in 2003, including NYTWA. NYTWA had good reason to petition for a fare increase in 2003. There had not been a fare increase in seven (7) years, since 1996!

    3. The next paragraph, Paragraph 5 of Salkin I, then begins with the startling statement: "[t]he Commission's ultimate conclusion was that taxi passengers should get something in return

for higher taxi fares." In other words, TLC unilaterally determined before any proposals concerning fare increases were discussed with anyone that there would be no consideration of fare increases without consideration of "customer service enhancements." TLC thus candidly admits that even though drivers had not had an increase for seven years, it presented "customer service enhancements" to all of them as a fete accompli, not a departure point for discussion. Certainly NYTWA always has lobbied for fare increases, but never by expressing support for such fare increases did it signal at any time that it had agreed to accept "customer service enhancements" in general or the specific package presented as TTS as any kind of a quid pro quo for fare increases.

4. Representatives of NYTWA spoke consistently against the imposition of Global Positioning System ("GPS") technology, even at the first public hearing on March 30, 2004. (See March 30, 2004 TLC hearing transcript, submitted by TLC as Exhibit B to Salkin I, at pp. 78ff) When NYTWA's representative tried to broach the issue of drivers' privacy at a TLC hearing in May, 2005, rather than hearing that person's views and engaging in an open exchange of opinions, TLC branded the speaker as racist and revoked his speaking privilege (May 4, 2005 TLC hearing transcript, Exhibit C to Salkin I, pp. 48ff).

5. NYTWA also raised concerns as early as March 30, 2004 about the installation of credit/debit card readers, particularly that there ought to be some minimum transaction level to protect drivers from losing income from transaction fees. (March 30, 2004 TLC Hearing Transcript, Exhibit B to Salkin 1, pp. 21-2).

6. In Salkin I, Salkin then goes on to state, essentially, that all the elements of TTS were adopted by TLC as of March 30, 2004 (Salkin I ¶ 10). This simply is not true. While a gener-

alized plan for consideration was authorized, even the TLC Commissioners recognized that there would have to be a great deal more discussion, consultation and refinements of the technology before it was ready to be installed in every taxicab in New York City. (Ibid., pp. 227+ff).

7. Defendants complain that plaintiffs very inconveniently have commenced their suit at the very last moment. The reason why plaintiffs feel compelled now to assert their constitutional protections is that they are facing suspension of their medallions and loss of their livelihood immediately after October 1, 2007, when TTS becomes mandatory. Past airings of their concerns about matters such as cost and privacy received no response in the public hearings, and, because TLC always acted as if TTS were pre-ordained, were never addressed in any meaningful way in the scattered discussions between NYTWA and TLC. Up until the time they filed, plaintiffs hoped that some reasonable accommodation of their property and privacy concerns could be reached with TLC through mutual accord. NYTWA and representatives of the City even asked plaintiffs to postpone filing the lawsuit at the end of August, 2007 while talks between NYTWA and the Mayor's office continued.

8. However, defendants have imposed October 1, 2007, inflexibly, as the deadline for the installation of TTS and the information drivers actually received about TTS was either non-existent or contradictory. Defendants repeat the same kinds of contradictions in the papers they submit to this Court. Their representation concerning the costs of implementing TTS, the inconvenience of installing TTS and the number of trials of TTS conducted are even inconsistent from document to document within their submission:

    a. Concerning cost, defendants state that the cost is only imposed on medallion owners (Affidavit of Andrew Salkin, sworn to September 24 ("Salkin II") ¶¶ 28), and that

plaintiffs' installation and maintenance cost numbers were "pure fiction or were the highest possible prices a vendor could charge," (Declaration of Ira J Goldstein ("Goldstein Dec." ¶34), made September 24, 2007, ¶34), that vendors offered a wide variety of pricing options (Ibid., ¶ 35) and that "all signed contracts include some kind of revenue share [from advertising] for the medallion owner. (Ibid., ¶ 37)" The Amended Affidavit of Mamnunul Haq, sworn to September 21, 2007, belies the fact that drivers other than medallion owners are bearing the inconvenience as well as the installation and maintenance cost of TTS. Goldstein's reply to that allegation is, "yes" (Goldstein Dec. ¶ 41), and offers the weak excuse that TLC does not "regulate this [agent-DOV] relationship." (Goldstein Dec. ¶ 39). Plaintiffs' cost estimates could hardly be termed "pure fiction" because they were copied verbatim from TLC's postings on its own website. Plaintiffs owner-operators certainly never learned about the "wide variety of options" or the "share of revenue" they would receive when they themselves attempted to obtain information from the vendors (See Chartelain Affidavit ¶ 18), a matter defendants do not even choose to directly address, claiming that mailings, "expos" and "outreach" fulfilled their responsibility (Goldstein Dec. ¶¶ 28 - 32).

      b. Concerning the importance of October 1, 2007 as the installation of TTS, TLC's Goldstein suggests that the installation is not even permanent and involves only a "few screws."(Goldstein Dec. ¶ 25). CMT even asserts that "[n]ew partitions were purchased and custom cut to accommodate the new technology," (Davis Aff. ¶ 12) and later in the same paragraph claims that the need to vigorously pursue the "slow and laborious task of installations" (Ibid.) of the new technology outweighs any delay that would be gained by the Court's staying such installation while it fulfills its obligation to make an thorough and reasoned examination of

plaintiffs' constitutional rights[1]. In the vendor affidavits, VTS asserts that it has invested $10,000,000 in developing TTS (Affidavit of Amos Tamam, sworn to September 21, 2007 ("Tamam Aff.") ¶ 4) and CMT affirms that it has invested $17,000,000 in TTS (Affidavit of Jesse Davis, sworn to September 24, 2007 ("Davis Aff") ¶4), and each will face "significant harm" (Tamam Aff. ¶ 7) or even bankruptcy (Davis Aff ¶ 11) if TTS is delayed even a single day beyond October 1, 2007. However, that urgency should be nothing new or different for them. TLC has gradually postponed the original TTS installation since November, 2005, and the significance of October 1, 2007 as a "drop-dead" date must be weighed against the violation of protections which the drivers will experience if TTS goes forward without a proper assessment of their constitutional rights. Moreover, Davis asserts that if any driver does not want the technology, there are "11,000+ vehicles lacking the enhancements" (Davis Aff. ¶25) for anyone who does not want the new technology, which contradicts TLC's argument that there are a bare few holdouts against the overwhelming popularity of TTS (Salkin I, ¶ 26), and gives credence to plaintiffs' assertion that if owner-operators had not been forced to agree to installation under the duress of medallion suspension and loss of livelihood, those "11,000+ vehicles" would remain TTS free permanently.

  c. Concerning tests of reliability of TTS, which will impact 13,000+ taxicabs permanently, Goldstein declares that "live" testing of TTS was conducted by each of the four vendors it selected, using 50 cabs over a "minimum 45 days", or a grand total of 200 taxicabs for less than two months (Goldstein Dec. ¶ 18) completing perhaps 50 trips a day (Goldstein Dec. ¶ 42), possibly a maximum of 450,000 trips. Yet one of the vendors, CMT says it alone "has

---

[1] As to de-installation, Davis basically says "never mind" (Davis Aff ¶ 8).

conducted over 2.3 million trips with vehicles duly equipped with the subject enhancements." (Davis Affidavit ¶ 10). To the drivers, these numbers only add up to incoherence. It should be noted that TLC previously tested another technology, a television monitor in the rear of the taxi - the so-called "TV taxi," which was quite similar to the PIM, for twelve (12) months in a pilot program before cancelling it altogether. It is astounding to NYTWA that a more complicated program such as TTS requires so much less pilot testing, and that TLC so willing and uncritically accepts vendors' successful results.

9. TLC states that it is collecting the same information it did before. This is not true. Because of the way GPS works, each taxi is tracked in real time, whether on-duty or off. It cannot be stated too often that GPS has no "off" button. Tracking must be conducted by the technology vendors, and can be done by any purchaser of the technology, if the purchaser arranges for such tracking with the technology vendors. Since defendants and the technology vendors whose affidavits support defendants all talk about advertising revenue to be earned from the implementation of TTS, the tracking information clearly is designed to allow advertisers to transmit their advertisements over the PIM in real time, thus producing business for the advertisers and a profit for everyone else who has lobbied so hard for the installation of TTS. TLC claims no power to regulate the advertising revenue generated by TTS operation, takes no position about the arrangements the vendors make with the large TTS purchasers (Goldstein Dec. ¶ 36) and claims that its contracts with the vendors adequately protect drivers because vendors are prohibited from "disseminating [off duty] trip sheet data" (Goldstein Dec ¶16). That prohibition, however, is modified, as Goldstein recognizes, by any arrangement the technology vendor and technology purchaser agree to make between themselves. That very prohibition,

weak though it is, confirms that the vendors will have both on-duty and off-duty information available. Apparently, vendors will have the ability to make on-duty vehicle location information available to TLC in real time (Salkin II Dec. ¶ 9) which may even lead TLC to change how it regulates the drivers (Salkin II Dec. ¶ 14). This is definitely information that TLC has never previously sought and goes far beyond what TLC has had available to it until now. In fact, TLC's assertion that it will use this information to make regulatory changes, such as ordering more drivers to be on duty at 2 a.m., is one of NYTWA's profound concerns.

10. Just as TLC has made its economic forecast about the impact of TTS on drivers, so too has NYTWA constructed its own chart of how TTS, and specifically the use of debit/credit card readers will impact on drivers:

|  | Credit Card Fare | Cash Fare |
|---|---|---|
| Fare | $20.00 | $20.00 |
| Tip | $1.00 | $1.00 |
| Projected Increase in tip - 18% | .18 |  |
| Total Fare | $21.18 | $21.00 |
| 5% surcharge deducted by garage/broker before reimbursing drivers | $1.06 |  |
| Total Final Fare | $ 20.12 |  |
| Amount driver loses in cash vs. credit card fare | $ 0.88 |  |
| Amount lost with 30 trips | $26.70 |  |
| Amount lost per month (4 weeks times 30 such credit card fares/week) | $106.80 |  |
| Amount lost per year( 52 weeks times 30 such credit card fares per week) | $1,388.40 |  |

- 7 -

_____
Bhairavi Desai

Sworn to before me this
25th day of September, 2007

_____
Notary Public

MALCOLM A. GOLDSTEIN
Notary Public, State of New York
No. 60-6580040
Qualified in Westchester County
Commission Expires May 31, 2010