UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
LOUBERT ALEXANDRE, YVON AUGUSTIN,
MAX CHARTELAIN, WILFRED GERMAIN, CLAUDE
LESSAGE, and JEAN PIERRE, INDIVIDUALLY AS
OWNERS OF YELLOW CAB MEDALLIONS IN THE
CITY OF NEW YORK AND ON BEHALF OF A CLASS
OF ALL OWNERS SIMILARLY SITUATED, AS WELL AS       Civil Action No.
INDIVIDUALLY, TOGETHER WITH MAMNUNUL HAQ
and ASIM AKHTAR, AS HOLDERS OF HACK
LICENSES IN THE CITY OF NEW YORK AND AS
REPRESENTATIVES ON BEHALF OF A CLASS OF
ALL HOLDERS OF HACK LICENSES IN THE CITY OF
NEW YORK, and the NEW YORK TAXI WORKERS
ALLIANCE,                                          AFFIDAVIT OF
                                                   MAMNUNUL HAQ
                    Plaintiffs,

        - against -

THE NEW YORK CITY TAXI AND LIMOUSINE COM-
MISSION, MATTHEW DAUS, AS COMMISSIONER
/CHAIR OF THE NEW YORK CITY TAXI AND LIMO-
USINE COMMISSION, AND THE CITY OF NEW YORK,

                    Defendants.
------------------------------------------------------------------------x

STATE OF NEW YORK    )
                     SS.:
COUNTY OF NEW YORK   )

    MAMNUNUL HAQ, being duly sworn, deposes and says:

    1.    I am the plaintiff in this proceeding and make this affidavit in support of the

instant motion for a temporary restraining order and preliminary injunction.

    2.    I reside in the county of Brooklyn, New York. I am a small business owner who

owns a yellow cab taxi vehicle. My Vehicle Identification Number ("VIN") is

2FAFP70W57X117609. My hack license number is 466852. I have had my hack license since

approximately since 1992.

3. I bought my yellow cab vehicle, which is a 2007 Ford, on January 29, 2007, for approximately THIRTY THOUSAND SEVEN HUNDRED ELEVEN DOLLARS ("$30,711.50").

4. Since about 1993, my sole means of livelihood for the last fourteen years has been to drive as a New York City yellow cab driver. I currently drive my yellow taxi vehicle approximately six days a week to earn my living.

5. My monthly operating costs of my yellow taxi cab are approximately FIVE THOUSAND SIX HUNDRED DOLLARS ("$5,600.00"), itemized roughly as follows:

| | | | |
|---|---|---|---|
| A) | Weekly Medallion Lease: | | $800.00 per week (At 12% Finance Charge) |
| B) | Yellow Cab Vehicle Loan Payment: | | $265.00 per week (At 12% Finance Charge) |
| C) | Weekly Credit Card Fee: | | $5.00 per week |
| D) | Gas: | | $1,032.00 per month |
| E) | Oil Change: | | $100.00 per month |
| F) | Tax Stamp: | | $1,000 per year |
| G) | Vehicle TLC Inspection: | | $150.00 per year |
| H) | Motor Vehicle Registration Renewal: | | $25.25 per year |
| I) | License Renewal Fee: | | $120 every two years |

    J)  Annual Drug Test Fee:      $25 per year

    K)  Wear and Tear/Maintenance:  $2000 per year

  6.  I drive the night shift and I have a partner who drives the day shift. He pays me FIVE HUNDRED SIXTY DOLLARS ("$560.00") per week. I alone, however, am solely responsible to pay for needed repairs to the taxi and for payment to the broker for the weekly lease payments.

  7.  Defendant New York City Taxi and Limousine Commission ("TLC") has declared mandatory that an before August 1, 2007, owner- operators must sign a contract for the installation of the Taxi Technology System ("TTS") with one of their chosen vendors. The pieces of equipment necessary to operate TTS are: 1) a text message box; 2) a credit card machine; and 3) a Passenger information Monitor and 4) software to create an electronic trip sheet, which includes GPS technology. I must allow TTS to be installed inside of my taxi cab on my next safety inspection date, on approximately October 17, 2007.

  8.  For installation of the TTS technology, the TLC's website cites the imposition of the following costs on the owner-operator: a) an upfront installation cost, which I understand the TLC has estimated to be between "$10 and $4,115"; b) a monthly service fee which I understand the TLC has estimated to cost me "between $43 and $200"; c) the maximum costs of the technology over the term of a contract as "between $2,900 and $7,200 based upon the contract between the vendors and the TLC".

  9.  The TLC claims that it is placing the costs of the installation and maintenance only upon owner-operators; this is simply false.

  10.  The TLC's mandated TTS is going to cause irreparable harm to me in that the TLC is authorizing a direct and permanent physical alteration of my purchased yellow taxi cab

vehicle- my property- without my consent and is taking money out of my pocket to pay for the burdensome expense of the TTS.

11.  The TLC's new TTS rules, which are posted on the website, also mandate that if the technology malfunctions, I am required to report it within two hours and such malfunction must be repaired within forty eight hours by the particular vendors' service center. Each time the technology malfunctions, I will have to take my vehicle off the road and will lose my livelihood while I take the taxi to the repair shop and for the time period my taxi is kept off the road while the malfunction is being fixed, without any compensation by the TLC.

12.  The TLC's new rules also say that I must bear the cost of the transaction fee for each credit and debit card transaction which they have estimated will be no less than 2.5% and may be as high as five percent (5%) of each fare. I believe that such transaction fees will result in a huge loss of revenue for me.

13.  Not only is the TLC making me pay for the forced installation of TTS into my property, but the taxi garages and brokers are already passing on the costs to me and all other non-owner operators.

14.  In early March 2007, the garage from whom I lease my medallion and purchased my vehicle, issued a notice to myself and all DOV drivers. See Copy of All Taxi Management Notice annexed hereto as Exhibit A. This notice says that effective March 5, 2007, all DOVS will have to pay the following costs: a) $1,000 for tax stamp per year; b) $150 for Vehicle TLC Inspection; and c) $25.25 for Motor Vehicle Registration Renewal per year. This totals to me paying an extra ONE THOUSAND ONE HUNDRED SEVENTY FIVE DOLLARS AND TWENTY FIVE CENTS ("$1,175.25") per year.

14A.  Pursuant to my Medallion Lease and Taxicab Purchase Contract , I agreed to pay

a total of ONE THOUSAND SEVENTY DOLLARS ("$1,070.00") to my garage. See Copy of Medallion Lease and Taxicab Purchase Contract annexed hereto as Exhibit B. Effective March 5, 2007, I am *actually* paying the total of ONE THOUSAND NINETY TWO DOLLARS ("$1,092.00") to my garage. (The extra $1,175.25 per year referred to in paragraph 14 above is divided by 52 weeks to calculate the approximately extra $22.00 I am paying weekly to the garage).

15. Before TTS, I was not required to pay these fees. I believe that now, as the installation date of the TTS is approaching closer, the garage is passing on these costs to me.

16. Also, my contract clearly says that in addition to the lease and car payments, I am obligated to pay a fee for the installation, use and maintenance of the credit card accessible equipment *and* GPS. It also states that I must pay a fee for the credit card transaction. See Paragraph 4 (b) of Annexed Exhibit B.

17. I simply cannot afford the burden of these extra costs and if TTS is imposed, I will not be able to support my three children, twins who are age 14 and a 3 year old..

18. It is more than obvious that the garage's imposed increased costs which I am suddenly required to pay, along with the TLC mandated credit and debit card transaction fees, are ways to make me pay for the TLC's TTS.

19. If the TLC forces the owner-operators to sign the contracts and forces the technology to be installed inside of my yellow cab, I will face the irreparable harm of the permanent alteration of my property and of losing my livelihood because I cannot afford the extra TTS costs.

20. I also feel that the GPS component of the TLC mandated technology is an invasion of my privacy because it will track me every single minute of the day, seven days a

week and twenty four hours each day, even when I am off-duty and using my yellow taxi vehicle for my own personal use.

21. The yellow taxi cab vehicle is my property and I do not think its fair that the government should force me to rip up my taxi cab and put in all this new technology into my property when I never asked for it, I have no desire for it, and it is too expensive for me to afford. When I purchased my taxicab I did not know that one day the government would be allowed to reach into my personal property and forcibly install four pieces of physical gadgetry and GPS, while making me bear the exorbitant cost of operating all of this technology. My investment in the yellow taxi cab vehicle should be looked at no differently than that of any other small business owner.

22. If the court does not intervene, I will lose my livelihood and the TLC will permanently change the inside of my yellow taxi cab forever without my will.

MAMNUNUL HAQ

Sworn to before me this

23rd day of August, 2007

NOTARY PUBLIC

KATHY ROSADO
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01RO6142270
QUALIFIED IN BRONX COUNTY
MY COMMISSION EXPIRES MAR. 13, 20 10

# EXHIBIT A

# All Taxi Driver Owned Vehicles (DOVs)

Effective Monday March 5, 2007 **_all DOVs_** will need to pay for the following vehicle expenses:

| | |
|---|---|
| * Motor Vehicle Tax Return (Tax Stamp) | $ 1,000.00 year |
| * Vehicle TLC Inspection | $ 150.00 year |
| * Motor Vehicle Registration Renewal | $ 25.25 year |
| Annual Total | $ 1,175.25 year |

All Drivers will have an option on how they wish to pay this amount. You can choose to pay it in a lump sum, or $ 97.00 monthly, or $22.00 weekly in advance.
If you do not make an election, it will be deemed that you have chosen to pay $22.00 weekly, and the weekly amount will be added to your vehicle lease payment.

**To offset these charges,** you will be allowed to arrange through our office for the placement of a roof top advertisement on your vehicle. If you choose to do so, we will credit your lease payment by the sum of **$ 100.00 per month. (certain conditions will be required)**

Roof top advertising is **only** available with approval of Management. All others must be removed.

If you wish to place a roof top advertisement on your vehicle, please make a selection and see Merab or Ana.

    Roof Top    ☐              Weekly Lease Payment    ☐

Medallion Number _____      Hack Number _____

Vehicle Owner Name _____      Phone Number _____

Address _____      Cell Number _____

_____      E-Mail _____

Signature _____

# EXHIBIT B

## MEDALLION LEASE & TAXICAB PURCHASE CONTRACT

**MANAGER**
ALL TAXI MANAGEMENT INC.
41-25 36th STREET
LONG ISLAND CITY, NY 11101
Tel :( 718) 361-0055 Fax :(718) 361-7477

CONTRACT DATE: 01/25/07

PERIOD: 130 WEEKS

WEEKLY LEASE AMT: **$800.00**
1st PAYMENT DUE: 01/29/07

MEDALLION NO: 3M64

OWNER: BISON TRANS CORP

VEHICLE MAKE/YR: 2007 FORD

VIN: 2FAFP70W57X117609

DEALER: MANHATTAN FORD

**DRIVER**
NAME: HAQ, MAMNUNUL
ADDRESS: 1504 38TH ST #2F
             BROOKLYN, NY 11218
TEL: (718) 686-8745, (917) 856-6975
DMV LIC NO.: 589 171 150

HACK LIC NO: 466852

BIRTH DATE: 09/03/62
SOC.SEC. NO.: 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

**PAYMENT TERMS**

| | |
|---|---|
| LEASE PYMT DEPOSIT: | $ 800.00 |
| ADVANCE LEASE PYMT: | |
| VEH PURCHASE PRICE: | $ 27,600.00 |
| SALES TAX – 8.375% | $ 2,311.50 |
| SUB TOTAL: | $ 30,711.50 |
| LESS CASH DOWN PYMT: | $ 1,000.00 #100059 |
| NET TOTAL: | $ 29,711.50 |
| FINANCE CHARGE: | **12% PERCENT** |
| WEEKLY CAR PYMT: | $ 265.00 |
| WEEKLY CREDIT CARD | $ 5.00 |
| TLC, DMV & TAX | $ |
| WEEKLY LEASE PYMT: | $ 800.00 |
| WEEKLY COLLISION PREM.: | |
| TOTAL WKLY PYMT: | $ 1,070.00 |

Driver hereby agrees to lease the above medallion (including the taximeter, rate card and roof light) from Manager and purchases the above vehicle (a fully "hacked up" taxicab) from Dealer under the following terms and conditions:

1. Upon original driver's full and complete performance of all the terms of this agreement he will receive a bonus of one additional week to use the medallion free of charge. As demonstration of manger's good will towards the original driver the bonus week will be awarded one week prior to the first weekly lease amount due stated on the first page agreement. Should driver default on any terms of this agreement such bonus is forfeited and manager is entitled to collect weekly medallion lease fee of the bonus week as the date of the agreement. The bonus shall not extend to the benefit of any other driver to whom the original driver may transfer the car and the medallion lease, even though such subsequent driver may complete performance of the original driver's agreement.

2. Driver has reviewed the contract information stated above and agrees that it is true and correct and will pay all stated amounts in person on Monday of each week by certified check or money order. Driver's failure to make any payment when due will immediately result in driver being in default of this contract.

3. Driver shall obey all rules and regulations established by the New York City Taxi & Limousine Commission (TLC) together with all changes and/or amendments to those rules and regulations as well as all rules and regulations established by Manager now or in the future. This includes all TLC and/or Manager's standards providing for the operating condition and repair of the vehicle. Any failure to maintain the vehicle in good condition shall be deemed an immediate default of this contract.

_____
Driver

_____
Manager

4. In addition to the lease and car payments stated above, Driver shall also be obligated to pay the following:

    a.) All tickets for violations of the New York City Parking Violations Bureau, Taxi & Limousine Commission, New York State Department of Motor Vehicles, or any other governmental entity authorized to issue rules and regulations governing motor vehicle operation and control over public roadways and thoroughfares.

    b) A fee for the installation, use and maintenance of the credit card accessible equipment and GPS (Global Positioning System). Driver shall also pay a percentage from each credit card transaction.

    c) Repair or replacement costs required to maintain the vehicle, medallion, ride fare meter and roof light in proper working conditions. The medallion, meter and roof light shall be returned to Manager in good condition upon the expiration or earlier cancellation of the lease. Any tampering with the meter shall be deemed an immediate default of this contract. Manager shall not be responsible to credit Driver for any down time which may result in providing any repairs to the vehicle.

    d) Driver's personal taxes or taxes of driver(s) named on the rate card, as well as all applicable sales taxes. Manager must pre-approve and may charge additional fee(s) for adding driver(s) to rate card.

    e) **Fire, theft and collision insurance covering the vehicle with a deductible not exceeding $----------- to be paid by the Driver in the event of such loss or damage to the vehicle as long as Manager continues to finance the vehicle. Driver shall provide Manager with proof of said insurance on demand. Driver shall be required to pay for and make all repairs to the vehicle for <u>which insurance is not provided.</u>**
    I accept ---------        I decline _[signature]_

    f) Any increase in liability or other insurance, which is included in calculating the lease payment. Driver may request Manager to provide a description of such insurance items at any time.

    g) Any increase in the medallion lease payment, which may result from fare or other increases authorized or required by the TLC.

    h) Motor Vehicle tax return.

    i) Taxi and Limousine Commission inspection.

    j) Renewal vehicle registration.

    Driver must pay all of the above charges within seven (7) days after being notified of such charges by Manager. After such (7) day period, Manager may elect to advance payment of such charges on Driver's behalf Driver's failure to pay Manager any and all such increases or charges upon demand by Manager shall be deemed an immediate default of this contract.

5. Driver is further obligated to:

    a.) report each accident to Manager and insurance company within 24 hours following the accident (Driver shall cooperate with Manager and insurance company in all proceedings, in or out of court, related to such accident. Failure to so cooperate shall be deemed an immediate default of this contract);

    b.) deliver any and all trip sheets for all drivers to Manager at the end of each shift;

    c.) file any claim Driver may have against Manager within 90 days of the expiration date of this contract;

    d.) promptly make the vehicle available to Manager for the purpose of exchanging the leased medallion (Manager shall not be responsible to credit Driver for any down time, which may result in effecting the medallion exchange. Manager may equip vehicle with rooftop advertising during lease);

    e.) and hereby designates Owner (named above) as Driver's agent for service of process and does consent to and authorize the filing of this document with any county clerk within New York State;

    f.) notify Manager of any change of address(es) or telephone number(s) within 24 hours of such change; &

    g.) file all Workers' Compensation claims with Manager's Preferred Provider Organization (PPO).

    h.) bring the car to the Manager once a week for an inspection;

    i) **Driver shall not alter, change, modify, or in any way effect the appearance, body construction or mechanical components of the vehicle without the express written authorization of Manager.** This provision does not apply to normal repairs intended to maintain the vehicle or return it to its original condition.

6. Driver shall not sublease the Medallion to another party.

_[signature]_                                                                                        _[signature]_
Driver                                                                                                    Manager

7. Title to the vehicle shall remain in the name of the owner until Driver completes all payments required under this contract including those required under the preceding paragraph 3. Upon completion of all such payments and returning of all TLC and DMV credentials to the Management Company, title to the vehicle shall be transferred to Driver. The balance of Driver's Advance Payment, if any, shall be paid to Driver within thirty (30) days after completion of this contract.

8. **If Driver defaults in any of the provisions of this agreement:**
   a) The entire down payment made by Driver and/or any monies due Driver hereunder shall be immediately forfeited.
   b) All monies due from Driver under this contract shall become immediately due and payable.
Manager shall also at its option, at any time, exercise the following:
   c) Terminate the agreement;
   d) Immediately, without demand or notice, repossess the taxicab wheresoever found and to remove and keep or dispose of the same, and
   e) Recover from the Driver for loss of a bargain and not as a penalty the amount equal to:
      - the difference between the vehicle contract price and the resale price (or if after the reasonable efforts the vehicle is not sold the unpaid vehicle contract price); plus
      - all commercially reasonable costs and expenses incurred by Manager in enforcing Manager's rights hereunder (including without limitation all costs of repossession, recovery, storage, repair, , resale, release and reasonable attorneys fees); plus
      - loss incurred because of the downtime from the moment of default till release of the Medallion.

All remedies of Manager are cumulative, are in addition to any other remedies provided for by law, can be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed to be an election of such remedy to preclude the exercise of any other remedy.

A default may be cured by Driver effecting full and satisfactory performance of the defaulted provision(s), or the payment of sufficient compensation should the performance have become impossible or unreasonable excessive, within 24 hours until the next business day after default occurs.

9. Manager may elect not to exercise its rights in the event of any default by driver in the terms of this contract. However, such election shall not be deemed a wavier or modification of managers rights in the event of any such default by driver or any future defaults.

10. **Driver hereby assumes and shall bear the entire risk of loss and damage to the vehicle from any and every cause whatsoever. No loss or damage to the vehicle or any part thereof shall impair any obligation of the Driver under this agreement which shall continue in full force and effect through the term of this agreement.**

11. Driver is aware that Manager is acting as an Agent for the Owner of the Medallion being leased and vehicle being sold by this contract and understands that Manager has an exclusive right to manage the operation of this Medallion. Driver further understands that the Owner has the right to cancel Manager's Agency relationship with Owner at any time. In the event the Medallion leased by Driver is required to be removed from Driver's taxicab, Manager shall not be required to provide a substitute medallion after the contract period has expired or unless Manager releases Driver from any further obligations under this contract and title to the vehicle is transferred to Driver.

12. Management is unconditionally entitles to all of the income arising directly or indirectly from any advertising, marketing or promoting achieved through any use of the vehicle (including any part thereto or herein) or the medallion, while under contract with All Taxi Management, Inc.

13. Driver has read, fully understands and agreed to all of the terms and provisions of this agreement. This contract may not be altered, changed or modified unless in writing signed by both Driver and Manager.

_____                                    _____
Driver                                                              Manager

Page 3 of 3

$270.00 – TO PAY
$800.00 - CREDIT