UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
LOUBERT ALEXANDRE et. al.,

                Plaintiffs,

    - against -

THE NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION et. al.

                Defendants.
----------------------------------------------------------------x

Civil Action No. 07-8175

AMENDED AFFIDAVIT OF THE
NEW YORK TAXI WORKERS
ALLIANCE

State of New York  )
               )ss.
County of New York)

    Bhairavi Desai, being duly sworn deposes and says:

    1. I am the Executive Director of the New York Taxi Workers Alliance ("NYTWA"), and make this affidavit in support of plaintiffs' motion for a preliminary injunction against defendants' mandatory imposition of their Taxi Technology System ("TTS") upon yellow medallion taxicab drivers in the City of New York on October 1, 2007. TTS was effectuated by the publication, on or about June 1, 2007, of changes in the TLC's governing Rules and Regulations. A copy of the amendment to TLC's Rules and Regulations which defines and regulates TTS in annexed to the Complaint as Exhibit A.

    2. NYTWA is a trade association composed of drivers of yellow medallion taxicabs in the City of New York. The organization has existed since 1998 and now has over 10,000 members. Its purpose is to improve working conditions of drivers in the taxi industry in the City of New York. In March 2007, it became the first and only non-union affiliate of the New York

City Central Labor Counsel.

3. The yellow medallion taxicab industry in the City of New York is regulated by defendant Taxi and Limousine Commission ("TLC")[1] which is an administrative arm of defendant City of New York. TLC's Commissioner/Chair is defendant Matthew Daus. There are 13, 187 yellow medallion taxicabs in the City of New York, each of which operates as such by virtue of its medallion, which is a thin metal plate affixed to the front hood, signifying that it is licensed by TLC.

4. To drive a yellow medallion taxicab, one must hold a hack license issued by the TLC. There are approximately 43,000 drivers who hold hack licenses. The license is issued every two years and costs $60 per year.

5. At the present time, all taxi drivers are considered independent contractors. They can be classified in three groups: 1) owner-operators, who own both their own medallion and their own vehicle, and who comprise approximately eighteen percent (18%) of the entire driver population; 2) driver owned vehicle operators ("DOVs"), who own the vehicle, but rent the medallion from a TLC licensed taxicab broker or agent, and who comprise approximately forty percent (40%) of the driver population; and 3) the balance of drivers who either a) rent from private medallion owners or b) rent from a TLC regulated taxi garage, which latter group comprises only about 15 to 25 percent (15% to 25%) of the total driver population. Renters in this third group do not even sign formal leases with the garages or owners that they rent from, but rather agree to accept that rent will be assessed on a weekly basis (so-called "weekly contracts")

---

[1] NYTWA numbers among its members avery small number of drivers who operate "black car" linousine and radio-dispatched car service drivers. These drivers choose to belong to NYTWA because they are also regulated by TLC.

or on a daily basis (so-called "daily contracts). Insofar as TLC regulates rental payments, they merely prescribe weekly and daily caps.

6. TLC first began mentioning the so-called "technology and service enhancements" hand in hand with a discussion of fare increases that TLC was voting upon on March 30, 2004. NYTWA was never formally recognized by TLC as the exclusive agent or spokesperson for drivers either with respect to the drivers' position concerning fare increases or the "technology and service enhancements", and could not have been, since it is not recognized as a collective bargaining agent for drivers, who, as mentioned above, are not employees or union members. At a public hearing on March 30, 2004, NYTWA did express its views in advance of the TLC's vote on both the fare increases and the "technology and service enhancements". See Letter from NYTWA to Honorable Mayor Michael R. Bloomberg, dated March 29, 2004, annexed hereto as Exhibit A.

7. Among the members of the public who testified at the March 30, 2004 hearing over twenty NYTWA members supported the fare increases and opposed "technology and service enhancements", including NYTWA Organizing Committee member and Professor of Information Systems at Rider University, Biju Mathew, who provided expert testimony in opposition to the operational and ethical impact of GPS technology, and others who testified as to problems associated with credit card technology.

8. Several NYTWA members have a thorough understanding of the workings of GPS technology because they had careers in fields other than driving taxicabs in their native countries. They have offered to NYTWA's governing body the following simplified explanation of the intricacies of GPS technology, drawn from wikipedia: it captures, second by second, the location

- 3 -

of the taxi cab, and, consequently, the location of the driver and the passenger at all given times.

Once it is installed in taxis, as TLC has presently mandated the GPS component of the TTS

system, there is no way to stop the second by second tracking. ***GPS technology contains no***

***"off" button.*** It has three parts: 1) a broadcast unit placed in each taxicab which emits a signal at

precisely timed intervals of 6 to 8 seconds; 2) 24 satellites orbiting above the Earth, positioned in

so-called medium orbits such that they remain stationary over a fixed location (the Global

Navigation Satellite System (GNSS)), which capture, amplify and redirect the signal from the

broadcast units in the taxis to 3) a computer, at a location remote from either the taxi or the GPS

satellite, which stores and analyzes the signals received from the taxicabs via the satellites. Since

the data storage computer is programed to track the differences in the signal from one interval to

the next, by  comparing the changes from one interval to the next, it is possible to derive from the

computer, in real time, precise information about the location of the taxicab as well as its, speed

and direction at any given moment.

    9. In its March, 2004 letter, while NYTWA endorsed the proposed fare increases, it

stated that it was not consenting to installation of GPS, nor the replacement of the current paper

trip sheets by technologically generated trip sheets, because the technology was too imprecise

and it was intrusive upon drivers' independence (see Exhibit A pp. 8 and 9). It further stated that

it opposed the imposition of credit card readers without a minimum charge and without

mechanisms to protect drivers against defective mechanisms interfering with their work (see

Exhibit A p. 10). The other features which TTS ultimately developed, the electronic "message

boards," and the Personal Information Monitor ("PIM") were not even contemplated by TLC at

that time. These same objections, first voiced before the fare increase vote took place, are the

- 4 -

same ones that NYTWA and the other plaintiffs are attempting to get defendants to address when they bring this lawsuit.

10. From the first mention of new technology by TLC, NYTWA has attempted to articulate the concerns of taxi drivers that "technology and service enhancements" is too intrusive into the drivers' lives and that it places too many financial burdens upon them. On the other hand, NYTWA has never heard TLC coherently articulate the public health, safety or welfare concerns it is addressing by insisting upon the installation of TTS. Over the years that TLC was shaping the TTS technology package, NYTWA met approximately eight (8) times with members of TLC's staff, but always found that its concerns were brushed aside by TLC as either unimportant, when it came to discussing drivers' privacy, or already addressed, when it came to discussing the cost of the new equipment.

11. On each of the approximately four (4) occasions between 2004 and 2007, when TLC held public hearings and engaged in its rule making process concerning "technology and service enhancements", NYTWA always appeared and spoke strongly against the adoption of "technology and service enhancements" because of its perception that the issue of drivers' privacy was not properly addressed by TLC. NYTWA also sought more precise and definitive regulation of the information, particularly with respect to GPS tracking of taxis. TLC always claimed that its concerns were narrow and simply a different means of capturing the same information it had always and traditionally collected. Moreover, it chose not to make the technology improvements itself, but rather to authorize private vendors to sell, install and maintain the TTS equipment, under sale or lease arrangement, and to store the information that is collected through TTS. For these two reasons, TLC chose neither to consider nor issue rules or

regulations with respect to the permitted use of GPS tracking information which TTS will record and collect.

12. By 2007, the four components of TTS had emerged: 1) credit/debit card readers; 2) electronic "trip sheets;" 3) electronic "message boards;" and the 4) PIM. Part of the information which TLC wants passengers to have is the ability to locate the taxicab on a map which can be displayed on the PIM. Likewise, TLC wants to enable potential advertisers to provide location specific advertising to passengers by displaying it on the PIM. To provide location information to both passengers and potential advertisers - and not for the purpose of aiding drivers to locate passengers' destination - TLC requires GPS to be installed in every cab as part of TTS. NYTWA has no agreement with TLC permitting TLC to implement TTS, never had an agreement with TLC concerning the implementation of any earlier "technology and service enhancements" package, and when TLC publically said that the New York Civil Liberties Union ("NYCLU") had agreed to TTS on NYTWA's behalf, NYCLU wrote to rebuke defendant Daus for making such an assertion. See May 17, 2007 letter from NYCLU to Daus attached hereto as Exhibit B.

13. I have heard drivers offer a number of different reasons why they believe TTS is too invasive into their private lives. Here are the two I hear most frequently. First, since they are independent contractors, so long as they abide by TLC's twelve hour maximum cap on hours of driving per day, they are not obliged to account to anyone for when they start or finish work, or when or where they go off-duty to eat or use a restroom, or whether they drop off and pick up their children from school. Even more significantly, many of them learn from experience where to position themselves to maximize passenger traffic and which offer the quickest way to com- plete trips in order to maximize their opportunities to carry more passengers. They come to

- 6 -

regard this information as their own proprietary trade secrets, which they are not obligated to share with anyone. Since GPS tracks and records the location of each taxi at all times, this information will no longer remain their own. Second, drivers find GPS particularly intrusive in that they have a high regard for the privacy of their religious convictions. For example, many drivers are Muslin and pray during the course of the day. They may come off duty to perform their rituals or to attend a mosque. Particularly in the post World Trade Center atmosphere of heightened scrutiny and harassment of Muslims, they are very sensitive about having anyone keep track of their private religious practices.

14. Although TLC has represented that TTS simply enhances its existing ability to collect information, this is not true. At present, drivers, such as plaintiffs, only record, literally with pencil and paper, the starting time, their hack license number, the requisite pick-up location, drop-off location, number of passengers, meter charges, additional charges, like tolls and tips, and ending time on forms mandated by TLC. Under current TLC rules, owner-operator drivers retain these "trip sheets," while DOVs and garage fleet drivers simply turn the "trip sheets" into their owners, broker or garages, but never the TLC itself. Presently, if TLC wants to review such records they must request them from the owner, broker or garage who is storing them. Drivers are not required to apprise TLC of each and every route that they chose to take to transport their passengers, nor the location of their vehicle in between fares, nor the places they go when they are off-duty and using their taxicabs for personal use. However, under the new TTS mandate, specifically the new Rule 3.06, not only will garages, brokers, vendors (and TLC should it choose to) obtain electronically drivers' identification because hack license numbers must be entered on the electronic time sheet, as well as starting and finishing times, but will also have the unfettered

- 7 -

ability at any time to collect any of the captured GPS location information as it is collected by GPS in real time.

15. For the benefit of owner-operators, DOVs and all other drivers, TLC has posted on its website a set of Frequently Asked Questions ("FAQs"). A copy of these Frequently Asked Questions is annexed to this affidavit as Exhibit C. For example, in the FAQs, TLC has estimated the TTS costs, to be as follows: a) installation: between "$10 and $4,115";  b) a monthly service fee between " $43 and $200"; c) the maximum costs of the technology over the term of a contract are between "$2,900 and $7,200".

16. Drivers who are DOVs and who lease from taxi garages have reported to me that they are already seeing changes in their lease arrangements which specify that new costs are being placed upon them to defray the cost of TTS.  Attached hereto as Exhibit D is a copy of the notice issued by Ronart Leasing Corp. brought by a lessee to NYTWA.

15. Drivers who rent both the medallion and the taxi vehicle have consistently reported to me that since the TLC announced the TTS system was being implemented, they have been pressured by their garages to agree to switch their rental charge schedule from "weekly contracts" to "daily contracts." Since many of these rental drivers are compelled to drive more than five days a week to make a living, and, since the daily rates authorized by the TLC vary depending on the day of the week, "daily contracts" cost the rental drivers significantly more than "weekly contracts." In this way, the rental drivers are also being forced, even if only indirectly, to bear the costs of TTS.

17. Another significant cost of TTS which all drivers will have to bear is the transaction fee for each fare charged on passengers' credit or debit cards. Drawing on information provided

- 8 -

in Rule 1-85 (b) of Exhibit A to the Complaint and the FAQs posted on the TLC's website, Exhibit B to the Affidavit, NYTWA has determined that TLC has fixed the lower and upper limits of the transaction fees at 2.5 percent (2.5%) and 5 percent (5%). Since that processing fee must be split between the card issuer, and the drivers' intermediary owner-operator, broker or garage, NYTWA has found that the drivers are reporting they are being assessed a transaction fee of 5 percent (5%).

18. In addition, TTS regulations require that if TTS malfunctions, that it be repaired within 48 hours. NYTWA members who are already driving taxicabs which have been outfitted with experimental TTS technology have reported frequent system malfunctions, and there has been news coverage of these malfunctions. Attached hereto as Exhibit E is an article published by the New York Times on July 19, 2007 concerning these TTS malfunctions.

19. There is another element which has emerged recently in the debate about whether to make mandatory full implementation of GPS on October 1, 2007. In my position as Executive Director of NYTWA, owner-operators of yellow taxi medallion vehicles daily tell me that they do not want and do not believe in the benefits of TTS Technology, while at the same time telling me that they felt obligated to sign the TTS installation contracts - essentially under duress - because they simply could not put their families at risk by defying TLC and risking suspension of their medallions and loss of their livelihood. The only two owner-operator members of NYTWA's Organizing Committee, who could not afford to become named plaintiffs in this action, both expressed this belief to me.

20. Moreover, owner-operators also have consistently reported to me that they visited one or more of the TTS Technology vendors to learn about the installation terms each was

offering. They recounted that they were told by the vendors simply to sign the contracts without any negotiation concerning the terms of the contract, without any questions being answered and without being able to take copies of the contracts with them for their attorneys to review prior to signing. Plaintiff Max Chartelain recounts that kind of treatment in his affidavit. He elected not to sign: however, even those drivers who did sign installation contracts, even in the absence of proper knowledge or understanding because they felt compelled not to jeopardize their families' well-being, were not provided copies of the contracts they had signed.

21. Those drivers who are DOVs have also faced unexpected problems arising from the installation of GPS. Aside from having their leases unilaterally modified in various ways, direct and indirect, to cover the cost of TTS, as recounted more fully in the affidavit of Mamnunul Haq, a driver whose broker scheduled for him a last minute appointment for the installation of TTS had his meter turned off the next morning, and had to take the cab to be outfitted with TTS before he could resume making his living.

22. Based on the conversations described in paragraphs 18 through 20 above, and scores of others like them, it is my informed belief that a substantial number of the medallion owners who did sign installation contracts, only signed them because they felt they were being pressured to the point of being overpowered by the force of the TLC's mandate under the threat of medallion suspension and loss of livelihood as promulgated by it in Exhibit A to the complaint in this action, and *if TLC were not insisting that all cabs inspected after October 1 have TTS Technology installed upon pain of declared unfit to operate as cabs, they would not install TTS Technology*.

23. Those drivers who are living with TTS have also reported many inconveniences: 1)

the heat from the PIM attached to the partition behind their seat is uncomfortable and worrisome, 2)and the noise level of the PIM is, at minimum, a distracting nuisance and, at maximum, a safety hazzard. NYTWA has already reached out to impartial evaluators work place health and safety issues and received commitments from some of them to conduct controlled studies to measure the actual physical impact of TTS upon drivers; 3) even taking personal break has become a nuisance because the drivers are required to log off and back on to the system each time they remove themselves from passenger service, and when drivers log back on, the electronic system is slow to register, meaning if a driver picks up a fare immediately when he returns to duty, the fare does not begin to record on the meter for several blocks; 4) as the number of taxis with TTS grows, NYTWA has heard a steadily growing number of stories that these cabbies are experiencing much slower transaction completion times for authorizing credit and debit card payments. When multiplied over the course of many transactions during the course of a driving shift, the additional time lost during each transaction represents lost revenue opportunities for the drivers; 5) drivers who must deal with credit and debit card payments have also found that a passenger will swipe the card through the reader, and disappear, only to have the card payment declined some minutes later, leaving the driver to cover the passenger's fare; 6) drivers have also reported that they find the text messaging box a distraction while they are driving, and the integration of the text messaging with the meter has added another step to registering tolls paid during trips, which must be acknowledged on the text message box to be added to the meter.

24. I have been told that this morning the Court requested counsel to add certain information about the law which governs this case to this affidavit. I accept, upon information

- 11 -

and belief, the representations which counsel make on my behalf.

25.    While we steadfastly maintain that ours is a case of first impression, we have been asked by the Court to direct the its attention to cases where TLC has been found to have acted beyond the scope of its authority and in violation of Due Process. The most important case for review is Padberg et al. v. McGrath-McKechnie, et al, 203 F.Supp.2d 261 (April 29, 2002). In that case, Judge Dearie declared unconstitutional TLC's policy of confiscating and suspending the licenses under a new policy that it had unilaterally decreed. In 1999, the TLC enacted a new rule whereby it would immediately-without a hearing- suspend the licenses of all taxi drivers that were accused of a service refusal and further, revoke these licenses following a hearing. In 2006, the TLC and the City entered into a settlement, whereby drivers whose licenses had been suspended and revoked under the Operation Refusal scheme were paid $27 million in damages.

25. In Padberg, the plaintiffs did argued that the TLC acted beyond the scope of its authority under the Administrative Code when it imposed the penalties of suspensions and revocations, even after a hearing. Judge Dearie viewed this argument as claim for violation of Substantive Due Process. "As distinguished from its procedural cousin...a substantive due process inquiry focuses on 'what' the government has done, as opposed to 'how and when' the government did it". Id., quoting Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990): "Accordingly, the protections of substantive due process are limited to government action that is 'arbitrary , conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect of ill-advised." Id., quoting Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994)(emphasis added).

26. Plaintiffs assert that TLC's imposition of TTS, which will subject all drivers to loss

- 12 -

of revenue as well as minute scrutiny in real time, and many drivers to immediate and irrevocable

changes to their own private property,  mostly to provide passengers with a copy of Zagat's in the

back seat of the taxi,  is 'arbitrary, conscience-shocking" and "oppressive" must live with the

technology, when their palpable concerns have never been explored and fully addressed.

Defendants' claims that they opened TTS to various public hearings, and that NYTWA and other

drivers were allowed to air their feelings at these hearings - and were not heard - is irrelevant to

plaintiffs' claims that the TLC's action has stepped across the boundary of reason and amounts to

a taking under the Fifth Amendment to the U.S. Constitution, a violation of their privacy under

the Fourth Amendment to the U.S. Constitution, and Articles 1 §6 and §12 of the New York

State Constitution.

     26. While <u>Padberg</u>, clearly discusses TLC's exceeding its regulatory authority when it

imposed an immediate suspension of drivers' licenses without a hearing for a new class of

offenses which it unilaterally designated and designed, there are state cases as well where TLC

has acted outside the scope of its authority and powers: 1) <u>Matter of Miah v. Taxi and Limousine</u>

<u>Comm. Of the City of New York</u>, 306 A.D.2d 203 (1sr Dept 2003), where the Supreme Court

held that the TLC acted arbitrarily and capriciously in revoking the taxi driver's license when it

attempted to change the method of calculating points to be charged against the driver under the

TLC's Program for Persistent Violators of Taxicab Drivers Rules, without following the public

hearing requirements outlined in the New York City Administrative Procedure Act ("CAPA").

This amounted to a rule change and the court held, "Inasmuch as it is plain that respondent's new

rule was not duly adopted in accordance with the procedures set forth in the New York City

Administrative Procedure Act, the revocation of petitioner's taxi driver's license pursuant to that

rule was arbitrary and capricious". Id: 2) <u>Udodenko v. the City of New York, Michael Bloomberg, Mayor; and Matthew W. Daus, Chair/Commissioner; Chief Administrative Law Judge Elizabeth Bonina, from the New York City Taxi & Limousine Commission (TLC)</u>, 780 N.Y.S.2d 869 (June 21, 2004), where the Supreme Court again held that the TLC acted outside the scope of its authority by attempting to enact a drug test policy without first making it subject to formal rule making procedures as is required under the New York City Administrative Code. Also, the TLC's failure to notify the driver of his license suspension and failure to provide him with any type of hearing violated Due Process; 3) <u>Jesse Jasim v. New York Taxi and Limousine Commission, et al.</u>, 5 A.D.3d 246 (March 18, 2004), where the court found TLC's determination was unsupported by substantial evidence, in that they held points and fines violations against the driver without ever sending a notice of the complaint or of the administrative hearing to him; 4) <u>Lys v. New York City Taxi and Limousine Commission</u>, 2002 WL 338187 (N.Y.City Civ. Ct.) (Jan.14, 2002), where the Court voided the suspension of the cab driver's license imposed for a first service refusal offense as a deprivation of his property right in violation of Due Process, because the penalty imposed by the TLC was greater that the penalty authorized by the New York City Administrative Code; 5) <u>Ravinder Pal Singh v. Taxi and Limousine Commission of the City of New York</u>, 282 A.D.2d 368 (1st Dept 2001), where the Court nullified the TLC's policy of shortening the grace period for renewal of a license from six months to thirty days after the license expired because TLC failed to comply with its authority as outlined in the New York City Administrative Code; and finally 6) there are several Office of Administrative Trials and Hearings ("OATH") cases which also negate penalties imposed upon drivers in excess of the limitations of TLC's authorities under section 19-507 of the Administrative Code. See <u>Taxi and</u>

Limousine Commision v. Ouali, OATH Index No. 1855/00 (Feb. 16, 2001); Taxi and Limousine

Commision v Asamoah, OATH Index No. 1120/00 (Feb. 2, 2000); Taxi and Limousine Com-

mission v. Park, OATH Index No. 1014/00 (Feb. 2, 2000);

_____
                                    Bhairavi Desai

Sworn to before me this
21st day of September, 2007

_____
        Notary Public

**MALCOLM A. GOLDSTEIN**
**Notary Public, State of New York**
**No. 60-6580040**
**Qualified in Westchester County**
**Commission Expires May 31, 2 6 1 0**

- 15 -

# EXHIBIT A

# **N**ew **Y**ork **T**axi **W**orkers **A**lliance

122 W. 27th St. – 10th Fl. NY, NY 10001
Phone: 212-627-5248 Fax: 212-741-4563 e-mail: nytwa1@aol.com

March 29, 2004

Honorable Mayor Michael R. Bloomberg
City Hall
New York, New York 10007

**Re: NYTWA's Response to TLC Proposals Under Consideration for Rulemaking on
March 30, 2004**

Dear Honorable Mayor Bloomberg,

Greetings. On behalf of the 5,011 members of the New York Taxi Workers Alliance, I am
writing to express our thoughts on the changes to the rate of fare and lease caps, and technology
and service enhancement requirements proposed for rulemaking by the Taxi and Limousine
Commission during a public hearing on Tuesday, March 30, 2004.[1]

**I am furthermore writing to ask for your support in particular to maintain the current
lease caps as part of the fare increase packet.** While we maintain our position that in fact the
lease caps need to be lowered in order for drivers to earn a fair livable income, in the interest of
moving things forward, we would endorse maintaining the caps at the current levels.

Over the past six months in particular, NYTWA has garnered unprecedented support for a raise
for taxi drivers. The riding public, editorial boards, 37 City Council Members, Borough
Presidents, and unions and community groups representing one-quarter-of-a-million New
Yorkers have publicly voiced their support for drivers.[2] Perhaps more than newsroom surveys,
letters and phone calls, this sentiment has been best captured on the editorial pages of *New York
Daily News*: "….every penny (of the fare raise) should go to the drivers." (January 5, 2004)

We are pleased to note that after a wait of eight long years, City Hall has heard the pleas of
NYC's hardest working labor force for the establishment of a livable income. We recognize that
it is your leadership and the work of Commissioner Iris Weinshall and her staff that have brought
us to this moment. The members of NYTWA also thank you for your endorsement of
maintaining the night surcharge and most importantly, your support for a living wage for taxi
drivers, the first call of its kind by a NYC Mayor. To realize such a vision, the lease caps must
not be increased any further than the current levels; an eight percent increase on the weekly caps
must be rejected.

---

[1] See **Exhibit 1**, "Summary of NYTWA's Response to TLC Proposals Under Consideration for Rulemaking on
March 30, 2004"
[2] See **Exhibit 2**

## NYTWA's Response to Proposed Changes to Rate of Fare and Lease Caps:

We accept the proposed increase in the base fare from $2.00 to $2.50; the increase in mileage calculation from 30cents per one-fifth (1/5) mile to 40 cents per one-fifth (1/5) mile; the addition of the rush hour surcharge of $1.00 from 4pm to 8pm; increase in the JFK Airport-Manhattan flat rate of $35 to $45; and the increase of $15 Newark Airport surcharge, up from the present $10.

The 40,000-licensed taxi workers of NYC and our families, ask of you, in addition to your endorsement of maintaining the night surcharge, to add the following amendments to the TLC's fare and lease cap proposals:

1. Freeze the current lease *rates* for the first six months of the fare raise:
   - o  Day and Night Shift:       $85
   - o  Weekend Night Shift:     $110
   - o  Weekly Garage:            $550
   - o  Medallion Only:            $625

2. Keep the lease caps at the current levels.

3. Raise the waiting time on the meter:  40 cents every 90 seconds.

4. Allow drivers to appoint authorized personnel of the New York Taxi Workers Alliance to file complaints of lease cap violations on their behalf.

## Freeze the current lease rates for the first six months of the fare raise:

During the six month period after the proposed fare increase goes into effect, drivers' incomes will be impacted by a number of factors:

- It is expected that following the fare increase, there will be a temporary drop in rider ship.
- Drivers will also face a temporary loss in tips.
- Coupled with this will be the traditional summer time rider ship drop, as the proposed fare raise is set to go into effect in May.
- Drivers will simultaneously be affected by increased competition and traffic through the issuance of 300 new medallions in April.
- The final blow will be yet another historic increase in fuel prices.  Fuel prices which hit a record high in Summer 2003 hit another all-time high on Thursday, March 25, 2004.[3] Memorial Day weekend in May will mark an even further increase. *Bloomberg News* reported that prices may rise to $2 per gallon this summer.[4]

The city must freeze the current lease rates to protect drivers from increased lease costs during this time period in particular.  Otherwise, drivers will lose an immediate benefit of the fare raise. Money they earn toward the latter half of the first year of the raise will be spent on compensating for the summer's loss, rather than improving the quality of their life as the city intends.

---

[3] "Gas prices set 3rd straight record," CNN Money, March 25, 2004.

[4] "Gas prices Expected to Surge This Summer," March 22, 2004.

www.progressivegrocer.com/progressivegrocer/magazine/article_display.jsp?vnu_cont...

**Keep the Lease Caps at the Current Levels:**

*Responding to Industry Transformations and Striking a Balance*

Unable to squeeze any more additional money out of drivers' meager earnings, garages and brokers have remained below the current caps. As such, owners still have enough of a margin to raise their rates without the caps being increased. Particularly for weekly shifts, the average rates are $67.00 below the cap for the night shift and $92.00 below for the day shift. The city does not have to raise the lease caps in order for garages to earn $159.00 more per week per car/medallion.

On the other hand, by raising the weekly garage lease cap up to $667, the city will enable garages to charge drivers $125 more per driver per week. So, while the leasing system does not guarantee driver incomes, their costs will be fixed at $667 for the lease and $150-$180 for the gas. Regardless of the lack of availability of passengers, drivers still have to maintain lease payments and in fact pay more in fuel, as they cruise longer hours.[5] The city should minimize the burdens and risks which drivers bear under the leasing system through regulating low lease caps.

Over 65% of drivers will be directly affected by the weekly lease caps. With the majority of them, (forty percent of the overall workforce) also directly bearing the costs of purchasing, upgrading and maintaining the taxicab. Another twelve percent of drivers additionally own and operate the medallion. Low lease caps will reduce the burden of drivers who own the vehicle and allow for their retention in the industry. NYTWA's lease cap proposal is balanced by the needs of both lease drivers and owner-drivers.

Over the past 25-years of the leasing system, taxi garages and brokers have not had to pay for any basic labor costs: salary, health care, pension, or time-off. And now, the garages also look to avoid paying toward operating costs as they argue for increases in lease caps to allow them to pass along costs to drivers. The priority of the distribution of the newly generated revenue of the industry must be toward establishing a fair and secure livable income for the city's 40,000-licensed drivers.

Under the current fare and lease structures, drivers take home 30% – 40% of the meter bookings, while using 60% – 70% of the generated fare toward lease, gas and other operating costs. Researcher Bruce Schaller writes, "From 1986-1993, despite two fare increases, there was no net change in driver take-home inflation-adjusted income." Mr. Schaller also reports that 86% of the revenues generated from the 1996 fare increase went to the owners while drivers received only 14%. Garage owners and brokers are able to pass along costs to drivers through the lease.

---

[5] "(C)ity data shows that drivers, struggling to make a living, have been putting in more hours. A combined result is that city cabs cruised for 303 million miles in 2002 in search for fares, up from 288 million in 1999, suggesting that it was about 5 percent easier to get a cab last year." See "Finding the Intersection of Supply and Demand," *New York Times,* Eric Lipton, November 23, 2003.

Drivers, however, can control neither the lease price nor the (metered) fare. The proposal to be passed by the city on March 30th must remedy this unequal distribution and confining structure.

Lower lease caps will begin to bring fairness under the city-established leasing system, while higher lease caps will be yet one more give-away and subsidy to taxi bosses at the expense of taxi workers. While it takes drivers two and a half years of 60-hour weeks to pay off the car, garages can do it with just six months of leasing profits. Garages' secondary cost - insurance on the medallion and vehicle - is off-set by their unique ability to self-insure. As such, their costs are much less than of drivers who lack the leverage to demand low market rates. Furthermore, most garages are NOT bound by medallion payment costs as they have paid off their medallions years ago. So, while drivers have seen a steep decline in their incomes, garages have enjoyed an increase of 25% in the medallion value since 1996. This rise in equity also gives the garages opportunity to further invest and create yet another source of income.

A call for lower lease caps is also a message to taxi companies to prioritize full service for riders. As driver after driver can tell you, taxi garages would rather charge a small group of drivers high leases rather than lower the leases and retain a larger pool of workers to service the public's demand for taxi service. Garage owners continue to ignore the simple business arithmetic of charging $80 for instance and recruiting 200 drivers, as opposed to charging $100 and recruiting 150 drivers.

For two and a half decades, the garages have been allowed to rob the drivers blind and underserve the public. The city has an opportunity to end these sweatshop conditions and establish dignity to driver incomes. This opportunity should not be lost.

***Recognizing and Rewarding The Labor of Drivers***

- **In order for drivers to earn the city endorsed living wage of $14 per hour, the current lease caps must be maintained.** Under the proposed combination of a 26% fare raise and 8% increases in the weekly lease cap, drivers will earn less than $11.50 per hour for a 66-hour work week.

  Under the current fare and lease structure, drivers begin their shift at a negative of approximately $130.00, paying for lease fees and other operating costs.[6] Ultimately, despite working long hours, drivers earn incomes that are less than half of the median hourly wage of New Yorkers.[7] Over sixty-five percent of the drivers rely on this meager income to support themselves and their families.[8] Drivers' incomes are well-below a self-sufficiency rate for NYC residents.[9] Additionally, each day a driver misses work due to an urgent matter or fatigue, he or she must still pay for the operating costs out of pocket and forego potential income.

---

[6] "Unfare: Taxi Drivers and the Cost of Moving the City," Community Development Project of the Urban Justice Center, September 2003. See *Exhibit 3*, "Statistics Summary"
[7] See *Exhibit 4*, "Current and Proposed Hourly Wages for Taxi Workers, and Other Wage Benchmarks, in 2002 dollars," Brennan Center for Justice at the NYU School of Law.
[8] See *Exhibit 3*
[9] See *Exhibit 4*

In a "Health Needs Assessment" conducted in Summer 2001 by the New York Asian American Network on Cancer Awareness, Research and Training (NY AANCART) at Columbia University, the majority of the 188 drivers interviewed (27%) reported earning $18,000 - $25,000 per year on average. Forty percent reported supporting five or more people on this income. The same drivers reported working on average 59 hours per week. Daily leasees reported paying $109 toward the medallion lease, while weekly lease drivers began at a negative of $623 in lease fees alone.[10]

NY AANCART reports that of the drivers they surveyed, 77% reported not having health care, citing high cost (55%), and lack of owner-sponsored care (25%) as the primary reasons. An astonishing 23% of the drivers reported never having had a check-up, although the average age of those interviewed was 37, with eight years of work in the taxi industry.[11] Among health issues of most concern to them, drivers ranked "occupation-related issues" the highest: lower back pain (27%), heart disease (27%), blood pressure (25%) and diabetes/sugar (21%). In fact, of the 58% who reported having been checked for cholesterol, 13% of the drivers were diagnosed with a condition warranting medical follow-up.

NYC's taxi drivers remain uncompensated for the dangerous conditions under which they labor. Furthermore, drivers' incomes are not reflective of the expensive and time-consuming licensing process required of them and their specialized skills remain undervalued.[12] Subjected to long hours, random acts of violence, fare beating and harassment, drivers are guaranteed neither safety nor income.

- **The city must recognize the precarious nature of the industry and drivers' lack of stable and secure incomes.** Any increase on the lease caps would mean that drivers would begin at an even steeper negative than the present $130. This is a step backwards, not forwards. High leases are detrimental to the drivers' ability to earn a living and the public's needs for greater service. Given drivers are not paid wages by taxi companies, they have no guarantees of a fixed take-home income. On any given day, drivers could be faced with setbacks such as car breakdown, weather-triggered shift loss, major traffic snarls, airport snarls, airport bottlenecks, etc. Taxi drivers, in these circumstances, must bear the loss of potential income as well as the lease and gas costs which they have paid up-front. By maintaining low lease caps, the city offers a safety net for drivers and reduces the all-too high risks of working under the city-regulated leasing system.

- **The economic burdens of eight-years of stagnating incomes in the midst of increases in operating costs, cost of living[13] and enormous loss and debt in the economic aftermath**

---

[10] See ***Exhibit 5***, "Health Needs Assessment: Stats Summary," The New York Asian American Network on Cancer Awareness, Research and Training (NY AANCART) of Columbia University.
[11] See ***Exhibit 5***
[12] Since the last fare increase in 1996, TLC fines have been increased by over 400% while various new fees and procedures have been added to both the new license and license renewal processes.
[13] In 2004, New York City still ranks as the most expensive city in the country. Cost of living in NYC is 117.1% higher than the average city in the United States. Taxi drivers have been paying these costs while collecting a fare set in 1996. See, "America's 5 Most and Least Expensive Cities," March 27, 2004,

of September 11, 2001[14] must be acknowledged by the city through a larger share of the fare raise. This is only possible through a proper lease cap structure to complement the proposed fare increase.

The Urban Justice Center (UJC) reports that of 581 drivers interviewed, 62% reported having post-disaster debt: among them, 38% reported inability to pay household rent or mortgage, while an overwhelming 95% reported having incurred credit card (44.2%) or personal loan (39.1%) debt or loss of savings (11.7%).[15] A study of pre-9/11/01 and post-9/11/01 economic factors (operating costs, meter bookings, income and hours worked) by the Russell Sage Foundation reveals that during the disaster month, September 2001, even after almost 10 hours of labor, drivers did not earn any take home pay and were in fact at a negative (-$11.03) after paying for operating costs. Although drivers' meter bookings fluctuated and fuel costs went up (from cruising longer for fares), they received no breaks on leases.[16]

Each emergency and cost increase further leads drivers deeper into debt. At the base of this cycle of debt is the underpinnings of the leasing system: no safety nets (to absorb or pass along costs), and no means to control the pricing of either their service or the operating costs. As such, drivers have ended the past year the way they begin each day – at a steep negative, reaching a point of crisis.

*In Summary*

NYC's taxi drivers remain uncompensated for the long, difficult and dangerous conditions under which they labor. While living in the country's most expensive city, 117.1 percent more costly than the average US city,[17] taxi drivers earn substandard incomes which deny the quality of life

---

http://houseandhome.aol.homestore.com/homefinance/mortgages/mostleastexpensive.asp?gate=aolhouseandhome&source=a2anvtft695&poe=homestore
    Between 1979 and 2003, the cost of living in NYC increased by 160% while the rate of fare went up by 112%. See *Exhibit 6*, "Increase in the Cost of Living, Gasoline, and Average Taxicab Fare in New York;" also see *Exhibit 7*, "Percentage Increase in the Cost of Living, Gasoline and Average Taxicab Fare, 1979 – 2002," Brennan Center for Justice at the NYU School of Law.
    NYC has the lowest fares and the second highest cost of living among twelve major U.S. cities. Nine out of eleven major US cities have increased the taxi fare since 1996. Nonetheless, both of the two remaining cities which have not instituted fare increases yield higher meter bookings per ride than NYC. See "Taxicab Fare Increases In Large U.S. Cities," *TLC Magazine*, March 2003, Page 4; also see *Exhibit 8*, "Typical Taxicab Fares for Major Metropolitan Areas, 2003 and Cost of Living for Major Metropolitan Areas, End of 2002," Brennan Center for Justice at NYU School of Law.

[14] See, "The Employment Impact of the September 11 World Trade Center Attacks: Updated Estimates based on the Benchmarked Employment Data," The Fiscal Policy Institute, March 8, 2002, available at http://www.fiscalpolicy.org/Employment%20Impact%20of%20September%2011_Update.pdf.
[15] See *Exhibit 3*
[16] See *Exhibit 9*, "Of Hardship and Hostility: The Impact of 9/11 On Taxi Drivers in New York City: Income and Expense Averages," Dr. Monisha Das Gupta, University of Hawaii at Manoa. The report is part of a larger research study by the Russell Sage Foundation on the impact of September 11, 2001 on various New York City communities and workforces.
[17] See, "America's 5 Most and Least Expensive Cities," March 27, 2004, http://houseandhome.aol.homestore.com/homefinance/mortgages/mostleastexpensive.asp?gate=aolhouseandhome&source=a2anvtft695&poe=homestore

of their families. Taxi drivers and their families have endured NYC rising costs by sacrificing living standards and by accumulating debt. Drivers' incomes are furthermore not reflective of drivers' operating costs, including fuel and expensive and time-consuming licensing processes. Drivers' invaluable service and specialized skills remain undervalued.[18] Subjected to long hours, random acts of violence, fare beating and harassment, drivers are guaranteed neither safety nor income. Furthermore, drivers receive no health benefits, pension, sick or vacation leave or unemployment insurance.[19] The proposed fare increase is a historic opportunity to address these wrongs and at the least, establish a livable income. The city should not fall short of its duties and promises.

## Raise the Waiting Time Yield on the Meter:

As there is no proposed increase in the rate, the yield when the meter is operational under the proposed waiting time sequence will remain $12 per hour or 20 cents per minute. Rather than distributing the burdens of the city's increased traffic congestion, drivers are being asked to solely absorb the costs. NYTWA proposes a nominal increase of 40 cents every 90 seconds.[20]

- **The taxi meter waiting time yield should be raised after remaining the same since 1990.** Over the past fourteen years, traffic congestion has increased on city streets, yet the factor on the taxi meter which allows drivers to still be paid while waiting in traffic is to remain the same. Drivers should not be forced to bear the costs of the city's traffic.

- **The taxi meter waiting time yield should reflect an hourly income of $12 plus overtime and average hourly operating costs of $15.** The waiting time should be increased to 40 cents for every 90 seconds.

- **Increasing the taxi meter waiting time yield recognizes that it is the route of the rider which carries drivers into traffic.** Drivers do not choose their destinations; and often times, they also do not choose the route. The burdens of traffic should be distributed between driver and rider. Presently, drivers are punished in two ways: low meter bookings from traffic-affected fares and lessened time to accumulate greater number of trips.

- **Increasing the taxi meter waiting time yield will provide an incentive for customers to opt for the quickest route, allowing drivers to service greater numbers of the public.** Although the role of the taxicab in the city's overall transit system should be to serve the greatest number of riders as quickly as possible, the low waiting time yield enables customers to occupy the cab for longer periods than necessary. Particularly during rush hour, for example, instead of opting for a quicker route at a faster pace, customers would rather choose a more traffic congested route where the cab can accumulate miles at a greater rate than the meter measures the fare.

---

[18] Since the last fare increase in 1996, TLC fines have been increased by over 400% while various new fees and procedures have been added to both the new license and license renewal processes.
[19] See "Cabbie's Lifestyle A Wheel of Struggle: Face Health Hazards Without Insurance," *New York Newsday*, Margaret Ramirez, March 8, 2002.
[20] See **Exhibit 10**, "NYTWA Alternative to Fare Increase Under Consideration"

*In Summary*

An increase in the waiting time rate will distribute the burdens of traffic congestion equitably between riders and drivers and create an incentive for quicker routes and shorter taxi rides, enabling greater rate of service.

## NYTWA's Response to Proposed Technology and Service Enhancements:

1. **Installation of Global Positioning System:** NYTWA strongly advises the TLC to delay the vote on a GPS requirement until the system is further studied.

   Technology design and information systems experts continue to study the commercial use of GPS in light of the high margin of error in the system. The University of North Carolina's Population Center writes:

   > *[GPS systems are susceptible to errors]due to orbital variations of the satellites, interference from buildings or trees, as well as delays created by the signal passing through the atmosphere.*[21]

   Notably, the most significant error rates for GPS systems occur in urban areas or other spaces with uneven terrain. According to Hung-yu Wei, Guor-Huar Lu1, Wai Chen of Columbia University, "GPS system performance (in urban areas) is limited by building shadowing."[22]

   In the commercial deployment of GPS systems, error rates often remain unreported because an average user has a reasonable error tolerance capacity. However, when a GPS system is used to code trip sheets, even a 5% error means that in 5% cases the system would report wrong data for which a driver may be found guilty while actually innocent. For workers whose livelihood is dependent on continued driving, such error rates are not acceptable.

   In addition, commercial GPS accessibility is premised on the United States Department of Defense's (DOD) continued disabling of an intentional error. Again, as per the University of North Carolina's Population Center:

   > *GPS was developed by the U.S. Department of Defense to assist U.S. troops in the battlefield and provide an accurate way to locate troops and targets. To prevent other combatants from using the same technology against the U.S., the Department of Defense introduces an error in the signal. This error is known as Selective Availability. Though U.S. military GPS receivers know how to correct for selective availability, commercial units are affected by the error, so users must take steps to correct the points and improve their accuracy. Without such correction efforts the collected point is only accurate to 100 meters. However, for the time being selective availability is turned off. It was disabled by the DOD in the Spring of 2000 for an unspecified length of time…*[23]

---

[21] www.cpc.unc.edu
[22] www.ee.columbia.edu/~hywey/vtcfall01.pdf
[23] www.cpc.unc.edu

Until the DOD declares that it has permanently disabled "selective availability," the TLC may end up requiring the industry to invest into a technology that may be deemed irrelevant if the DOD reverses its 2000 decision. The TLC should not so hastily rush to judgment.

### *In Summary*

Overall, we feel that the GPS system cannot be introduced in the taxi industry unless a research study is undertaken to ensure zero error rates. This cannot be assured at this time especially in low cost GPS systems. Any error rate will invariably mean an innocent worker will be found guilty in adjudication processes. Further, the TLC will be requiring the taxi industry to unnecessarily invest in a technology that may be deemed valueless by the DOD at any point in time. Finally, it is critical that we study emergent alternative technologies to GPS such as DGPS (Deferential Global Positioning System), GLONAS (Global Orbiting Navigational Satellite System), GEOSTAR, SPS (Standard Positioning System), and PPS (Precision Positioning System) before making a final decision.

NYTWA recommends the following:

▶ Further study the GPS system and alternatives identified above. Such a study must be carried out by independent research institutions which have no commercial ties to the wireless industry.

▶ Reject the use of any computer/technology-generated trip sheets to replace ones hand-written by taxi drivers for adjudications or enforcement purposes. The TLC currently uses trip sheets to determine the driver at the center of a complaint. Drivers' due process rights should not be violated.

Trip sheets which are filled out by drivers are used for more than just recording the time of pick-up and drop off, number of passengers and price of the fare. In recording trip sheets, drivers are able to note peculiarities of the fare. The very process of writing the record also allows drivers to remember the nuances of fares which may be necessary to recall to their own benefit (or defense) or the benefit of the rider.

Taxi drivers are classified as independent contractors, yet the invasive use of GPS to monitor drivers extends "shop floor" supervisory privileges over drivers' movements. In essence, drivers' independence would be compromised to an extent that it would not be if they were classified as employees. The city should decide in which camp drivers belong and not maintain such a double standard.

▶ Establish a transparent process by which the technology will be programmed to signal drivers of fare availability. That is, an overzealous agent should not send a signal to recruit a disproportionate higher number of drivers vs. the available number of riders to appease selective classes of passengers who the city does not want to have waiting.

▶ Hold a separate hearing on GPS or any such technology once this information is gathered and processed.

2. **Credit Card readers:** Taxi drivers are required to pay their costs in cash and upfront either daily, weekly or monthly. Credit card payments will add to drivers' debts as their receipt of cash incomes will be delayed. To address this dilemma and hardship, NYTWA proposes the following:

▶ Establish a minimum requirement for credit card use, similar to other (small) businesses.

▶ Allow garage drivers to finish their shift before returning the car to the garage if the reader becomes inoperable. There is no real "credit" system offered by garages to compensate drivers for loss of time due to mechanical failures (or any other matter such as a medical emergency or family crisis.) The TLC's proposed regulation places an unfair restriction on drivers in the context of the modern leasing system.

▶ Establish a process to allow drivers to collect the credit card payments daily.

▶ Require garages and brokers to collect weekly payments at the end of the week.

▶ Stop the arbitrary and aggressive enforcement against drivers which may result from drivers pulling over for longer period of times as they wait for the transaction to complete.

3. **New requirements for the partition:** The partition is a critical mechanism to ensure safety for taxi drivers. In as much as the new measurements will maintain the safeguards while facilitating driver-rider relations, we are in support of the proposal. To maximize this opportunity, the following are proposed:

▶ Require the installment of the new partition as part of the hack-up process, similar to the process which was established during the vehicle upgrade to the stretch car. Do not make it retroactive for the cars which are already out on the roads.

▶ Use funds from the sale of the new medallions to subsidize the installation of the partitions. When the TLC required the installation of the partition or video camera in all livery cars, New York state subsidized the costs as a means to show its commitment to livery driver safety. NYC should hold the same commitment for yellow cab drivers.

▶ Add to the partition changes, the addition of a sticker which warns against crimes against taxi drivers. Bus drivers are extended this protection by the city; the life of a taxi driver should be equally safeguarded.

4. **Group ride pilot programs:** NYTWA endorses the proposed regulations.

▶ The structure by which fares will be collected from riders at group ride locations should be adopted for a group of passengers making multiple stops in a cab hailed on the street. The current policy does not compensate drivers who must travel criss-crossed without charging extra per head or per stop.

Respectfully submitted,

By:


Bhairavi Desai, Director
New York Taxi Workers Alliance
122 West 27th Street, 10th Floor
New York, NY  10001-6281
Phone:  (212) 627-5248
Fax:     (212) 741-4563

cc:     Commissioner Elias Arout
        Commissioner/Chairperson Mathew
        Daus
        Commissioner Noach Dear
        Commissioner Harry Giannoulis

        Commissioner Stanley Michels
        Commissioner Harry Rubenstein
        Commissioner Eliot Sander
        Commissioner Alberto Torres
        Commissioner Iris Weinshall

EXHIBIT B



**NYCLU**

125 Broad Street
New York, NY 10004
(212) 607 3300
Fax (212) 607 3318
www.nyclu.org

**NEW YORK CIVIL LIBERTIES UNION**

May 17, 2007

<u>VIA FACSIMILE AND FIRST CLASS MAIL</u>
Commissioner Matthew Daus
Charles Fraser, Esq.
Taxi and Limousine Commission
40 Rector Street
New York, New York 10006

Re:    The Taxi and Limousine Commission's Representations
       At Its May 10, 2007 Public Meeting Concerning the NYCLU's
       <u>Involvement In The Technology Enhancements Service Agreements</u>

Dear Commissioner Daus and Chuck:

We write to comment on the statements that you made during the Taxi and Limousine Commission's ("TLC") Public Meeting held on May 10, 2007 (the "Meeting") regarding our contribution to the Medallion Taxicab Technology Enhancements Service Agreements (the "Agreements"). Because our role in the review of these Agreements was different than what was suggested, we want to clarify our involvement for the record.

Specifically, the statements that "the New York Civil Liberties Union has … agreed on [the Agreements'] language …" and "… the [NYCLU] indicated to us that they were fully satisfied with the privacy protections we incorporated [in the Agreements]" do not reflect an accurate depiction of our inquiry into privacy issues arising out of the TLC's technology enhancement program and its corresponding Agreements. These statements broaden the scope of our review of this program and, thus, may mislead the public.

During our March 6, 2006 meeting, we had a discussion about the Agreements in general and sought assurances from the TLC that there will be no collection of taxi location data when the drivers are not engaged for a fare and, thus, such information would not be available to be disseminated by any entity, including the TLC. And, we confirmed this in a letter to Andy Salkin and Chuck dated March 9, 2006. While we certainly explored the privacy implications of the Agreements, it was not our understanding that the TLC was looking at our role as one to authorize or sign off on the Agreements. Indeed, we had no knowledge whatsoever that you were holding off on executing the Agreements until we authorized them.

We assume that you meant well when you referred to our discussions to underscore that the TLC has taken the drivers' privacy interests into account. We are very concerned that your description of our involvement, however, created an implication that we were involved in drafting and negotiating the language of the Agreements. We were not. Contrary to your statement at the Meeting, neither of us ever stated to the TLC that we were "fully satisfied" with the language incorporated into the Agreements or anything to that effect. While we did look at draft excerpts of the Agreements and one complete draft Agreement that you provided to us as a courtesy, we did not know, and still do not know, that we reviewed the final version or excerpts thereof of the Agreements. There is a significant distinction between being actively involved in negotiating and signing off on the Agreements' language and seeking assurances from the TLC that, at a minimum, no off-duty location data was being collected.

The NYCLU appreciates the TLC's willingness to address our various concerns regarding the TLC's adjudications process over the past few years and hopes that we will work together in the future in the same vain. In an effort to be constructive, we urge you to clarify the possible misinterpretation of our general inquiry into the issues raised by the use of GPS technology in taxicabs on your website in the same location that the Meeting's transcript will be posted. We further ask that you post such clarification simultaneously with the posting of the transcript. Thank you.

Sincerely,

Christopher Dunn
Assistant Legal Director

Lisa J. Laplace
Attorney

EXHIBIT C



Search | Email Updat

Residents | Business | Visitors | Government | Offic

## NEW YORK CITY TAXI & LIMOUSINE COMMISSION

Home

About TLC

TLC Rules and Local Laws

Court Administration

Passenger Information

Licenses

Safety & Emissions

**Industry Information**
- New Taxicab Logo
- TLC Rules and Local Laws
- Financial Disclosure
- Service Enhancements
- Wheelchair Accessible
  Vehicle Providers
- Request Records from TLC
- Frequently Asked Questions
- Sign up for official e-mail
  updates, news and Industry
  Notices from the TLC

Commission Meetings

TLC News

Current Licensees

Employment Opportunities

FAQ

Contact / Visit TLC

TLC Site Map

�֍ Medallion Sale Web Site

**SEARCH TLC**

### INDUSTRY INFORMATION | TAXICAB SERVICE ENHANCEMENTS

## Medallion Taxicab Technology Enhancements
Click on the links below for more information about this project.

- ✖ Driver Frequently Asked Questions **Updated**
- ✖ Owner Frequently Asked Questions **Updated**
- ✖ Technology Enhancements Email Updates
- ✖ Technology Vendor Expo
- ✖ Contract Between Medallion Holder and Technology Vendor
- ✖ Contact Information for Contractors
- ✖ Technology Enhancements Seminar
- ✖ Focus Groups
- ✖ Archive
- ✖ Download Adobe Acrobat

## Overview of the Technology Enhancements Service Project

### Better Communication & Better Service

In March 2004, the TLC's Board of Commissioners mandated that specific technolo
based service improvements be implemented in all medallion taxicabs. The techno
enhancements focus on four areas: automated collection and submission of trip da
installation of a passenger information monitor (including a passenger information
incorporating electronic message transmission capability into the taxicab, and final
addition of equipment to enable the acceptance of credit/debit cards.

These service enhancements represent a rare opportunity to significantly improve
riding experience of countless New Yorkers and visitors, as well as for drivers. The
technology will greatly improve communication between the TLC and its constituen
medallion taxicabs will now offer varied payment options for the riding public. The
to communicate with taxi drivers on a real time basis will enable the TLC to increas
level of service available to the riding public in groundbreaking ways.

### Text Messaging
Text messaging services will offer many benefits to drivers and passengers:
communication with taxis in the event of a citywide emergency; streamlining the p
for lost property claims; and directing taxicabs to fare opportunities by advising dr
of cruise ship schedules, major public events, and other needs for transportation.

The new system will allow the TLC to send short alphanumeric messages to cabs a
receive pre-programmed responses from the driver. The driver will be able to trans
response by pushing a single button.

### Automated Trip Sheet Data Collection
Today, drivers are required to maintain a trip-log that details each and every fare t
they serve. The trip sheet is filled out by hand and stored in paper form. Medallion

owners are required to maintain these trip sheets for three years.

The TLC will leverage state of the art vehicle location technology to automate this process. By integrating with the taximeter, the technology enhancement equipmer automatically capture the pick-up and drop-off location of every fare. Paper trip sh will disappear as the TLC will receive the data electronically. The data collected wi be more accurate.

### Credit Card / Debit Card Payment

The new system will allow all taxicabs to accept credit and debit cards as a form of payment. Credit cards and debit cards are widely accepted as a payment mechanis the United States:

- 22% of all consumer payments are made by credit card
- 31% of all consumer payments are made by debit card.

Research shows that acceptance of credit and debit cards presents an opportunity increased revenue - more trips and greater tips! Drivers will also benefit from incre safety. Although the crime rate is near an all time low, since there will be less cas hand, the use of credit/debit cards should further diminish the possibility of theft.

### Passenger Information Monitor (PIM)

The passenger information monitor (PIM) is a flat screen monitor, similar to a lapto screen, that will provide information such as news, sports, and weather to the passenger.

The PIM will be installed in the rear-seat passenger area of the taxicab where it wil used to complete the electronic payment process. The PIM will display the total far the end of every trip. The PIM will be used to communicate TLC Safety and Public Service Announcements (PSAs) and will provide a map allowing the passenger to f his or her journey through New York City and surrounding metropolitan areas.

The PIM will NOT provide "directions" to the passenger. Every PIM has an on/off ar mute button that can be controlled by the passenger.

### Timeline

**June, 2007** - All four vendors successfully complete rigorous field testing of equip

**August 1, 2007** - Sign Up Deadline - All taxicab owners are required to enter into contracts with one of the four vendors

**October 1, 2007 to January 31, 2008** - Installation Phase - All taxicabs are requ to be enhanced by their inspection date during this inspection cycle

**January 31, 2008** - Systems rolled out to virtually all taxicabs

### Driver Frequently Asked Questions

#### When will the systems be installed?

Medallion holders have the option of installing the system today. All taxicab owner required to enter into a contract by August 1, 2007. The date the system is require be installed depends on the inspection date, but virtually all cabs will have the syst installed by January 31st, 2008.

**Is the TLC going to use this technology to track drivers?**
No, the TLC will only use this technology to provide those customer service improvements described here. Even more importantly for drivers, the TLC will use replace the current hand-written trip sheets with automatic electronic trip sheets will be limited to collecting pick-up, drop-off, and fare information, all of which are already required.

**I have heard that this system will cost drivers between $3,000 and $5,000 this true?**
The primary cost of the system will be the responsibility of medallion owners, not drivers. There will be some transaction or service fees or monthly charges. The TL worked hard to negotiate fair contracts with vendors to minimize the cost to our licensees.

**How will the system be maintained? Who will pay for maintenance?**
Repair locations will be set up throughout the City and, in many cases, the repair s will be meter shops. Medallion owners may pay for a maintenance contract to cov equipment repairs and replacements.

**Are there any benefits for drivers?**
Yes, we expect more trips and larger tips due to the acceptance of credit/debit car Most retailers have reported increased revenue when they start accepting credit/d cards. The text messaging system will alert drivers to fare opportunities such as th arrival of a passenger cruise ship or the end of a large event.

**Are passengers going to use the map displayed on the screen in the back cab to give drivers directions to go to a location?**
The map will not encourage "backseat" driving by passengers. It will only show th current location of the cab and the path the cab has traveled – no directions will b provided.

**Are there any other benefits?**
Use of credit/debit cards means that the driver will have less cash on-hand, which creates safer conditions. And the text messaging system means drivers can be no in case of emergency situations.

**Will I need training? How will I be trained?**
The systems will be made as user-friendly as possible, but some training may be necessary, at first. Suppliers are required to provide the training it and it should t about one hour. The first training session will be available free of charge. In additi vendors have posted their training materials on their websites. Click here for:

⚹ Taxitronic/Verifone Transportation Systems (Note: you will be leaving the TLC we
⚹ Creative Mobile Technologies with Mobile Knowledge (Note: you will be leaving th website)
⚹ Taxi Technology Corporation (Note: you will be leaving the TLC website)
⚹ Digital Dispatch Systems Inc. (Note: you will be leaving the TLC website)

**Will my trip/fare information be transmitted to the Internal Revenue Serv (IRS)?**
No, your fare information will not be automatically sent to the IRS. There will be r changes to the current system, in which the IRS must send a subpoena to the TLC requesting trip sheet information.

**Will I need to enter my Social Security Number to log onto the system?**
No, your Social Security Number is not required to log onto the system. Each driv be given a unique ID number and password based on the vendors' requirements.

**Will the systems be used to issue speeding tickets or other infractions?**

No, there are no plans to issue tickets for speeding or other infractions using the systems.

**When do drivers get paid for credit card transactions?**
If you are a:

> **Fleet Driver** - You will be paid at the end of your shift. Print out an "En(
> Shift" report from your system which will show all credit card charges du
> your shift and present it to the garage's cashier. The garage will deduct
> 5% of the credit card charge.
>
> **2nd Driver for Individual Owner** - There are two main options. 1) Yo
> operate under the owner's merchant account, and be paid after your
> shift/have your charges deducted from your lease fee. or 2) You can set
> your own merchant account and have the payment deposited automatica
> your account.
>
> **DOV or Working with an Agent** - This is basically the same as with a 2
> driver for Individual Owner. (see above), details need to be negotiated
> between the medallion holder and driver.

**Can the driver act as his or her own merchant for credit card transactions**
The drivers will be responsible for the credit card transaction fees and may decide
more convenient or less expensive to open his own or her own merchant account.
driver is not a merchant, an owner must pay a driver for his or her credit card
transactions at the end of a shift (minus the cost of processing the transaction and
handling charges).

**Do I have to accept credit/debit cards for all trips?**
Yes, drivers are required to accept credit/debit cards all fares, even if they are only
$2.50. Setting a minimum payment amount is not allowed under the agreement s
with the credit card companies.

**Can a driver charge the passenger for the credit card fees?**
No, drivers are not permitted to charge more for credit than for cash.

**If a passenger is paying by credit/debit card, can they also charge their ti
their credit/debit card?**
Yes, the passenger can place their tip on the credit/debit card. The systems ask th
passenger how much tip they would like to give to the driver.

**What happens if the systems go down?**
First, the driver must immediately report the problem to the help desk's toll free
number. If the meter is still functioning, the driver may continue his/her shift unti
vendor schedule's a repair appointment. In no event may a vehicle operate for mc
than 48 hours following the system's malfunction. If the meter is not functioning,
driver must return the taxicab for repairs.

**What happens if a passenger uses a stolen credit/debit card?**
As long as the driver follows these simple requirements, he/she will be paid.
#1 - The driver must receive an authorization code from the credit/debit card proc
#2 - If the amount of the fare is over $25, the driver must also get a signature fro
passenger.
If these two rules are followed, the driver will receive his/her money for the fare.

**Is the credit/debit card fee a percentage on the total fare including the to
tip, or just based on the fare?**
Credit/debit card fees are based on the total charge including toll and tip.

**How will drivers access their electronic tripsheet data?**

All drivers will be able to access their electronic tripsheets by logging on to a secur
website provided by their technology vendor, using their unique userID and passw
If the drivers do not have access to the internet, they can request their tripsheet fr
their fleet or agent. Some vendors will also have kiosks at their service stations w
drivers will be able to access their trip sheet information.

**Do drivers have to maintain handwritten trip sheets, even if their cab is
enhanced?**
Handwritten trip sheets are required until the enhancements are installed. Therefc
handwritten trip sheets are required in all taxicabs until at least October. In additi
there is a failure in the enhancements, drivers are required to maintain handwritte
sheets.

**Can the driver share in advertising revenue from the PIMs?**
As the medallion owner is responsible for the costs of the enhancements, he/she/il
also entitled to enter into an agreement with the vendors for a share of the advert
revenue.

**What should a driver do if a passenger has no cash and his/her credit/del
card is not accepted by the system?**
Credit/debit cards can be rejected for two main reasons:

> **1** - The taxicab is in a "dead spot" and unable to connect to the data net
> for credit/debit card approval.
>
> If located in a "dead spot" driving to another location may result in a
> successful credit/debit card transaction.
> **2** - The passengers credit/debit card is invalid / over the limit.
> In this situation, the driver should seek out an ATM to enable the passen
> pay in cash. If the passenger is unwilling to locate an ATM, the driver sh
> suggest going to the nearest police precinct instead.
>
> In both cases, when they seek a location with a signal or an ATM, the cal
> should go off duty, using the code "Fare Dispute".

**Can a driver request that the passenger swipe his/her credit card at the
beginning of a long trip? Is it possible to request pre-authorization of
credit/debit card fees?**
No, under the current rules, a driver cannot request that a trip be pre-paid. The T
investigating pre-authorization of fares as many drivers have expressed interest in
seeing this feature introduced for longer trips.

**What happens when someone drives an enhanced cab more than 12 hours**
TLC Rules state "A driver shall not operate a taxicab for more than twelve (12)
consecutive hours."

**What happens if a passenger disputes a charge?**
> **a.** If the fare is below $25 and the driver received an authorization, the c
> will be paid. Only in very rare circumstances will the driver or merchant
> account owner not be paid
>
> **b.** If the fare is above $25, the credit/debit card company may request tl
> passenger signature to ensure that the signature is valid. For this reaso
> important for drivers to save all signed credit card receipts. In this insta
> chargeback may be charged to the technology vendor, merchant of recor
> driver.

**Owner Frequently Asked Questions**

**Who makes the Systems and where can a medallion owner buy one and ha installed?**
The four competing companies, in alphabetical order, are Digital Dispatch Systems Mobile Knowledge Corp. doing business in New York through its agent, Creative Mc Technology; Taxi Technology Corporation; and VeriFone Transportation Systems Ir d/b/a Taxitronic. Each of the service providers has subcontracted with various gar and meter shops to install and service the systems or have conveniently located dedicated facilities to provide service to you.

**Who is responsible for the costs of the system?**
The costs of the System and its installation are the responsibility of the medallion ( while the costs of the credit card transaction fees are primarily the responsibility of driver. These costs are offset by the fare increase enacted in March of 2004, the la increase in the history of the TLC.

**Is there a recommended form for the contract?**
Yes, the vendors must use a specific contract form with medallion owners. This for includes TLC negotiated specific protections for medallion owners and which is cons with the contracts that the TLC has with the vendors. The form contract will also r the maximum price that a vendor is allowed to charge. A medallion owner can atte to negotiate a lower price and determine whether he or she wants additional optior services. Click here for a sample of the form.

**How much will it cost to install the system?**
Fixed costs: There will be an up front cost of between $10 and $4,115 followed by monthly service charge of between $43 and $200. The maximum total cost of ownership over a three year period depends upon the vendor and options that you choose. The maximum total could be between $2,900 and $7,200 based upon the contract between the vendors and the TLC, advertising fees may offset costs. Sor vendors are offering systems at minimal costs. In many ways, signing up for the s enhancements is similar to cell phone contracts. Each vendor offers different pack with different fee structures.

Variable credit/debit card transaction costs: Credit/debit card fees are expected t average 3.5% to 4.00%. These costs include fees for banks and vendors. On a $ credit/debit card charge, costs will be $0.88 to $1.00.

**Can I negotiate with a vendor for lower prices?**
Yes, the figures cited above are the maximum prices permitted.

**How much of this cost can I pass onto drivers?**
The owner can charge the driver not more than 5.00% of the credit/debit card cha incurred during the driver's shift.

**What if a medallion owner has a previously existing contract for a meter t includes a point of sale credit card device and wants to choose a different service enhancement system?**
Medallion owners that currently accept credit cards cannot be bound by the terms contract and are free to choose whichever service enhancement system that they '

**If a medallion owner currently has rooftop advertising, does he or she hav use or buy that company's System?**
No. The medallion owner has the option to choose any approved System without a financial penalty. However, the contract regarding rooftop advertising remains in (

**Will the taximeter currently installed in my cab work with all Technology Enhancements vendors solutions?**
Not all meters will work with the systems. There are some that are inadequate for task. Meters require sufficient memory and processing capability to interface with Technology Enhancements.

| The following taximeters may work with any of the four enhancement vendors: | The following meter requires an upgrade to work with the four enhancement vendors: | The following mete are inadequate for task: |
|---|---|---|
| Centrodyne - 620 | MetroMeter 21R | Pulsar - 2020R |
| Centrodyne - 610 | | Pulsar - 2010R |
| Genie Taximeter - Genie | | Synalta - 720 |
| Pulsar - 2030R | | |
| Taxitronic - TX-36 older versions require an upgrade | | |

**How long will the contract last?**
The contract will last for up to three years. Owners may have the option to extend contract for one or two years more.

**Can I switch vendors after I sign a contract?**
Yes, but cancellation fees will apply. It is similar to a cell phone contract.

**When do I have to sign a contract with one of the four vendors?**
The Sign-Up Deadline (SUD) is set for August 1, 2007. By this date, all medallion holders must have entered into a contract to have their taxicab(s) enhanced with systems of one of the four vendors.

**When do I have to install the system?**
Your mandatory installation date will be based on your inspection date. All vehicle scheduled for inspection at the TLC Woodside Safety and Emission Facility on and a October 1st, 2007 will be required to have the system installed and working proper

**Are we going to get a fare increase to pay for the technology enhancemen**
The fare increase authorized in March, 2004 included a mandate for the service improvements. There was also a subsequent fare adjustment that benefited all dri in November 2006.

**Will the medallion holder own the technology after the contract expires?**
In some cases, yes. This varies depending on the vendor and the option chosen.

**What is the term of the contract?**
Medallion owners may choose a one, two or three year contract.

**Is the standard three year contract extendable? By how much time? For th same terms?**
The TLC has mandated the systems be installed for three years. After that, the fut uncertain. There is the possibility that more vendors may enter the market. Ther guidance after three years at the current time.

**After the initial installation, who is responsible (costs) for the maintenanc the units? Who pays if my screen in the front or back seat (PIM or DIM) i damaged in an accident?**
That is something to ask each vendor. Some vendors offer service contracts and differing warranties.

**Will the vendors offer warranties or insurance for the Systems?**
Warranties and/or insurance options vary widely among the vendors. Some includ
the cost, while others may charge for protection, similar to cell phone contracts. T
TLC recommends that you read the Vendor's information carefully and choose the
System that best suits your needs and concerns.

Furthermore, medallion owners should check your vehicle's insurance plan to learn
is covered in terms of vandalism, accidents, or theft.

**Will smaller cars (such as hybrids) be offered a smaller PIM? If so, where
be mounted?**
That is something to ask each vendor. At least one vendor is developing a small P
be installed in the back of the driver's headrest, but this has not been approved ye

**Do the smaller cars, like the Prius, have enough room in front for the DIM**
The TLC does not foresee a problem.

**If someone in the beta test program decides to change vendor, who is
responsible for system removal and costs?**
The vendor who installed the equipment for the beta test is responsible for all syst
removal costs.

**What if the System does not work but the meter still operates. Will the ta
be able to continue to pick-up fares?**
Some Systems work independently of the taximeter, others do not. If this is impo
to you, make sure you ask the vendors this question. Either way, if the System ha
malfunction, those taxicabs will continue to operate for hire for a period of time so
as their meter is working properly. (Owners, drivers and agents will have required
reporting and maintenance guidelines/ timelines for system malfunctions.)

**If my vehicle retirement date is shortly after my mandatory installation da
can I receive an extension?**
Any taxicab retiring within 6 months of the TLC Compliance/Inspection date from
October 1, 2007 through January 31, 2008 is not required to install the new techn
for the regularly scheduled inspection date. The technology must be installed in th
taxicab when it is hacked-up.

Exemptions are available only for taxicabs that will retire within 6 months of the
Compliance/Inspection dates in the months of October, November and December 2
and January 2008 as shown:

> If your inspection date is in October 2007, for the vehicle to be exempt,
> the latest the vehicle retirement date can be is April 2008

> If your inspection date is in November 2007, for the vehicle to be exemp
> the latest the vehicle retirement date can be is May 2008

> If your inspection date is in December 2007, for the vehicle to be exemp
> the latest the vehicle retirement date can be is June 2008

> If your inspection date is in January 2008, for the vehicle to be exempt,
> the latest the vehicle retirement date can be is July 2008

All newly hacked up vehicles reporting to TLC's Woodside Safety and Emissions Fa
after October 1st, 2007 are required to contain the enhancements.

**If a car is set to be retired more than 6 months after the mandatory instal**

date, will the vendors charge to move the equipment from one cab to anot
Vendors are permitted to charge for a de-install and re-install.  This is something t
negotiate prior to signing a contract.

**If an owner's enhanced system in unreliable, what can they do?  What car
do if the system is defective?**
The enhancements are required to work properly based on standards set by the TL
problems are encountered the contract permits the owner to not pay monthly fees
the contract can even be voided.

**What happens if a medallion owner refuses to have the enhancements ins
or the driver simply drives around with them turned off?**
If the enhancements are not installed, the owner will be subject to fines and suspe
If a driver tampers with the enhancements system and drives a cab with the
enhancements turned off, the driver will be subject to fines and suspension.

**If a medallion is in storage on August 1st, does the owner still have to sig
contract?**
No, a medallion in storage is not subject to the August 1st sign up deadline.
Keep in mind that all newly hacked up vehicles must contain the enhancements af
October 1st.

**What happens to a medallion owner that does not sign a contract by Augu
1st?**
The owner is subject to fines and suspension.  The TLC receives a copy of all contr
entered into between medallion owners and vendors.  After August 1st, the TLC wi
begin the process of sending notices to all medallion owners who have not yet sigr
contract.  Failure to comply may result in a suspension of your medallion.

**If an owner wants to transfer management of his/her medallion to an age
that does not work with his/her current technology vendor, can the contra
broken?**
If the contract is broken, the medallion owner will be responsible to pay all penalti
stipulated in the contract between the medallion owner and technology vendor.

| Chart of Vendors Offering Sale, Lease, Rent or Use of Equipment | | | | |
|---|---|---|---|---|
| | **Digital Dispatch Systems Inc.** | **Mobile Knowledge Corp./ Creative Mobile Technologies LLC** | **Taxi Technology Corp.** | **VeriFone Transportat Systems I d/b/a Taxitr** |
| **Method of Acquisition** | Lease | Use | Purchase (Green Plan) | Purchase - Plan Upfront paym( Monthly Paym |
| | | | Purchase (Blue Plan) | |
| | | | Rent (Purple Plan) | |
| | | | Rent (Orange Plan) | Plan #2 - Monthly Payn Only |
| | | | Rent (Yellow Plan) | |
| **Details** | A Non-advertising model and two Advertising Models | Two Advertising Models | All Advertising Model, except for Blue Plan | Advertising M |

**Technology Enhancements Email Updates**
The Taxi and Limousine Commission will be sending out periodic updates regarding
Taxicab Technology Enhancements program.  If you would like to sign up, please c
here

**Contract Between Medallion Holder and Technology Vendor**
Medallion holders and certain others will be required to enter into contracts with or
four authorized vendors to provide taxicab enhancements systems and services.  T
generic form contract between the medallion holder and an authorized vendor whic
linked below is the single basic form created by the TLC that each authorized vend
must use, and in which each vendor will set forth its respective pricing and other
pertinent terms.  Some vendors may have, in addition to the basic form, additiona
contract terms that supplement, but do not take the place of the basic form.

**Disclaimer**
Please note this generic form Attachment OCF (Owner-Contractor Contract Form) t
Medallion Taxicab Enhancements Service Agreements is intended for general inforr
only and should not be relied upon as a replacement or interpretation of the Medal
Taxicab Enhancements Service Agreements, with Attachments OCF, executed betw
the City of New York through the New York City Taxi and Limousine Commission (T
and contractor signatories. The TLC makes no representation or warranty, express
implied, as to the contents of this document and will not be responsible for errors (
omissions.

⌘ Attachment OCF (Owner-Contractor Contract Form)

**Contact Information for Contractors** Who Have Received Approval from the
to Proceed in Furtherance of the Proposal Each Submitted in Response to the RFP

Contact information for the four companies is listed below:

Creative Mobile Technologies, LLC
Contractor Agent for Mobile Knowledge Corp.
22-01 40th Avenue
Long Island City, NY 11101

www.cmtnyc.com

T: (718)349-7700
F: (718)937-8471

President and Chief Operating Officer:  Jesse H. Davis
Vice President Sales & Customer Relations: Michael A. Sahm
Vice President Operations:   Jed Appelbaum

Digital Dispatch Systems Inc.
Suite 300, 36-36 33rd Street
Astoria, NY 11106

www.digital-dispatch.com

T: (718)361-2345
T: (718) 361-2688
T: (604)241-1441
F: (718) 361-3112

Ken Holland , Sales  Manager, North America - Taxi
Dean Featherling, Operations

---

TaxiTech
25 Rockwood Place, 4th Floor
Englewood, NJ 07631

www.taxitechnology.com
info@taxitechnology.com

T: toll free (888)618-8480
T: in NYC:  (212)267-9909
T: in NJ:  (201)871-8894

Ed Sloam, President

---

VeriFone Transportation Systems Inc. d/b/a Taxitronic
36-15 13th Street.
Long Island City, NY 11106

www.verifonets.com

T: (718)752-1656

## Technology Vendor Expo

On Tuesday, July 10 - 2 P.M. - 6 P.M., the TLC will Host a Technology Vendor Expo
the TLC Woodside Safety & Emissions Facility, 24-55 BQE West, Woodside, NY.  Fo
more info click here

## Technology Enhancements Seminar

On Saturday, September 30, 2006 medallion owners, drivers, and agents of NYC Y
Taxi Cabs attended a seminar to learn about and view the Technology Enhancemen
Vendors and TLC representatives were on hand to answer questions.

To view the presentation click on the following link
✖ Technology Enhancement Seminar (PDF Format)

## Focus Groups

The TLC has commissioned three focus group studies to help evaluate the response
taxicab drivers and passengers to the technology service enhancements.
You can view the findings of the studies using the links below:

✖ Driver Study 2005 (PDF Format)

✖ Passenger Study 2004 (PDF Format)
✖ Passenger Study 2006 (PDF Format)

EXHIBIT D

**Ronart Leasing Corp**
**25-11 41ˢᵗ Avenue**
**Long Island City, New York 11101**
**(718) 392-3013**

June 27, 2007

To All DOV Vehicle Owners:

We regret to inform you that the fees that we have paid to medallion owners over the last few months have increased dramatically. We make a very small amount of money on medallion leases and DOVs to begin with, and with the new price that we have to pay we are now making no money at all.

Our current leases with you, the DOV owners, are for $800.00 per month, and we pay for the tax stamp, renewal fees, and registration fees. As of Monday, July 2, 2007, we will be passing these costs directly on to you. The result will be an increase to you of $34.00 per week per medallion.

We want to be clear that WE ARE NOT INCREASING THE AMOUNT WE CHARGE FOR THE ACTUAL LEASE OF THE MEDALLION. We are simply passing more of the associated costs on to you.

The Management

EXHIBIT E