UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

LOUBERT ALEXANDRE, YVON AUGUSTIN,
MAX CHARTELAIN, WILFRED GERMAIN, CLAUDE
LESSAGE, and JEAN PIERRE, INDIVIDUALLY AS
OWNERS OF YELLOW CAB MEDALLIONS IN THE
CITY OF NEW YORK AND ON BEHALF OF A CLASS
OF ALL OWNERS SIMILARLY SITUATED, AS WELL AS          Civil Action No.
INDIVIDUALLY, TOGETHER WITH MAMNUNUL HAQ
and ASIM AKHTAR, AS HOLDERS OF HACK
LICENSES IN THE CITY OF NEW YORK AND AS
REPRESENTATIVES ON BEHALF OF A CLASS OF
ALL HOLDERS OF HACK LICENSES IN THE CITY OF
NEW YORK, and the NEW YORK TAXI WORKERS
ALLIANCE,

                          Plaintiffs,

          - against -

THE NEW YORK CITY TAXI AND LIMOUSINE COM-
MISSION, MATTHEW DAUS, AS COMMISSIONER
/CHAIR OF THE NEW YORK CITY TAXI AND LIMO-
USINE COMMISSION, AND THE CITY OF NEW YORK,

                          Defendants.

-------------------------------------------------------------------------x

MEMORANDUM IN SUPPORT OF
PLAINTIFFS' ORDER TO SHOW CAUSE FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

MEMORANDUM IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Preliminary Statement..................................................................................................1

Statement of Facts.......................................................................................................3

Argument....................................................................................................................5

I     Current Circumstances Require a TRO and Preliminary
Injunction...................................................................................................................5

    1. Individual Plaintiffs Face Imminent Irreparable Harm................................5

    2. Plaintiffs Have A Likelihood of Success On The Merits Plaintiffs Have A
Likelihood of Success on the Merits.............................................................8

      A. Per Se Taking.......................................................................................9

      B. Functionally Equivalent Taking........................................................11

          i.     Economic Harm..........................................................12
          ii.    Investment Backed Expectations..................................14
          iii.   Character of Government Action..................................15

      C. Privacy...............................................................................................16

         i. Facts Especially Pertaining to Privacy Claim........................17

            a.     GPS Technology.........................17

            b.     TLC's Present Information Gathering
                Technology...................................18

            c.     TLC Has Mandated No Use Limitations On GPS
                Information...........................19

            d.     GPS Technology Undermines The Entire Notion of
                Drivers Acting as Either Independent Small
                Businessmen or Independent
                Contractors...............20

ii.    The Law Grants Plaintiffs The Right of Privacy They
       Seek..................................................................................21

              a.    The Federal Constitution.......................21
              b.    The State Constitution...........................24

Summary and Conclusion...........................................................................27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
LOUBERT ALEXANDRE, YVON AUGUSTIN,
MAX CHARTELAIN, WILFRED GERMAIN, CLAUDE
LESSAGE, and JEAN PIERRE,  INDIVIDUALLY AS
OWNERS OF YELLOW CAB MEDALLIONS IN THE
CITY OF NEW YORK AND ON BEHALF OF A CLASS
OF ALL OWNERS SIMILARLY SITUATED, AS WELL AS          Civil Action No.
INDIVIDUALLY, TOGETHER WITH MAMNUNUL HAQ
and ASIM AKHTAR,  AS HOLDERS OF HACK
LICENSES IN THE CITY OF NEW YORK AND AS
REPRESENTATIVES ON BEHALF OF A CLASS OF
ALL HOLDERS OF HACK LICENSES IN THE CITY OF
NEW YORK, and the NEW YORK TAXI WORKERS
ALLIANCE,

      Plaintiffs,

   - against -

THE NEW YORK CITY TAXI AND LIMOUSINE COM-
MISSION, MATTHEW DAUS, AS COMMISSIONER
/CHAIR OF THE NEW YORK CITY TAXI AND LIMO-
USINE COMMISSION, AND THE CITY OF NEW YORK,

      Defendants.
-------------------------------------------------------------------------------x

MEMORANDUM IN SUPPORT OF
PLAINTIFFS' ORDER TO SHOW CAUSE FOR
TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

Preliminary Statement

  In a case of first impression, plaintiffs, acting on behalf of the 43,000 drivers who operate

the 13,187 yellow medallion taxicabs in the City of New York, seek relief against defendant City

of New York ("City") acting through defendant Taxi and Limousine Commission ("TLC"),

which in turn, acts through individual defendant Daus as its Commissioner/Chair.  Defendants

are trying to force individual plaintiffs to install its mandated "Taxi Technology System.

(hereinafter "TTS") into each and every yellow medallion taxicab which operates within the City

of New York by January 31, 2008. Plaintiffs seek expedited relief, by Temporary Restraining

Order ("TRO"), because on or about September 1, 2007, Plaintiffs Alexandre, Chartelaine,

Germain, Lessage, Augustin, and Pierre each received a TLC Summons charging each driver

with a violation of TLC Owner Rules Sec.1-11(g) for failure to sign a contract with a TLC

authorized vendor to "buy, lease, rent or use a Taxicab Technology Enhancements System and

Service for [my] medallion", requiring appearances at their scheduled administrative hearings,

where they face the suspension of their medallions. A copy of the TLC Summons is annexed

hereto as Exhibit C to the Complaint.. Violation of Rule 1-11(g) carries a penalty of "$250 and

suspension until compliance".

Plaintiff Alexandre has a hearing scheduled to occur on September 24th, 2007. Plaintiff

Chartelaine has a hearing on September 26th, 2007. Plaintiff Germain has a hearing set for

September 26th, 2007. Plaintiff Lessage has a hearing date of September 26th, 2007. Plaintiff

Augustin has a hearing scheduled to occur on September 28th, 2007. Plaintiff Pierre has a

hearing on September 28th, 2007.

Further plaintiffs seek both a TRO and a preliminary injunction ("PI"), because

defendants have declared that on and after October 1, 2007 no vehicle which is inspected in

accordance with the TLC's mandated thrice-yearly inspection program will be deemed fit for

service as a yellow medallion taxicab unless it includes the equipment necessary to fulfill the

TTS.  Thus drivers, such as plaintiff Haq, who own their vehicles but do not own the medallions

face the same permanent alteration and reconfiguration of their own private property.  In

addition, drivers, such as plaintiff Akhtar are also being impacted by having the hack licenses - which allow them to drive taxicabs - burdened, as explained more fully below. Because the issues plaintiffs raise encompass basic constitutional rights asserted and applied in an unconventional way, they believe that defendants must be restrained from imperiling the livelihood of any individual plaintiffs to any degree or forcing permanent changes to their private property while these difficult issues are properly weighed and resolved by this Court.

Statement of Facts

By way of background information, defendants claim to have been developing TTS since 2004 and claim to have consulted all interested parties prior to initiating it (Affidavit of New York Taxi Workers Association, hereinafter "NYTWA Affidavit," ¶10). In the past two years, on a few occasions, they met with representatives of plaintiff NYTWA, but never addressed any of the issues it raised on behalf of taxi drivers, particularly concerning such matters as the impact of TTS on driver privacy (NYTWA Aff ¶9). While defendants vetted certain aspects of TTS through TLC's formal rule-making procedures in the form of revising the mandated physical specifications for licensed taxicabs, they have never explained fully the scope of the information collected by TTS equipment or, more significantly, the ownership, control and uses to be made of this information . Instead, defendants have steadfastly maintained that TLC will continue to collect through TTS only the same limited data which it now collects in other ways, and thus that it need not concern itself with any larger questions about the data which will be collected and stored (NYTWA Aff ¶10). Moreover, since TLC has defined a general schematic for the results TTS is supposed to produce and has approved four (4) private contractors to implement the system, it has left it to these vendors to set their own specific terms

3

of the TTS installation and maintenance contracts with the medallion owners, and has abdicated

any responsibility at all to the vast majority of drivers who neither own their own medallions or

nor taxi vehicles, and who must rent them through taxi industry brokers or from fleet owners of

medallions (See NYTWA Aff ¶5).

The circumstances which bring immediate focus to these issues arose on or about June 1,

2007, when TLC put a notice on its website informing medallion holders that by August 1, 2007

they would have to sign a contract with one of four approved vendors to buy TTS technology.

(Complaint ¶19) On or about July 30, 2007, TLC sent a "Final Notice" (Complaint ¶ 20 and

Exhibit B annexed thereto; see also Affidavit of Max Chartelain ¶19, hereinafter "Chartelain

Affidavit" and Exhibit A annexed thereto; see also Affidavit of Jean Pierre ¶17, hereinafter

"Pierre Affidavit" and Exhibit A annexed thereto) to medallion holders whom the vendors

reported had not signed such contracts. Plaintiffs Loubert Alexandre, Yvon Augustin, Max

Chartelain, Wilfred Germain, Claude Lessage, and Jean Pierre all own and operate their own

yellow medallion taxicabs, and have not signed contracts to buy the TTS technology. For the

very first time in this letter, TLC raised the possibility of fining or suspending the medallions of

medallion holders who had not signed contracts. Thereafter, the threat of fine or medallion

suspension was repeated in phone calls made by representatives of TLC who phoned plaintiff

Lessage (See Affidavit of Claude Lessage ¶19, hereinafter "Lessage Affidavit")

Finally, on or about September 1st, 2007, Plaintiffs  Alexandre, Chartelaine, Germain,

Lessage, Augustin, and Pierre  each received a TLC Summons charging each driver with a

violation of TLC Owner Rules Sec.1-11(g) for failure to sign a contract with a TLC authorized

vendor, and  requiring appearances for their scheduled administrative hearings, mostly scheduled

4

within the last week of September 2007. .Plaintiff Alexandre has a hearing scheduled to occur

on September 24th, 2007.   Plaintiff Chartelaine has a hearing on September 26th, 2007. Plaintiff

Germain has a hearing set for September 26th, 2007.  Plaintiff Lessage has a hearing date of

September 26th, 2007. Plaintiff Augustin has a hearing scheduled to occur on September 28th,

2007.  Plaintiff Pierre has a hearing on September 28th, 2007.  These plaintiffs imminently face

the suspension of their medallions, and hence loss of their livelihood, at their scheduled TLC

hearings unless the Court grants plaintiffs' TRO and Preliminary Injunction

Argument

I      Current Circumstances Require a TRO and Preliminary Injunction

        The standards for seeking both a TRO and a PI are the same in this circuit.  Plaintiffs

must demonstrate: 1) irreparable harm in the absence of the injunction and a) either a likelihood

of success on the merits; or b) sufficiently serious questions going to the merits to make them

fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor.

See, Alba Samoza v. New York City Department of Education, 2006 WL 1981758, 3

(S.D.N.Y.), July 10, 2006. See, MyWebGrocer, L.L.C. v. Hometown Info., Inc., 375 F.3d 190,

192 (2d Cir.2004).  Plaintiffs believe such circumstances are present in this matter.

        1.  Individual Plaintiffs Face Imminent Irreparable Harm

        To prove irreparable harm, a plaintiff must show that absent the grant of a preliminary

injunction, it "will suffer an injury that is neither remote nor speculative, but actual and

imminent and one that cannot be remedied if a court waits until the end of the trial to resolve the

harm." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir 2005).  In addition,

irreparable harm has to consist of more than just money damages.  Rose Associates v. The

5

Spanish State-Permanent Mission6 of Spain to the United Nations, 1994 WL 330355, 1

(S.D.N.Y. 7/8/94). Plaintiffs Alexandre, Augustin, Chartelain, Germain, Lessage and Pierre are

under imminent threat of not only monetary fines but also suspension of their TLC medallion.

Such a suspension effectively deprives them of their livelihood, for, if their medallions are sus-

pended they may not operate as taxicabs the vehicles to which they are attached, nor may they

transfer them to other vehicles. Loss of a business and livelihood constitutes the most

immediate kind of irreparable harm. See Padberg v. McGrath-McKechnie, 203 F.Supp.2d 261,

289 quoting Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d. 27, 37 (2d Cir

1995).

Moreover, leaving aside the concerns of whether owner-operator plaintiffs, such as

Alexandre, Augustin, Chartelain, Germain, Lessage and Pierre, can be penalized for refusing -

against their wishes to sign by a date certain a contract to receive the TTS from a vendor as

mandated by TLC, a much larger group of drivers, which also includes plaintiff Haq, who own

their own vehicles (even if they do not own the medallion) still must endure irrevocable physical

changes to their own private property - which their vehicles represent - to accommodate the

equipment necessary to implement the TTS on or after October 1, 2007, the date on which TLC

has decreed its inspectors must see the TTS equipment installed as a part of the routine safety

inspections. DOVs do not even have control of which TTS package will be installed in their

vehicles since, under TLC rules, the owners bear the responsibility of signing the TTS contracts.

Absent the intervention of this Court, all of these plaintiffs must agree to having their cabs

literally chopped apart without their consent in order for the vehicles to remain qualified to

operate as taxicabs. This authoritarian and permanent invasion and alteration to individual

plaintiffs' private property compels them to seek temporary and preliminary relief.

The more intriguing question, and one of first impression, is whether those drivers, such as plaintiff Akhtar, who own no property interest in either their medallion, or the vehicle they drive which bears it, can assert a constitutional claim. Moreover, it can be justly asked why, since the taxi industry is an industry normally regulated by government, the installation of TTS rises to the level of a constitutional infringement as against any driver? The affirmative answer to the first question is more readily apparent than it would seem, but to appreciate why it is so requires some understanding of the manner in which the taxi business operates in New York City.

Cab drivers whose qualification to participate in the taxi industry in New York City is their hack license are no more employees than the owner-operators or the DOVs. The law regards all drivers who lease the medallions and vehicles from medallion owners, whether individuals or garages, as independent contractors. Albeit the TLC's regulations ostensibly impose no costs for TTS directly upon those who do not own the medallions, as a practical matter, the medallion owners are already passing the costs of TTS on to renters by altering the terms of the lease agreements to pick up TTS costs. (See NYTWA Aff. ¶13 ; Affidavit of Plaintiff Mamnunul Haq ¶14-¶16, hereinafter "Haq Affidavit", and Exhibit A annexed thereto). Thus even those who hold no interest in the medallion are being made to bear the cost of TTS, outside of the boundaries of TLC's regulation, and seemingly without TLC taking any interest in these important financial considerations upon which so many taxicab drivers' welfare depends.

A string of cases make apparent the fact that a hack license is property within the constitutional ambit. <u>Hecht v. Monaghan</u>, 307 N.Y. 461, 121 N.E.2d 421 (1954); <u>Studefin v.</u>

7

NYCTLC, 135 Misc.2d 923, 516, N.Y.S.2d 1012 (Sup. Ct., N.Y. Co., 1987); Lys v. New York

City Taxi, __ Misc. __, 2002 WL 338187 (N.Y. City Civ. Ct., 2002).  The reasoning of these

cases is readily apparent.  If a hack license is a prerequisite to driving a yellow medallion taxicab

in New York City, it becomes so essential to the livelihood of the bearer that interference with its

possession is tantamount to an unlawful seizure of property.

 Moreover, the interference does not have to be instantaneous to obtain temporary injunc-

tive relief. In some situations, the imminent likelihood of loss is sufficient to demonstrate the

irreparability of the harm which will befall a litigant if relief is not granted.  In  Yong Ki Hong,

v. KBS America, Inc., 2005 WL 1712236 (E.D.N.Y.), plaintiff owner of video rental store

brought an Order to Show Cause and TRO seeking to restrain defendant KBS from ceasing

supply of master tapes of Korean language programs.  KBS controlled sixty (60%) of the Korean

television program market and was one of only three suppliers of such videos in New York City.

The Court granted the plaintiff TRO based upon the showing of their loss of future revenues to

such a degree that they would be forced to shut down their business and lose their livelihood.

> Because plaintiffs' inability to provide customers with Korean language
> videos from these master tapes has caused and will likely continue to
> cause plaintiffs a loss of customers and revenue, and because, as a result,
> plaintiffs will have no choice but to close their business, the court finds
> that plaintiffs have satisfied their burden of demonstrating irreparable
> harm for purposes of their motion for a TRO.  Yong, 2005 WL 1712236,
> at 2 (E.D.N.Y.)

2.  Plaintiffs Have A Likelihood of Success On The Merits

 In order to challenge the constitutionality of an action utilizing 42 U.S.C. §1983, plain-

tiffs: "(1) [m]ust allege that action occurred under color of state law;" and that the "(2) [a]ction

resulted in a deprivation of constitutional or statutory right." Arakawa v.Sakata, 133 F.Supp.2d

8

1223, 1225 (D Hawaii 2001). There can be no question that the TLC's mandate of TTS constitutes state action, so the first part of the test is easily met. That there is a permanent invasion and alteration of individual plaintiffs' vehicles necessitated by the installation of the equipment to effectuate TTS is beyond question, and that this alteration interferes with their fundamental use of their own property is also readily apparent.

### A. Per Se Taking

With respect to owner-operated medallion vehicles and driver owned medallion vehicles, plaintiffs assert that the permanent physical alteration of the taxicab vehicles necessitated by the installation of the TTS system is a per se taking under the Fifth Amendment. Such a per se taking can be asserted either: 1) where a government requires owners to suffer a permanent physical invasion of their property; or 2) where regulations completely deprive an owner of "all economically beneficial use of her property." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876, 73 USLW 4343, 35 Envtl. L. Rep. 20,106, 05 Cal. Daily Op. Serv. 4301, 2005 Daily Journal D.A.R. 5868, 18 Fla. L. Weekly Fed. S 303 (2005); Loretto v. Teleprompter Manhattan CATY Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, 8 Media L. Rep. 1849 (1982); Penn Central Transportation Co. v. City of New York,  438 U.S.104, 98 S.Ct. 2646 (1978); Palmieri v. Town of Babylon, Not Reported in F.Supp.2d, 2006 WL 115162 (E.D.N.Y. 2006).

In the instant case, the TTS program requires the permanent installation of: 1) A Text messaging box to be placed in the front of the taxicab near the driver's seat; 2) a credit and debt card reading device in the back seat of the taxicab (NYTWA Aff ¶ 6); 3) a passenger information

9

monitor[1], like a television screen, in the back seat of the taxicab attached to the partition wall between the drivers and the passengers; and 4) software to create an electronic trip sheet, which includes Global Positioning System ("GPS") hardware and software integrated into the taxi meter circuitry software.

The physical amount of the an unconstitutionally improper invasion is much less significant than its impropriety. In Loretto, supra, the Supreme Court found a per se unconstitutional taking under a New York law which permitted the defendant television company to install its cable television wires in plaintiff landlord's building, saying: "…[c]ases, relying on the character of a physical occupation, clearly establish that permanent occupations of land by such installations as telegraph and telephone lines, rails, and underground pipes or wires are landowner's use of the rest of his land". Loretto, supra, at 430.  See also, United States v. Pewee Coal Co., 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951) (holding that the government seizure of coal mine operations is a taking);  United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (government occupation of private warehouse leased to General Motors is a constitutional taking).

The Loretto Court wrote:

> [T]he cable installation on appellant's building constituted a taking under the traditional physical occupation test, since it involved a direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall. There is no constitutional difference between a crossover and noncrossover

---

[1]The PIM is the only piece of technology for which dimensions are outlined in TLC Rules Section 3-07, described as "...a screen that is no less than ten (10) inches measured diagonally" and for hybrid and low emission taxis, may be "less than ten (10) inches but not less than five and one-half (5 ½) inches measured diagonally.  Apparently, the TLC did not deem it important to define the dimensions of the remaining three pieces of gadgetry comprising TTS.

10

installation, since portions of the installation necessary for both
types of installation permanently appropriated appellant's property.
The fact that the New York statute applies only to buildings used as
rental property does not make it simply a regulation of the use of real
property.  Physical occupation of one type of property but not
another is  no less a physical occupation.
Loretto v. Teleprompter Manhattan CATY Corp, 458 U.S. 419 at
420.


### B.  Functionally Equivalent Taking

Even were this Court to find that the TLC's mandate is not a per s

taking because the physical alteration or invasion of plaintiffs' property is not being carried out

by the governmental agency itself, nevertheless courts have held that a taking can occur if the

government action is "functionally equivalent" to a per se taking, when the governmental

regulation of private property becomes "so onerous that its effect is tantamount to a direct

appropriation or ouster." Lingle v. Chevron U.S.A., Inc., supra, at p. 537.  See also Penn Central

Transportation Co. v. City of New York, supra.

Although the Supreme Court has been unable to define a "set formula" "for

determining when 'justice and fairness' require that economic injuries caused by a public action

be compensated by the government, rather than remain disproportionately concentrated on a few

person," it has attached significance to the following factors: 1) economic impact of the

regulation on the claimant; 2) the extent to which the regulation interferes with distinct

investment-backed expectations; and 3) the character of the governmental action, specifically

whether there was a physical invasion or whether the regulation merely affects property interests

through "some public program adjusting the benefits and burdens of economic life to promote

the common goal." Penn Central Transp. Co., supra, at 124; Lingle v. Chevron U.S.A., Inc.,

11

supra at 539.  A closer discussion of these factors will demonstrate how these factors articulated

in the Penn Central case, apply to the TLC's TTS regulation.

i.      Economic Harm

While the economic harm alone is not enough to constitute a functionally

equivalent taking, it is certainly one of the most important factors.  "... the Penn Central inquiry

turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic

impact and the degree to which it interferes with legitimate property interests." Lingle v.

Chevron U.S.A., Inc., supra, at 540.  "[I]t is the owner's loss, not the taker's gain, which is the

measure of the value of the property taken". United States v. Causby, 328 U.S. 256, 261, 328

U.S. 256, 66 S.Ct 1062, 90 L.Ed 1206 (1946).  In a case where the taking is not per se, "we have

acknowledged time and again, '[t]he economic impact of the regulation on the claimant and…the

extent to which the regulation has interfered with distinct investment-backed expectations' are

keenly relevant to takings analysis generally".  Lucas v. South Carolina Coastal Council, 505

U.S. 1003, note 8, 112 S.Ct. 2886, 34 ERC 1897, 120 L.Ed.2d 798, 60 USLW 4842, 22 Envtl. L.

Rep.(1992).

In the case at hand, the severe and debilitating economic harm which can and will befall

plaintiffs is readily apparent.[2]  First, with respect to owner-operator plaintiffs, suspension of their

medallions prevents them from earning their livelihood.  Second, the TLC has estimated the

range of TTS installation to extend from a minimum of $10 to a maximum of $4115  and the

system maintenance fees to range from $43 to $200 See NYTWA Aff ¶12 and Exhibit A

---

[2] The Taking Clause obstructs government from "…forcing some people alone to bear
public burdens which, in all fairness and justice, should be borne by the public as a
whole". Armstrong v. United States, 364 U.S. 40, 49 (1960).

12

annexed thereto.   Third, once the TTS systems are installed and operational, all plaintiffs will be

paying an up front charge of up to 5% of each fare paid by credit or debit card as a merchant

transaction fee.   See a copy of the TLC's TTS regulations annexed as Exhibit A to Complaint.

Fourth, all plaintiff drivers are required to take the taxi off the road if there is a malfunction,

within two hours of the discovery of such malfunction in the technology, and may not return to

their livelihood if the technology  is not operational within forty eight hours.     See a copy of

the TLC's TTS regulations annexed as Exhibit A to Complaint.  See Driver Affidavits.  See

NYTWA Affidavit.  Who will reimburse the driver for the loss of his/her income while he is

takes his cab off the road to ensure that the PIM is properly running ads? [3] No one.

The DOV plaintiff will suffer added economic harm at the hands of their taxi brokers by

increased weekly payments resultant of the TTS Mandate.  One garage has already raised the

weekly fees for the DOVS in two distinct ways. See Haq Aff ¶14-16 and Exhibit A annexed

thereto.  The Medallion Lease & Taxicab Purchase Contract, Paragraph 4 blatantly states, " In

addition to the lease and car payments stated above, the Driver shall be obligated to pay the

following…b) A fee for the installation, use and maintenance of the credit card accessible

equipment and TTS (Global Positioning System). Driver shall also pay a percentage from each

credit card transaction." See Haq Aff ¶16 and Exhibit A annexed thereto.   In addition, the

garage imposed upon all DOV drivers an extra cost of $1,175.25 per year for payment of fees

that they were not responsible for before March 5, 2007[4] See Haq Aff ¶15.

---

[3] Out of the approximately 1000 cabs that already have TTS installed, there have already
     been reports of technology malfunctions. See NYTWA Aff ¶15 and Exhibit C
     annexed  thereto.

[4] This Notice appears to be a unilateral modification of the contract imposing a change
     without giving the driver an opportunity to review the terms. Also, the timing of the

Another garage has issued a notice to the DOV Vehicle owners, dated July 27, 2007, stating clearly that as of July 2, 2007, they are now going to directly pass on the costs the tax stamp, renewal fees, and registration fees onto the DOV due to recently increased fees paid out to medallion owners,

> We regret to inform you that the fees that we have paid to medallion owners **over the last few months** have increased dramatically….Our current leases with you…are for $800.00 per month, and we pay for the tax stamp, renewal fees, and registration fees. As of Monday, July 2, 2007, we will be passing these **costs directly on to you** . The result will be an increase to you of $34.00 per week per medallion. See NYTWA Aff ¶13 and Exhibit B annexed thereto (emphasis added).

The garage driver plaintiffs will face pressure to accept the more expensive daily driving lease rates as opposed to the less expensive and preferable weekly lease rates. See NYTWA Aff ¶13A.

In sum, it is clear as day that plaintiffs will suffer an irreparable economic harm due to the        TLC TTS regulations.

ii.    Investment Backed Expectations

While serving the expectations of the TTS vendors, who stand to profit from the costs and fees exacted during the installation process, as well as, undoubtedly from the advertising revenue pumped into the taxis over the passenger information monitor, and may also have an opportunity to cash in on the GPS information recorded for each cab as a new advertising data base, the TLC TTS rules interfere with the investment-backed expectations of the owner-

---

imposition of the extra fees-"as of Monday, March 5, 2007"-is coincidentally in sync with the time that the TLC passed the TTS rules. The rules were published on January 2007, for public comment in the City Record and on March 8, 2007, a public hearing was held at the TLC Manhattan headquarters.

operator and DOV plaintiffs, who are, when all is said and done, really just small businessmen themselves. They have undertaken, generally by borrowing, the multiple hundreds-of-thousand dollar cost of the medallion and the multiple tens- of-thousand dollar cost of the taxicab vehicle. At the time the plaintiffs purchased their medallion and taxis the cars they drove did not contain the TTS technology. They contracted for, and have been operating with, a certain amount of costs, expenses and revenue. With the advent of TTS, their costs and expenses are increasing while their income will decrease (See Affidavits of Alexandre, Augustin, Chartelain, Germain, Lessage, Pierre, and Haq). This same diminution of income will be experienced even by those whose property interest lies in their hack license (See Affidavit of Asim Akhtar, hereinafter "Akhtar Affidavit").

iii.     Character of Government Action

Defendants can assert no compelling public health, safety or welfare concern which justifies the permanent alteration of the property and the livelihood of plaintiffs [ "…[E]ach of these tests focuses directly upon the severity of the burden that government imposes upon private property rights." Lingle v. Chevron, 544 U.S. at 539.] While "customer service" might be a legitimate area of governmental concern, TLC has never offered evidence that the taxi riding customer base will diminish if the TTS program is not implemented or that taxi rider ship is falling because TTS has not yet been implemented. [NYTWA Aff ¶ 9] If defendants offer the rationale that TLC must stay ahead of the curve with its technology, such a rationale hardly justifies the involuntary burden that TLC is imposing upon plaintiffs. [NYTWA Aff ¶ 9] A taxi passenger's ability to sift through a Zagat's restaurant guide on the PIM inside the taxi cab hardly necessitates a forced permanent alteration of a drivers' private property forever. When

15

balanced against the cost and disruption to taxi drivers, such a frivolous use of defendants'
mandate to uphold the public health, safety and welfare warrants emergency review and scrutiny
by this Court [5].

C.  Privacy

Completely separate and apart from the claims of TTS constitution an unconstitutional
taking of property, plaintiffs also assert that their fundamental right to privacy guaranteed by the
Fourth Amendment and the New York State Constitution is being violated by the GPS facet of
the TTS program, which will enable drivers to be tracked at all times, whether on duty or off,
twenty four hours a day, seven days a week.  In order to assert a constitutional privacy claim,
plaintiffs must have legal standing to assert such a claim.   Plaintiffs are permitted standing if
they can establish that they have a legitimate and reasonable expectation of privacy, which the
Supreme Court has set a two-part test to measure.  First, an individual must demonstrate [by his
conduct], an  "actual (subjective) expectation of privacy." Then, such individual must also
demonstrate that this expectation when  "[v]iewed objectively"  is one that society also
recognizes as reasonable under the circumstances.  See  United States v. Knotts, 460 U.S. 276
(1983), 281 quoting  Katz v. United States, 389 U.S. 347 (1967).
In the instant case,  which they believe to be the first civil case of its kind, plaintiffs assert
 that the GPS technology, one of the four components of the TTS, violates their legitimate

---

[5] Perhaps even the TLC is oblivious to its purpose in passing the TTS.  It's "Statement of
Basis and Purpose" attached to the "Notice of Promulgation of Rules" [the TTC Rules],
is deficient of any stated purpose of passing these rules whatsoever. See TLC TTS
Regulations annexed as Exhibit A to the Complaint.

expectation of privacy[6]. Plaintiffs lay claim to both a "positive" subjective expectation of

privacy in wanting to prohibit real time tracking of each movement while they are on duty -

which protects their proprietary choices of routes by which they convey their customers[7] - and a

"negative" expectation that they will not by tracked in any way, shape or form when they are

using the taxi *not* for business, but, rather for *personal use unrelated to their occupation.* A

brief explanation of the GPS technology itself is required to make plain why plaintiffs' concerns

are so significant and require expedited consideration.

### i. Facts Especially Pertaining to Privacy Claim

#### a.    GPS Technology

The nature of the technology is such that it literally captures, second by second, the

location of the taxi cab, and, consequently, the location of the driver and the passenger at all

given times. It contains no "off" button. Once it is installed in plaintiffs' taxis, as TLC has

presently mandated the GPS component of the TTS system, there is no way to stop the second by

second tracking. The GPS technology has three parts: 1) a broadcast unit placed in each taxicab

which emits a signal at precisely timed intervals of 6 to 8 seconds; 2) 24 satellites orbiting above

the Earth, positioned in so-called medium orbits such that they remain stationary over a fixed

---

[6] Note that the GPS technology is not included in the TTS package to benefit the drivers
by permitting them to locate passengers' destinations and pick the most efficient route    to
proceed to them, but rather, directly, for the amusement and edification of the    passengers, and,
indirectly, to allow advertisers to make available location specific    advertising to the
passenger. (NYTWA Aff ¶ 7)

[7] The People of the State of New York v. Spinelli, 35 N.Y.2d 77, 80 (1974) ("It is well-settled
that a businessman's private commercial property is entitled to Fourth Amendment protections")
(See See v. City of Seattle, 387 U.S. 541, 543 (1967)("The businessman, like the occupant of a
residence, has a constitutional right to go about his business free from unreasonable official
entries upon his private commercial property.")

17

location (the Global Navigation Satellite System (GNSS)), which capture, amplify and redirect

the signal from the broadcast units in the taxis to 3) a computer at a location remote from either

the taxi or the GPS satellite which stores and analyzes the signals received from the taxicabs via

the satellites. Since the data storage computer is programed to track the differences in the signal

from one interval to the next, by comparing the changes from one interval to the next, it is

possible to derive from the computer, in real time, precise information about the location of the

taxicab as well as its, speed and direction at any given moment.

http://en.wikipedia.org/wiki/GPS].

b.     TLC's Present Information Gathering Technology

Moreover, it is absolutely false for TLC to attempt to represent that the TTS system

merely *enhances* its existing ability to collect information. At present, drivers, such as plaintiffs,

only record, literally with pencil and paper, the requisite pick-up location, drop-off location.

They enter their hack license number on the meter at the beginning and at the end of their time in

the vehicle and the number of passengers when they drop the flag on the meter. Under current

TLC rules,[8] owner-operator drivers retain these "trip sheets," while DOVs and fleet drivers

simply turn the "trip sheets" into their owners, brokers or garages, but never to the TLC itself.[9]

The TLC has never kept track of drivers' beginning times and drivers are not required to

report such information. They are not required to apprise the TLC of each and every route that

they chose to take to transport their passengers, nor the location of their vehicle in between fares,

---

[8] TLC Rules and Local Laws, Chapter 2-Taxicab Driver Rules-"Section 2-28 (a) (1)
Requirements of Trip Sheet: (1) at the start of each trip, the starting time, specific
location and number of passengers; (2) on completion of the trip, the destination, the
time, the amount of the fare, and any tolls paid; (3) the taximeter readings and the
concluding time of his or her workshift".

[9]Id.

18

nor the places they go when they are off-duty and using their taxi cab for personal use.

However, under the new TTS mandate, specifically TLC's most recent modification to its Rule

3.06, not only will the TLC obtain log in and log out information but also will have the

unfettered ability to collect any of the captured GPS information at any time. See TLC TTS

Regulations as Exhibit A annexed to Complaint.

Thus, GPS technology enables TLC to know the location of taxi vehicles in between

fares, as well as when the drivers are off duty. While TLC disclaims its intention to use such

data at present, in this post-World Trade Center world that drivers and everyone else inhabits,

that oversight ability means that GPS will record location and route of a driver's journey to pick

up his children from school when he is off-duty, or the location of the religious institution where

he chooses to pray, when and if he does so during the day, as certain religions require.[10]

> c.    TLC Has Mandated No Use Limitations On GPS
>        Information

An even more sinister specter looms beyond TLC's so-called "enhancement" of its own

information gathering technology. While TLC Rule 3.06 gives it the right to immediate access

to any data collected by the GPS system, as show above, TLC has blandly and blithely claimed

that, for the present, it will only harvest from the GPS data banks the same information which it

previously collected. However, since TLC will not itself operate any part of the GPS system

---

10 There is a constitutional right to non-disclosure of personal information. *See* United
   States v. Westinghouse Electric Corp., 638 F.2d 570, 577-580 (3d Cir.1980) (holding
   that there is a constitutional right to privacy of medical records kept by an employer,
   but that the government's interest in protecting the safety of employees was sufficient
   to permit examination); Plante v. Gonzalez, 575 F.2d 1119 (5th Cir.1978), cert. de-
   nied, 439 U.S. 1129 (1979) (identifying a "right to confidentiality" and holding that
   balancing is necessary to weigh intrusions); See also, Hawaii Psychiatric Soc'y Dist.
   Branch v. Ariyoshi, 481 F.Supp. 1028, 1043 (D.Hawai'i 1979) (holding that disclo-
   sure of psychiatric records implicates the constitutional right to confidentiality).

including the storage computer component (which apparently are slated to be operated by the TLC-mandated TTS vendors), there is an appalling gap in its rules, since TLC has mandated no rules concerning the use of this GPS data which the TTS vendors will be collecting. The TLC's TTS rules, as presently promulgated, contain no limitations on the use these vendors may make of the GPS data they collect (NYTWA Aff ¶10). Any suitably equipped third parties seeking information concerning drivers will be able to obtain it - perhaps legally by purchase if the vendor chooses to sell it to such third party, or perhaps surreptitiously by electronic eavesdropping.

So beyond TLC's expanding its own right to invade plaintiffs' privacy by facilitating capture of the exact location of any vehicle at any time, it is also potentially making this information available to the world in general by failing to implement any rules to protect such information from being accessed or abused by third parties. The U.S. Supreme Court has emphasized the need to prevent unwarranted disclosure of private data to third parties: "The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures.". Whalen v. Roe, 429 U.S. 5at 605.

> d. GPS Technology Undermines The Entire Notion of
> Drivers Acting As Either Independent Small
> Businessmen Or Independent Contractors

Finally, GPS technology robs drivers of the "independence" presupposed to exist when plaintiffs purchased their own yellow medallion taxicab vehicles or rented them as "independent contractors". [NYTWA Aff ¶5] Traditionally small businessmen or independent contractors have a certain flexibility as workers. Now if drivers decide, for example, to take a two hour

20

break in the middle of the day to take their sick relatives to the hospital, they will have to remain

aware that TLC has the capacity to watch their every move, even when they are not technically

"at work." Or, if they want to take their children to the park on their day off, using the taxi for

their personal use, they must keep in mind that every minute of the route to the destination and

the destination itself is being captured through the GPS technology. TLC has no need for this

information since drivers are not employees of the TLC. [11]

> ii.    The Law Grants Plaintiffs The Right of Privacy They Seek

> a.    The Federal Constitution

The Fourth Amendment of the Constitution guarantees the "right of the people to be

secure in their persons...and effects, against unreasonable searches and seizures," shall not be

violated unless a warrant has been issued based on probable cause particularly describing the

place to be searched." People v. Lacey, 787 N.Y.S.2d 680 (2004). What makes plaintiffs'

assertion of their constitutional right to privacy - both the "positive" right to keep private the

proprietary aspects of their manner of driving while they are working and the "negative" right

not to be observed when they are not working - is that twenty four years ago the Supreme Court

held there is no constitutional privacy on the public thoroughfare. United States v. Knotts, 460

U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) ("Knotts").

There are a number of factors which make plaintiffs believe that their case of first

---

[11] "Such a determination [whether an employer-employee relationship exists] turns on whether the purported employer exercises control over the results produced or, more importantly, the means by which those results are produced. " In the Matter of Medical Transaction Plus [Commissioner of Labor], 302 A.D.2d 689, 689-690 (2003). See In re Singh, 2007WL 2198440 (N.Y.A.D. 3 Dept.); Matter of Saalfield [Eber Bros. Wine & Liq. Co.-Commissioner of Labor], 37 A.D.3d 928 (2007). The TLC is controlling the means by which the driver transports his/her passengers by tracking every movement of the taxi through GPS.

impression merits consideration by this Court, even in the face of <u>Knotts</u>.  First, <u>Knotts</u> was a

criminal case, while, as plaintiffs have noted before, this issue is raised as a civil matter.  While

in <u>Knotts,</u> the defendant argued that permitting such government conduct would mean that

"twenty-four hour surveillance of any citizen of this country without judicial knowledge or

supervision." Br. For Resp., at 9 (footnote omitted). *Id.* at 284,  the court held that warrant less

monitoring of a beeper placed in a container of chemical used to manufacture illegal drugs did

not invade a criminal defendant's legitimate expectation of privacy.

      The Court was not impressed by the argument that on a public thoroughfare a criminal

could assert privacy to cloak his criminal activity.  While plaintiff drivers conduct their activity

on the public thoroughfare, they are quite different from criminals.  They are engaged in earning

their livelihood by means of legitimate activity.  Surveillance of them certainly would not

disclose criminal activity, but it is extremely intrusive, and is not far short of the plot of a science

fiction movie like "Minority Report," where the government has implanted computer chips in its

citizens so that it can anticipate thoughts of illegal activity.  On a more realistic note, such

intrusion might reveal taxi drivers' manner of maximizing their profit opportunities by their

personal choices of which location to start the shift, when and where to take a bathroom and/or

food breaks, and other information which they regard as proprietary. (NYTWA Aff ¶9A; See

Affidavit of Wilfred Germaine  ¶22A, hereinafter "Germaine Aff".)  A second factor

distinguishing <u>Knotts</u> from the present case, which is much more prescient and significant, is that

the technology itself has changed over time.  <u>Knotts</u> itself anticipated that such changes would

occur.   While finding, in essence, that the beeper only enhanced the ability of the police to

"hear"  the defendant with the now antiquated technology of the late 1970s, the <u>Knotts</u> Court

understood and confirmed that advancing technology might require further consideration at a

later time. It said:

> If such dragnet type law enforcement practices as
> respondent envisions should eventually occur, there
> will be time enough then to determine whether different
> Constitutional principles may be applicable.

The court was careful to note the limitation of its holding only to the particular case at

hand it allowed a window of re-evaluation of the issues at a later date:

> We therefore need not, and do not, decide any question
> which might be presented by the unwarranted disclosure of
> accumulated private data whether intentional or unintentional
> or by a system that did not contain comparable security
> provisions. We simply hold that this record (emphasis
> added) does not establish an invasion of any right or liberty
> protected by the Fourteenth Amendment. *Id.* at 284.

Plaintiffs believe that here and now, in this case, that time for a re-examination and re-evaluation

of the burgeoning technology of limitless observation of men by men has arrived.

In other areas, as well, the Supreme Court, has also expressed strong concerns regarding

the danger to personal privacy inherent in the retention of personal information in the custody of

a government data bank. "We are not unaware of the threat to privacy implicit in the

accumulation of vast amounts of personal information in computerized data banks or other

massive government files." Whalen v. Roe, 429 U.S. 589, 605 (1977). Further, Justice

Brennan's concurring opinion Whalen highlighted the possibility that future technological

advances could warrant expanded privacy protections:

> [T]he Constitution puts limits not only on the type of Information that
> State may gather, but also on the means it may use to gather it. The
> central storage and easy accessibility of computerized data vastly increase
> the potential for abuse of that information, and I am not prepared to say

23

> that future developments will not demonstrate the necessity of some curb
> on such technology. *Id.* at 606, 607."

Justice Brennan farsighted comment points the way to a more expansive examination of the

constitutional right of privacy should the appropriate circumstances require the need for further

curbs on governmental intrusion into the private lives of its citizens.  Plaintiffs are the yeoman

small businessmen and "independent contractors" that the Constitution's protection is meant to

sweep within its aegis, and this case presents the kind of unwarranted intrusion which Brennan

foresaw.

b.    State Constitution.

Plaintiffs also assert their right to privacy pursuant to Article section 12 of the New York

State Constitution ("NYSC").  That provision provides as follows:

> The right of the people to be secure in their persons, houses, papers and
> effects, against unreasonable searches and seizures, shall not be violated,
> and no warrants shall issue, but upon probable cause , supported by oath
> or affirmation, and particularly describing the place to be searched, and
> the persons or things to be seized. The right of the people to be secure
> against unreasonable interception of telephone and telegraph
> communications shall not be violated, and ex parte orders or warrants
> shall issue only upon oath or affirmation that there is reasonable ground to
> believe that evidence of crime may be thus obtained, and identifying the
> particular means of communication, and particularly describing the person
> or persons whose communications are to be intercepted and the purpose
> thereof.  McKinney's Const. Art. 1, section 12

Thus, Article 1 section 12 of the NYS Constitution extends beyond the Fourth Amendment to

provide explicit privacy protections to telephone and telegraph communications of the citizens of

New York State.  Utilizing this more broadly stroked mandate, state courts have bravely

24

ventured to expand its reach as necessitated by relentless advances in technology.  In <u>People</u> v.

<u>Lacey</u>, 787 N.Y.S.2d 680 (2004)[12], the Court stated:

> The citizens of NY have the right to be free in their property, especially in
> light of technological advances which have and continue to diminish this
> privacy….At this time, more than ever, individuals must be given the con-
> stitutional protections necessary to their continued unfettered freedom
> from a "big brother" society. Other than in the most exigent
> circumstances, a person must feel secure that his or her every movement
> will not be tracked except upon a warrant based on probable cause
> establishing that such person has been or is about to commit a crime.
> Technology cannot abrogate our constitutional protections.At 7.

In the instant case, TLC's orchestrated placement of GPS technology inside and upon the

plaintiffs' property falls squarely within the "telephonic and telegraphic communications"

category which is a protected privacy right within the NY State Constitution,[13] and thus is a

violation of plaintiffs' constitutional right under the NYS Constitution.  Even while the <u>Lacey</u>

court recognized that police are generally required to obtain a warrant before placing a GPS

device in the defendant's car due to its highly intrusive nature, it ultimately found defendant did

not have a legitimate expectation of privacy in a car that was stolen and "which was used for the

sole purpose of furthering a criminal enterprise." *Id.* at 9.  This reasoning patently does not fit the

instant circumstances.  In this case, the drivers are conducting business with their own property,

whether medallion and vehicle, vehicle, or only hack license, and using this property in the

course of earning their livelihood or for their own personal use.  Neither scenario resembles

---

[12]<u>People v. Lacey</u>, *supra*, was a case of first impression. "The Court is now asked for the
first time to extend this constitutional protection to the installation of a GPS device." *Id.*
at 4.
[13] . "…[T]he GPS used herein incorporated cellular technology.  This touches upon
Article 1 section 12 which specifically requires a warrant for telephonic and telegraphic
communications." *Id.* at 7.

25

Court's recognition that some form of scrutiny beyond rational relation is necessary to safeguard the confidentiality interest. Id.

Plaintiffs assert that it is nearly impossible for the TLC to define an "important governmental interest" that is furthered by the "substantially related means" of the TTS scheme. Considering that TTS is a drastic measure which permanently alters every taxicab operating in New York City, it does not approach the level of the traditionally defined notions of important government purposes, such as advancing public health, safety, or welfare. The only apparent interest furthered by TLC's insistence on TTS is TLC's eagerness to jump on the technology bandwagon by requiring the installation of the TTS equipment in taxicabs. Plaintiffs assert that giving passengers the ability to check to see where the closest Starbucks is located on a screen of the PIM in the back of the cab should not be deemed an "important governmental" interest. If TLC asserts that the public is better served by the GPS technology aspects of TTS which permit it to better track taxicabs, plaintiffs believe that such interest can be sufficiently served by means which are much less intrusive upon the privacy of taxi drivers.

<u>Summary and Conclusion</u>

Plaintiffs seek emergency relief before this Court because TLC's TTS program will permanently physically alter every yellow medallion taxicab in New York City, and will impose additional costs on every person who drives one. Owner-Operator plaintiffs face the immediate suspension of their medallions and loss of their livelihood on the dates of their requisite TLC administrative hearings-specifically Plaintiff Alexandre has a hearing scheduled to occur on September 24th, 2007. Plaintiff Chartelaine has a hearing on September 26th, 2007. Plaintiff Germain has a hearing set for September 26th, 2007. Plaintiff Lessage has a hearing date of

27

September 26th, 2007. Plaintiff Augustin has a hearing scheduled to occur on September 28th, 2007. Plaintiff Pierre has a hearing on September 28th, 2007. Without the grant of a TRO, owner-operator plaintiffs will be forced into signing the contracts with the vendors binding them into what they deem an unconstitutional taking of their property without their consent.

Moreover, all plaintiffs must bear the physical disruption of their property and costs of these changes immediately because TTS equipment must be installed in their vehicles for TLC mandated safety inspections which occur after October 1, 2007. While TLC has not directly imposed these costs on hack license holders who rent both their medallions and vehicles, there is strong evidence that these costs are being passed through to them as well, impinging upon their livelihood which flows from their constitutionally protected hack licenses. Because the permanent alteration of property cannot be undone, plaintiffs believe TLC should be enjoined from penalizing all plaintiffs and others similarly situated until these questions of constitutional import are resolved.

For the reasons set forth herein and in the various affidavits and exhibits submitted in support of this motion, the Court should grant plaintiffs order to show cause for a temporary restraining order and preliminary injunction prohibiting TLC from seeking punishment against owner-operators who have not consented to sign a TTS contract, and, on or after October 1, 2007, from enforcing the TTS requirements until such time as this Court has determined fully the merits of this matter.


Dated: September 19, 2007                    Respectfully submitted,
        New York, New York                    KOEHLER & ISAACS


28

By:   /S MALCOLM GOLDSTEIN
       Malcolm A. Goldstein (MAG 4602)


By:   /S NAUREEN RASHID
       Naureen Rashid (NR 5803)

Attorneys for Plaintiffs Alexandre, Augustin, Char-
telain, Germain, Lessage, Pierre, Haq, Akhtar, and
New York Taxi Workers Alliance
61 Broadway, 25th Floor
New York, New York 10006
(917) 551-1300

29