UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

LOUBERT ALEXANDRE, YVON AUGUSTIN, :
MAX CHARTELAIN, WILFRED GERMAIN, :
CLAUDE LESSAGE, and JEAN PIERRE, :
individually as owners of Yellow Cab medallions :
in the City of New York and on behalf of a class :
of all owners similarly situated, as well as :
individually, together with MAMNUNUL HAQ :
and ASIM AKHTAR, as holders of hack licenses :
in the City of New York and as representatives on :
behalf of a class of all holders of hack licenses in :
the City of New York, and THE NEW YORK :
TAXI WORKERS ALLIANCE, :
                                                              :
                                                              :
                            Plaintiffs, :
                                                              :
            -against- :
                                                              :
THE NEW YORK CITY TAXI AND LIMOUSINE:
COMMISSION, MATTHEW DAUS, as :
Commissioner/Chair of the New York City Taxi :
and Limousine Commission, and THE CITY OF :
NEW YORK, :
                                                              :
                            Defendants. :

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/28/07

07 Civ. 8175 (RMB)

**DECISION AND ORDER**
**REGARDING APPLICATION**
**FOR PRELIMINARY INJUNCTION**

## I.    Introduction

This litigation concerns the (impending) implementation of New York City Taxi and

Limousine Commission rules requiring the installation in all yellow cabs of new technology

which is intended to improve taxi service.  Called the Taxicab Technology System or "TTS," the

technology consists of hardware and software which offers four "core services":  (i) credit, debit,

and prepaid card payment for cab rides; (ii) text messaging, for example, to cab drivers in an

emergency; (iii) automated trip data collection to replace the current manual (hand-written)

records; and (iv) data transmission such as trip tracking and other communications by and for

passengers.  TTS includes the installation of global positioning equipment or "GPS."  (Class Action Complaint for Injunctive Relief and Damages, dated Sept. 19, 2007 ("Compl.") ¶ 9.)

As of September 21, 2007, approximately 2,280 of the City's 13,085 yellow cabs have installed TTS, and 12,950 out of 13,085 medallion owners had entered into contracts for the installation of TTS prior to the City-imposed deadline of August 1, 2007.  Thus, it appears that at the present time 135 of the 13,085 medallion owners—or approximately 1%—have refused to sign TTS contracts.  All taxicabs are required to have TTS installed by the time they undergo their next safety inspections after October 1, 2007.[1]

**For the reasons set forth below, the Court denies Plaintiffs' motion preliminarily to enjoin the City from proceeding with the implementation of TTS.[2]**

## II.    Background

### Procedural History

On or about September 19, 2007, Loubert Alexandre, Yvon Augustin, Max Chartelain, Wilfred Germain, Claude Lessage, Jean Pierre, Mamnunul Haq, Asim Akhtar, and the New York City Taxi Workers Alliance ("TWA") (collectively, "Plaintiffs") filed a putative class action complaint against the New York City Taxi and Limousine Commission ("TLC"), Matthew Daus, the Chairman of the TLC, and the City of New York (collectively, "Defendants"), challenging the TLC's Rules requiring the installation of Taxicab Technology System equipment by

---

[1]    The parties have stipulated on the record that no administrative hearings would take place during the week of September 24, 2007 and no penalties would be imposed upon Plaintiffs who failed to contract for the installation of TTS until after the Court decided Plaintiffs' instant motion.  (Tr. of Proceedings, dated Sept. 20, 2007, at 9:20 to 10:4, 15:14 to 17:13.)

[2]    The Court is not deciding the ultimate merits of Plaintiffs' claims at this time, as no trial has yet been conducted.  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.")

2

October 1, 2007. Plaintiffs allege that the technology changes required "constitute[] a deprivation of [Plaintiffs'] property without due process in violation of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, and Article[] I § 6 and [Article] I § 12 [of] the Constitution of the State of New York." (Compl. ¶ 1.)

On September 19, 2007, Plaintiffs moved by Order to Show Cause for a preliminary injunction and temporary restraining order, pursuant to Rule 65 of the Federal Rules of Civil Procedure, to enjoin Defendants from "penalizing [Plaintiffs] . . . for failing to sign a contract by August 1, 2007 to install . . . [TTS] in their yellow medallion taxicabs; . . . [or] failing to present at TLC mandated safety inspections held after October 1, 2007[] vehicles which are equipped with TTS." (Order to Show Cause for Prelim. Inj. & TRO, dated Sept. 19, 2007 ("OTSC"), at 2.) In support of their motion, Plaintiffs submitted affidavits from Loubert Alexandre, dated August 29, 2007, Yvon Augustin, dated August 29, 2007, Max Chartelain, dated August 21, 2007, Wilfred Germain, dated August 29, 2007, Claude Lessage, dated August 29, 2007, Jean Vaillant Pierre, dated August 29, 2007, Mamnunul Haq, dated August 23, 2007, Asim Akhtar, dated August 22, 2007 ("Akhtar Aff."), and Bhairavi Desai, Executive Director of the TWA, dated August 23, 2007 ("TWA Aff.").[3] Plaintiffs also filed a Memorandum of Law, dated September 19, 2007 ("Pls.' Mem."), arguing, among other things, that mandating the installation of TTS "interferes with [Plaintiffs'] fundamental use of their own property" and amounts to a "taking under the Fifth Amendment" because Plaintiffs will suffer "severe and debilitating economic harm" and be "prevent[ed] from earning their livelihood"; and requiring the

---

[3]     On September 21, 2007, Plaintiffs submitted revised affidavits from Mamnunul Haq, dated September 20, 2007 ("Am. Haq. Aff."), and Bhairavi Desai, dated September 21, 2007 ("Am. TWA Aff.").

installation of global positioning system technology violates Plaintiffs' "fundamental right to privacy guaranteed by the Fourth Amendment and the New York State Constitution" because the "GPS technology enables TLC to know the location of taxi vehicles in between fares, as well as when the drivers are off duty."  (Pls.' Mem. at 9, 12, 16–17, 19.)

In response, Defendants submitted a letter from Assistant Corporation Counsel Paula Van Meter, dated September 19, 2007 ("Sept. 19, 2007 Letter"), arguing, among other things, that it is in the public interest for taxicabs to have TTS equipment (including GPS) installed because, among other reasons, TTS electronic trip records "will obviate the need for written records and will . . . enable the TLC to respond to the thousands of consumer [lost property] requests"; the "text-messaging equipment will enable the TLC to contact drivers with emergency notifications"; the "Passenger Information Monitors will provide a means of communicating public service information to passengers, and allow [passengers] to track their trips and locate destinations"; and the "credit card capability will provide a service [and convenience] to passengers."  (Sept. 19, 2007 Letter at 2–3.)  The September 19, 2007 Letter also states that the TLC Rule mandating installation of TTS equipment dates back to 2004 when it was understood "that a rate increase would be approved by the TLC, but that the TLC would commence the process to require equipment for the generation of electronic trip records" (Sept. 19, 2007 Letter at 1); Plaintiffs' "expectation of privacy in the location of their for-hire vehicles being driven on City streets is not legitimate"; and, under the regulations covering TTS, "the TLC may not access any GPS information concerning off-duty operation of taxicabs."  (Sept. 19, 2007 Letter at 3.)

On September 23, 2007, Defendants submitted the Declaration of Andrew Salkin, the First Deputy Commissioner of the TLC, dated September 23, 2007 ("Salkin Decl."), and on September 24, 2007, Defendants submitted transcripts of the TLC meeting on January 29, 2004

("Salkin Decl., Ex. A"), and of public hearings held before the TLC on March 30, 2004 ("Salkin Decl., Ex. B"), May 4, 2005 ("Salkin Decl., Ex. C"), March 8, 2007 ("Salkin Decl., Ex. D") and May 10, 2007 ("Salkin Decl., Ex. E").  On September 25, 2007, Defendants submitted a Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, dated September 24, 2007 ("Defs.' Mem."), a Declaration from Paula Van Meter, dated September 24, 2007 ("Van Meter Decl."), a second Declaration from Andrew Salkin, dated September 24, 2007 ("2d Salkin Decl."), the Declaration of Ira Goldstein, Chief of Staff of the TLC, dated September 24, 2007 ("Goldstein Decl."), the Affidavit of Amos Tamam, President and Chief Executive Officer of Verifone Transportation Systems, Inc., dated September 21, 2007, and the Affidavit of Jesse Davis, President and Chief Operating Officer of Creative Mobile Technologies, LLC, dated September 24, 2007.

On September 26, 2007, Plaintiffs submitted a Reply Memorandum, dated September 25, 2007 ("Pls.' Reply"), in further support of their arguments that Defendants "have never attempted to make the slightest showing that the TTS amendments 'achieve the legislative end,'" that Plaintiffs have "demonstrated a physical invasion of their property," and that "TTS, particularly GPS, gives [the] TLC the ability to . . . search deeply into the private lives of drivers."  (Pls.' Reply at 2, 5.)  Plaintiffs also filed a Reply Affidavit from Bhairavi Desai, dated September 25, 2007.

A hearing was held on September 26, 2007.  (See Hr'g Tr., dated Sept. 26, 2007.)

**Factual Background**

In or around mid-2003, the issue of new technological enhancements to taxicabs was discussed within the New York City taxi industry and publicly.  (See Salkin Decl. ¶ 4.)  The City contends that as part and parcel of approving an increase in taxi fares of approximately 25 to 30

percent in 2004 (which became effective in 2006), the TLC required that medallion owners provide certain "customer service enhancements," including TTS.[4]  (Salkin Decl. ¶ 5; Ex. A at 22:24 to 23:3 ("[Drivers] might be able to use the GPS technology that's out there . . . to map out the most direct route and help the passengers get where they need to go in a quick and safe way.").)[5]

At a public TLC hearing on March 30, 2004, the merits of TTS and other "customer service enhancements" were actively debated.  (Am. TWA Aff. ¶ 6; Salkin Decl. ¶ 9; Ex. B at 11:22 to 13:25.)  TLC Chairman Michael Daus stated that the "technology proposals" would "change an antiquated, difficult process . . . of drivers filling out trip sheets manually, to one where information about vehicle location, trip duration and frequency, as well as fare amount could be automatically collected."  (Salkin Decl., Ex. B at 12:13–21.)  Chairman Daus also

---

[4]    The base fare was increased by the TLC from $2.00 to $2.50; the mileage charge increased from 30 cents per one-fifth mile to 40 cents per one-fifth mile; a (rush hour) surcharge of $1.00 was added to fares between 4:00 p.m. and 8:00 p.m.; the flat rate fare from JFK Airport to Manhattan increased from $35.00 to $45.00; and the Newark Airport surcharge increased from $10.00 to $15.00.  (Am. TWA Aff., Ex. A (TWA Letter to Hon. Michael R. Bloomberg, dated Mar. 29, 2004) at 2.)

[5]    The TLC argues that (the components of) TTS "provides benefit[] to both passengers and taxi drivers."  (Defs.' Mem. at 6.)  For example, the TLC claims that the credit card component of TTS will "result in increased fares and tips to drivers from the riding public that may otherwise not be able to hail a cab because of lack of cash."  (Sept. 19, 2007 Letter at 3; see also 2d Salkin Decl. ¶ 8.)  The text messaging component of TTS will enable the TLC to send a message directly to the driver of a taxicab to assist in locating "lost property for return to the passenger," to "alert drivers to fare opportunities," and to communicate "street obstacles, like accidents, construction, [and] traffic delays."  (2d Salkin Decl. ¶ 9.)  The Passenger Information Monitor functions as an interactive map to assist passengers following their trip locations, and serves as a medium through which the TLC can "communicate reminder[s] to passengers," and display "the components of the fare . . . more clearly showing the calculation of the total fare than does the meter."  (2d Salkin Decl. ¶ 11.)  The electronic trip sheets will enable the TLC to "conduct automated, comprehensive analyses of pick-up points, drop-off points, trip time and distance, and passenger counts."  (2d Salkin Decl. ¶ 14.)  "It also will help [TLC] to map out where the cabs are going . . . which will be good for DOT [Department of Transportation] and the Government officials to understand where the service is and where it isn't."  (Salkin Decl., Ex. A at 23:18–21.)

argued that payment by credit and debit card "is a necessary component of paying for virtually any service in the 21st Century and will be especially useful for tourists and travelers coming from airports." (Salkin Decl., Ex. B at 13:12–15.)

Approximately twenty TWA members testified at the March 30 hearing in support of the fare increase but in opposition to the technology and service enhancements. (Am. TWA Aff. ¶ 7.) For example, Vinny Sapone, the Managing Director of the League of Mutual Taxi Owners, stated, "The GPS is going to cost [medallion owners] maybe $1,500. . . . I appreciate the 26 percent [fare increase]. I don't want to do anything to stop it, but when you figure it all out, we are giving a lot back." (Salkin Decl., Ex. B at 44:23 to 45:3.) At the conclusion of the March 30 hearing, the TLC approved the fare increase and the "customer service enhancements package, including . . . electronic trip sheets, driver information monitors, passenger information monitors, and the credit card readers." (Salkin Decl. ¶ 10.) New rules were published in the City Record on April 14, 2004 and became effective on May 14, 2004. (Defs.' Mem. at 4; see also Van Meter Decl., Ex. C (Notice of Final Rule Promulgation).)

On March 2, 2005, the TLC issued a request for proposals from potential vendors to develop and service TTS, (Salkin Decl. ¶¶ 18–20), and the four finalists selected GPS as the technology of choice. (Salkin Decl. ¶ 22.) The TLC has estimated that the cost of TTS installation—to be borne by medallion owners—would be between "$10 and $4,115" plus a monthly service charge of between "$43 and $200." (Am. TWA Aff. ¶ 15; Ex. C (TLC's Frequently Asked Questions) at 6; see also Goldstein Decl. ¶ 42 (stating that the cost of TTS including installation and maintenance "average[s] less than $600 per year".) "Credit/debit card fees are expected to average 3.5% to 4.00%." (Am. TWA Aff., Ex. C at 6.) These costs may be

offset by advertising revenues.  (See Am. TWA Aff. ¶ 17); see also New York, N.Y., R.C.N.Y.

("RCNY"), tit. 35, ch. 3, § 3-07(b)(iv).

The TLC published supplemental rules pertaining to TTS and held a public hearing on

May 4, 2005.  (Salkin Decl. ¶ 13.)  Some taxicab drivers testified in favor of TTS.  (See, e.g.,

Salkin Decl., Ex. C at 20:10–13 ("[I]n the beginning I wasn't too pleased about it [TTS], but you

know, we're in the 21st century.  From what I hear, Chicago is doing it and Las Vegas and a few

other cities.").)  A taxicab medallion owner stated:

> I think this new technology overall is a good improvement to the
> taxi industry.  Credit card as a means of payment can only add to
> our business and GPS is a wonderful system that can help us give
> more professional service to our passengers, and being able to
> communicate with TLC through text messaging can also prove
> useful . . . .

(Salkin Decl., Ex. C at 31:3–9.)  A speaker representing the Committee for Taxi Safety, an

association of taxicab medallion owners, licensed leasing agents, and taxicab drivers, stated that

his organization "strongly supports the implementation of credit card meters" and also "supports

electronic trip sheet data" and also "believes that text messaging to drivers will benefit the riding

public and drivers."  (Salkin Decl., Ex. C at 60:13–14, 61:6–7, 61:11–12.)  At the same time,

TWA members testified in opposition to TTS, arguing, among other things, that the increased

"revenue potential [from TTS] is close to zero," the technology is "totally unnecessary and

costly," there is a "high likelihood of kinks and breakdown," the GPS will be "primarily used for

surveillance purposes," and the drivers "are concerned they're going to be paying for [TTS]

through increases in the leases."  (Salkin Decl., Ex. C at 46:13–14, 46:20–21, 47:11–12, 54:25

to 55:1, 57:14–16.)

"The proposed rules provided a deadline of August 1, 2007, for each medallion owner to

enter into a contract for the purchase of a [TTS] . . . . [and] further provided for deadlines

ranging from October 1, 2007[] to January 31, 2008, for the installation of the systems, with some exceptions." (Salkin Decl. ¶ 14.) The TLC adopted these rules after public hearings were held on March 8 and May 10, 2007, at which TWA representatives spoke in opposition. (See Salkin Decl. ¶¶ 15–16; Ex. D at 175–292, Ex. E at 19–76; Am. TWA Aff. ¶ 11.) The Executive Director of the TWA, Bhairavi Desai, argued, among other things, that "[d]rivers continually will be the only ones that are bearing the risks [associated with TTS], and they will not be seeing any of the profits from this [technology]," and TTS "is a complete waste of money." (Salkin Decl., Ex. D at 183:3–5, 184:3.)

On or about June 1, 2007, the TLC published a notice on its website reiterating that, by August 1, 2007, "all owner-operators of public hire yellow medallion bearing taxi vehicles . . . [must] sign a contract . . . to have TTS installed in each of their vehicles no later than the first inspection date for the taxi vehicle that falls after October 1, 2007."[6] (Compl. ¶ 19); see also RCNY tit. 35, chs. 1–3.

## III.    Legal Standard

"A preliminary injunction may be granted only when the party seeking the injunction establishes that '(1) absent injunctive relief, it will suffer irreparable harm, and (2) either (a) that it is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.'"[7] Statharos v. New York City Taxi & Limousine

---

[6]      On or about July 30, 2007, the TLC mailed a "Final Notice" to medallion owners stating that if a contract is not signed by August 1, 2007, the medallion owners "will be subject to a fine and [the] medallion may be suspended." (Compl., Ex. B (TLC Final Notice).)

[7]      The standards for granting a temporary restraining order are the same as those which govern granting a preliminary injunction. Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, 965 F.2d 1224, 1228 (2d Cir. 1992).

Comm'n, 198 F.3d 317, 321 (2d Cir. 1999) (quoting Otokoyama Co. v. Wine of Japan Import, Inc., 175 F.3d 266, 270 (2d Cir. 1999)).

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1990) (citations omitted).

Where there is a "deprivation of a constitutional right, no separate showing of irreparable harm is necessary." Statharos, 198 F.3d at 322 (citing Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996)). "[I]njuries compensable by monetary damages ordinarily do not give rise to irreparable harm." Pashaian v. Eccelston Props., Ltd., 88 F.3d 77, 86–87 (2d Cir. 1996) (citation omitted).

Where "the injunction 'seeks to prevent government action taken pursuant to statutory authority, which is presumed to be in the public interest,' only the likelihood of success standard applies." Statharos, 198 F.3d at 321 (quoting Molloy v. Metro. Transp. Auth., 94 F.3d 808, 811 (2d Cir. 1996)). "In federal preliminary injunction practice, a movant obliged to establish a likelihood of success must demonstrate that the movant is more likely than not to prevail in the action." Davila Pena v. Morgan, 149 F. Supp. 2d 91, 94 (S.D.N.Y. 2001).

## IV.    Analysis

### Standing

Defendants argue that the Plaintiffs who are "not owners of taxi medallions" and the TWA lack standing in this litigation because the TTS Rules "impose the obligation to install the TTS equipment on medallion owners, not on taxi drivers who lease the medallion and/or vehicle." (Defs.' Mem. at 23 (citing RCNY tit. 35, ch. 1, § 1-11(g)).)  Plaintiffs say that although the "TLC's regulations ostensibly impose no costs for TTS directly upon those who do

10

not own the medallions, as a practical matter, the medallion owners are already passing the costs of TTS on to renters by altering the terms of the lease agreements."  (Pls.' Mem. at 7; see also Pls.' Reply at 6–7.)

In order to have standing, a plaintiff must be able to demonstrate that, "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Padberg v. McGrath-McKechnie, 203 F. Supp. 2d 261, 274 (E.D.N.Y. 2002) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)).  The medallion owners clearly meet these criteria and have standing in this litigation as the TLC Rules impose responsibility for TTS directly upon them.  See RCNY tit. 35, ch. 1, § 1-11(g).  Yellow taxicab vehicle owners would also appear to have standing since their vehicles are "required to be equipped with [TTS]."  Id.

Drivers who are non-medallion owners and do not own their taxicabs less clearly have standing.  See Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor, 107 F.3d 1000, 1005 (2d Cir. 1997).  And, while the Plaintiff drivers claim that "[b]efore TTS, [they] w[ere] not required to pay [tax stamp, vehicle inspection, and registration] fees" and they believe that "as the installation date of TTS is approaching closer [sic], the [medallion owner] is passing on these

costs," (Am. Haq. Aff. ¶ 16), their allegations are without sufficient proof at this time.[8]  See

Doe v. Vill. of Mamaroneck, 462 F. Supp. 2d 520, 541 (S.D.N.Y. 2006).

TWA is "a trade association composed of drivers of yellow medallion taxicabs in the City

of New York.  The organization has existed since 1998 and now has over 10,000 members."

(Am. TWA Aff. ¶ 2.)  "[I]ts purpose is to improve working conditions of drivers in the taxi

industry in the City of New York."  (Am. TWA Aff. ¶ 2.)  TWA has written letters on behalf of

its members to Mayor Michael Bloomberg in opposition to TTS (see, e.g., Am. TWA Aff.,

Ex. A), and its members, including TWA's Executive Director, have testified at public hearings

in opposition to TTS (see, e.g., Salkin Decl., Ex. C at 53:13 to 57:16).  "An organization may

attempt to assert standing on its own behalf, or on behalf of its members."  Padberg, 203 F. Supp.

2d at 274 (citations omitted).  To the extent that the TWA represents medallion and yellow cab

owners, it has standing to pursue this litigation.

On the other hand, to the extent that drivers whom TWA represents do not have standing

(see supra at 11–12), then TWA does not have standing to assert claims on their behalf.  See

Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004), aff'd, 198 F. App'x 32

(2d Cir. 2006).[9]

---

[8]     While the drivers also argue that, under TLC Rules, they "must bear the cost of the
transaction fee for each credit and debit card transaction," and that these "transaction fee[s] will
result in a huge loss of revenue," (Akhtar Aff. ¶ 14), Defendants counter that credit card
payments will translate into increased revenues for the drivers based on higher fares and
increased ridership (Defs.' Mem. at 6–7).  This, too, is an issue that may be explored further
during discovery.

[9]     And, TWA lacks standing to raise civil rights claims on behalf of its members.  Padberg,
203 F. Supp. 2d at 274 ("Because [42 U.S.C.] § 1983 creates only a personal cause of action,
requiring that plaintiffs demonstrate that they personally suffer from a violation of their civil
rights, an organization may not bring § 1983 claims on behalf of its injured members.") (citations
omitted).

**<u>Likelihood of Success on the Merits</u>**[10]

Plaintiffs have not shown at this preliminary injunction stage that they are likely to succeed on the merits of their claims, as discussed below.  <u>See</u> <u>Dichiara v. Pataki</u>, No. 06 Civ. 6123, 2007 WL 749742, at *3 (E.D.N.Y. Mar. 7, 2007).

### A.    TLC's Rule Making Authority

The promulgation and adoption of the TTS Rules appear to have been open, noticed, and within the TLC's regulatory authority.  <u>See</u> New York, N.Y. Charter ("NYC Charter") ch. 65, § 2303; <u>Statharos</u>, 198 F.3d at 321.  Plaintiffs argue that, although Defendants "vetted certain aspects of TTS through TLC's formal rule-making procedures . . . [Defendants] have never explained fully the scope of the information collected by TTS equipment or . . . the ownership, control and uses to be made of this information."  (Pls.' Mem. at 3.)  Defendants counter that the TTS Rules were enacted to provide a "benefit to the City's 240,000,000 passengers who pay some $1.8 billion annually for taxicab rides as well as [to] benefit . . . the drivers of the 13,085 licensed taxicabs, [and] have been the subject of [extensive] public hearings . . . [for] more than three years."  (Defs.' Mem. at 2.)

The TLC was established in 1971 for the purpose of "continuance, further development and improvement of taxi and limousine service in the [C]ity of New York" and to establish, among other things, "certain rates, standards of service . . . driver safety, [and] . . . equipment safety and design."  NYC Charter ch. 65, § 2300; <u>Statharos</u>, 198 F.3d at 321.  The TLC is specifically authorized to develop and effectuate "a broad public policy of transportation . . . including innovation and experimentation in relation to type and design of

---

[10]      Because Plaintiffs assert violation(s) of constitutional rights and because they seek to prevent the implementation of a municipal program, the Court focuses upon likelihood of success on the merits.  <u>See</u> <u>Mitchell v. Cuomo</u>, 748 F.2d 804, 806 (2d Cir. 1984); <u>see also</u> 11A Charles Alan Wright, et al., <u>Federal Practice and Procedure</u> § 2948.1 (2d ed. 2007).

equipment, modes of service and manner of operation." NYC Charter, ch. 65, § 2303(b)(9); see also id. § 2303(b)(11) (granting the TLC the power to promulgate "rules and regulations reasonably designed to carry out" the TLC's mandate); New York, N.Y., Admin. Code. ("NYC Code") tit. 19, ch. 5, § 19-503(a) (same).

TLC "must publish the proposed rules, together with a statement of their basis and purpose, in the City Record at least 30 days prior to [a] public hearing." New York City Comm. for Taxi Safety v. New York City Taxi & Limousine Comm'n, 177 Misc. 2d 855, 858, 677 N.Y.S.2d 449, 452 (Sup. Ct. N.Y. County 1998) (citing NYC Charter, ch. 45, § 1043(b)). And, TLC "must provide the public with an opportunity to submit written comments on the rules and must conduct a public hearing at which interested persons are afforded the opportunity to comment orally on the rules." Id. (citing NYC Charter, ch. 45, § 1043(d)).

The TLC appears to have satisfied these substantive and procedural requirements. (See Salkin Decl. ¶¶ 7, 9, 13, 15–16; Ex. A at 22:6 to 24:25; Ex. B at 12:10 to 231:25; Ex. C at 13:23 to 98:23; Ex. D at 142:18 to 298:15; Ex E at 10:22 to 13:5, 19:18 to 66:18.) "Judicial review of an administrative agency's rule-making is extremely limited, and exercise of such authority is to be given a large degree of deference by the courts, especially where, as here, the agency has acted within the area of its expertise." United Car & Limousine Found., Inc. v. New York City Taxi & Limousine Comm'n, 178 Misc. 2d 734, 737, 680 N.Y.S.2d 815, 818 (Sup. Ct. N.Y. County 1998) (citing In re Consol. Nursing Home, Inc. v. Comm'r of N.Y. State Dep't of Health, 85 N.Y.2d 326, 331, 648 N.E.2d 1326, 1328, 624 N.Y.S.2d 563, 565 (1995)). "A court must determine whether the challenged agency rule has a rational basis and whether the rule is unreasonable, arbitrary, or capricious." Id. (citing Consol. Nursing Home, 85 N.Y.2d at 331, 648 N.E.2d at 1328, 624 N.Y.S.2d at 565.). Plaintiffs, at this stage of the litigation, have not shown

that TLC lacked the authority or "rational basis" to require installation of TTS or that the TLC

acted unreasonably, arbitrarily, or capriciously.  See Statharos, 198 F.3d at 322 ("We conclude

that the [TLC] acted within its statutorily delegated powers . . . .").  "[A]ctions undertaken by an

administrative entity are cloaked with a presumption of regularity, and are presumed to be valid

unless proven otherwise."  In re Entergy Nuclear Indian Point 2, LLC v. N.Y. State Dep't of

Envtl. Conservation, 23 A.D.3d 811, 813–14, 805 N.Y.S.2d 429, 432 (3d Dep't 2005) (internal

citations and quotations omitted).  And, New York courts have upheld TLC regulations requiring

medallion owners to install in their taxicabs auxiliary air conditioning systems, see Comm. for

Taxi Safety, 177 Misc. 2d at 865, 677 N.Y.S.2d at 456–57, aff'd, 256 A.D.2d 136, 681 N.Y.S.2d

509 (1st Dep't 1998) and requiring medallion owners to make financial disclosures to the TLC,

see Statharos, 198 F.3d at 326–27.  The TLC also mandates that the "exterior of all taxicabs shall

be painted yellow," NYC Code tit. 19, ch. 5, § 19-514(a), that "[a]ll taxicabs shall be equipped

with meters," id. § 19-508(a), and that the medallion "owner shall install a partition that isolates

the driver from the rear seat passengers," RCNY tit. 35, ch. 3, § 3-03(3)(3)(i).

     **B.**    **Takings Claims**

Plaintiffs argue, among other things, that the "permanent physical alteration of the

taxicab vehicles necessitated by the installation of [TTS] is a per se taking under the Fifth

Amendment."  (Pls.' Mem. at 9.)  Defendants counter that the "fact that some [P]laintiffs will

have to spend money to come into compliance with the TTS Rules is not a per se taking," and "to

the extent that any compensation were to be required, it has already been provided to

[P]laintiffs . . . by way of the . . . rate increase."  (Defs.' Mem. at 16–17.)

The Fifth Amendment to the United States Constitution provides, in pertinent part, that

private property shall not "be taken for public use, without just compensation."  U.S. Const.

amend. V. "[G]overnment regulation of property can amount to a taking requiring just compensation."[11] MCQ's Enters., Inc. v. Phila. Parking Auth., No. 07 Civ. 0067, 2007 WL 127728, at *3 (E.D. Pa. Jan. 11, 2007) (citing Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 536 (2005)). But a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government, than when [as here] interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978) (internal citation omitted). And, "[o]ne who chooses to engage in a publicly regulated business, such as the taxicab business, by so doing surrenders his right to unfettered discretion as to how to conduct same." Scherr v. City of New York, 55 Misc. 2d 176, 177, 284 N.Y.S.2d 775, 776 (Sup. Ct. N.Y. County 1967); see also Kostika v. Cuomo, 41 N.Y.2d 673, 676–77, 363 N.E.2d 568, 570–74, 394 N.Y.S.2d 862, 864–65 (1977).

At this stage of the litigation, Plaintiffs have not shown that the alleged regulatory taking falls into any of the three categories outlined in Lingle. Plaintiffs' property rights in their taxi medallions and vehicles are subject to the (public interest) regulatory requirements of the TLC. See Statharos, 198 F.3d at 321–22. The TTS Rules do not appear to leave the Plaintiffs' businesses worthless or "economically idle." See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1992). And, Plaintiffs have not demonstrated a "deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking" or that the TTS Rules prevent them from operating a profitable business. See Keystone Bituminous Coal Ass'n v.

---

[11]    The United States Supreme Court has described three categories of regulatory takings: (i) "where government requires an owner to suffer a permanent physical invasion of her property"; (ii) "where regulations completely deprive an owner of all economically beneficial us[e] of her property"; and (iii) where "character of the governmental action . . . amounts to a physical invasion." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538–39 (2005) (internal citations and quotations omitted).

DeBenedictis, 480 U.S. 470, 493 (1987); see also Goldblatt v. Town of Hempstead, N. Y., 369 U.S. 590, 595 (1962).

New York courts have upheld TLC rules in the face of allegations of unconstitutional takings where, as here, plaintiffs failed satisfy the heavy burden on someone alleging a regulatory taking.  See, e.g., Comm. for Taxi Safety, 177 Misc. 2d at 865, 677 N.Y.S.2d at 456–57 (determining that TLC regulations, including the requirement that taxicabs employ an auxiliary air conditioning system that would cool the rear compartment directly, do "not violate any statutory or constitutional proscription"); see also Transp. Unlimited Car Serv., Inc. v. New York City Taxi & Limousine Comm'n, 11 A.D.3d 384, 385, 784 N.Y.S.2d 41, 42 (1st Dep't 2004) (upholding wheelchair accessibility rule).  New York courts have not found takings violations where, as here, the TLC rules were promulgated "to protect the public interest."  See Scherr, 55 Misc. 2d at 177–78, 284 N.Y.S.2d at 776–77 (denying motion for a temporary restraining order enjoining the City from requiring a partition between front and rear seats of taxicabs); Teuch v. Murphy, 45 Misc. 2d 81, 83, 256 N.Y.S.2d 25, 27 (Sup. Ct. N.Y. County 1965) (requiring taxicabs owners to maintain roof lights on their vehicles).

While neither controlling nor dispositive of the issues at bar, a federal case filed in the Eastern District of Pennsylvania earlier this year involved the application by a taxicab company for a temporary restraining order and preliminary injunction against the Philadelphia Parking Authority, Taxicab and Limousine Division to enjoin the Authority from implementing a taxicab dispatch system that would require all taxicabs to be "equipped with a [GPS] tracking device." MCQ, 2007 WL 127728, at *1.  There, plaintiffs also alleged an "unconstitutional regulatory taking[] under the Fifth Amendment and supplemental state law."  Id.  The MCQ court determined that no preliminary injunction would issue because, among other reasons,

"Defendants' [regulation] [wa]s for the public good, since it [wa]s pursuant to a state legislative act to promote hospitality and tourism in Philadelphia." Id. (citation omitted).

### C. Privacy Claims

Plaintiffs argue, among other things, that "their fundamental right to privacy guaranteed by the Fourth Amendment [to the United States Constitution] is being violated by the GPS facet of the TTS program, which will enable drivers to be tracked at all times, whether on duty or off, twenty four hours a day, seven days a week." (Pls.' Mem. at 16.) Defendants counter that TTS Rules "will not create intrusions by the TLC on [P]laintiffs' operation of their regulated taxicabs beyond what already exists," and, in any case, "the information collected by the GPS equipment is not private information protected by the Fourth Amendment." (Defs. Mem. at 11.) Defendants also say that "[a]ny data concerning the location of off-duty taxi operations, or routes taken between trip initiation and termination . . . cannot be accessed by the TLC and may not be disclosed by the equipment vendors." (Defs.' Mem. at 11 (citing Goldstein Decl. ¶ 16).)

Plaintiffs' privacy claim is not likely to succeed on the merits. For one thing, practical steps have been taken by the TLC to help maintain the confidentiality of electronic trip data, including inserting a provision in TLC contracts with TTS vendors prohibiting vendors from "giving to any person or entity, which includes the City, the [TLC], or their employees, information about the location of a taxicab while it is off-duty."[12] (2d Salkin Decl. ¶¶ 24–26; see also Goldstein Decl. ¶ 16; Van Meter Decl., Ex. G (Agreement Between City of New York and VeriFone Transportation Systems, Inc.), § 11.5.)

---

[12] There are two exceptions: "one for legal process, such as subpoena, and another where a medallion owner or agent expressly contracts with the vendor to receive such information." (2d Salkin Decl. ¶ 26; see also Goldstein Decl. ¶ 16; Van Meter Decl., Ex. G, § 11.5.)

Second, and more importantly, while the Fourth Amendment prohibits "unreasonable searches and seizures," U.S. Const. amend. IV, its applicability "depends on whether the person invoking its protection can claim a 'justifiable,' 'reasonable' or 'legitimate expectation of privacy' that has been invaded by government action." Smith v. Maryland, 442 U.S. 735, 740 (1979) (citations omitted).  Where, as in the taxicab context presented here, there is likely "no legitimate expectation of privacy," there is also "no search or seizure within the ambit of the Fourth Amendment." United States v. Moran, 349 F. Supp. 2d 425, 467 (N.D.N.Y. 2005) (citing United States v. Knotts, 460 U.S. 276, 285 (1983)).  "There is a diminished expectation of privacy in a vehicle because of its availability to public scrutiny." Id. (citing Knotts, 460 U.S. at 281).  "A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Knotts, 460 U.S. at 281; see also Turner v. Am. Car Rental, Inc., 884 A.2d 7, 11 (Conn. App. Ct. 2005) ("[T]he plaintiff has not presented us with any authority that equipping a motor vehicle with a global positioning system violates the privacy of the vehicle's operator."); People v. Gant, 9 Misc. 3d 611, 620, 802 N.Y.S.2d 839, 847 (Westchester County Ct. 2005) (holding that a search warrant was not required prior to installing a GPS device to track the vehicle's whereabouts because there is no "legitimate expectation of privacy in a vehicle traveling upon . . . public roadways").

Third, a person's privacy interests are not absolute and "can be overcome by a sufficiently weighty government purpose." Statharos, 198 F.3d at 323.  The Court of Appeals for the Second Circuit had applied "intermediate level scrutiny" in evaluating regulations analogous to the TLC Rules considered here. Id. at 324 ("Because taxis are an important part of the public life of the City and have a City-granted monopoly on providing a crucial service, the taxi industry is pervasively regulated by the [TLC]. . . .  [M]edallion owners' nominal private

19

status does not sufficiently strengthen their confidentiality interest . . . so as to make the
intermediate scrutiny [test] . . . inadequate."). "When legislation burdens constitutionally
protected privacy rights, [the Second Circuit] will apply intermediate scrutiny and uphold the
statute only if a substantial government interest outweighs the burdened privacy right."
O'Connor v. Pierson, 426 F.3d 187, 202–03 (2d Cir. 2005).

The use of GPS technology in accordance with the TLC Rules appears to outweigh any
burdened privacy rights. Defendants require TTS (including GPS features) in medallion taxicabs
"to improve taxi service and TLC's ability to regulate it for the public good by utilizing modern
methods." (Defs. Mem. at 15.) Plaintiffs acknowledge that "'customer service' might be a
legitimate area of governmental concern." (Pls. Mem. at 15.) The City of New York (acting
through the TLC) has a substantial interest in promoting taxi customer service, taxicab ridership,
and passenger and driver safety. See Sugarman v. Vill. of Chester, 192 F. Supp. 2d 282, 300
(S.D.N.Y. 2002) (stating local government has a "substantial interests in aesthetics, public safety,
welfare and property value"); Comm. for Taxi Safety, 177 Misc. 2d at 865, 677 N.Y.S.2d 449,
456–57.

### State Law Claims

Plaintiffs assert that "TLC's orchestrated placement of [TTS] inside and upon the
[P]laintiffs' property" violates their property interests and privacy rights under the New York
State Constitution. (Pls.' Mem at 25; see also Compl. ¶ 1.)

The conclusions reached above (see supra at 15–20) also apply to Plaintiffs' state law
claims. Among other things, "New York courts routinely rely upon federal cases in their
determination of 'taking' claims under the State Constitution." Gangemi v. City of New York,
13 Misc. 3d 1112, 1122 n.3, 827 N.Y.S.2d 498, 506 n.3 (Sup. Ct. Kings County 2006) (citations

omitted); see also N.Y. Const. art. I, §§ 6–7.  And, New York courts have held that "no greater privacy interest is afforded to a vehicle traveling upon a public roadway under the New York State Constitution, that that which is afforded under the United States Constitution."  Gant, 9 Misc. 3d at 621, 802 N.Y.S.2d at 847 (citing People v. Belton, 55 N.Y.2d 49, 432 N.E.2d 745, 447 N.Y.S.2d 873 (1982)); see also N.Y. Const. art. I, § 12.

## V.    Conclusion and Order

For the reasons set forth above, Plaintiffs' motion for a temporary restraining order and preliminary injunction [# 2] is respectfully denied.

The parties are directed to appear at a case management scheduling conference with the Court on October 10, 2007 at 10:30 a.m. in Courtroom 14A at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York.

**The Court directs the parties to engage in good faith settlement negotiations prior to the conference.**

Dated: New York, New York
       September 28, 2007

$\mathcal{RMB}$

_____
**RICHARD M. BERMAN, U.S.D.J.**